## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WORLDWIDE NETWORK SERVICES, LLC,**<br>1900 M Street, NW<br>Suite 500<br>Washington, DC 20036<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**DYNCORP INTERNATIONAL, LLC,**<br>3190 Fairview Park Drive, Suite 350<br>Falls Church, VA 22042<br><br>**and**<br><br>**EDO CORPORATION,**<br>60 East 42nd Street<br>42nd Floor<br>New York, NY 10165<br><br>      **Defendants.** | **Civil Action No. _____**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Worldwide Network Services, LLC ("WWNS"), by and through its undersigned counsel, respectfully submits this Complaint against Defendants DynCorp International, LLC ("DynCorp") and EDO Corporation ("EDO").

## NATURE OF THE ACTION

1.    WWNS has been injured by the discriminatory actions of DynCorp and the tortious actions of DynCorp and EDO. Despite WWNS's efforts to perform its contractual duty to provide information technology services to U.S. Department of State operations in Iraq and Afghanistan, WWNS has been hampered at nearly every turn by DynCorp. DynCorp's actions,

clearly designed to force WWNS out of the Iraq and Afghanistan projects, were motivated by racial animus toward WWNS and its African-American founders and owners. Piling on DynCorp's racially discriminatory actions, DynCorp and EDO have conspired to defame WWNS, interfere with WWNS's contracts with its employees, and interfere with WWNS's prospective business relationships. WWNS therefore brings this action for violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981) and for defamation, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy and violation of Va. Code Ann. § 18.2-499.

## PARTIES

2.      Worldwide Network Services, LLC, is a Delaware limited liability company headquartered at 1900 M Street, NW, Suite 500, Washington, DC 20036. Founded in 1993, WWNS is certified by the Small Business Administration as an "8(a)" small disadvantaged business, pursuant to 13 C.F.R. § 124. It provides government and business with comprehensive voice, data and video services worldwide.

3.      WWNS is a firm skilled in deploying communications systems under difficult circumstances. In 2005, for example, WWNS's co-founders flew to Louisiana in the immediate aftermath of Hurricane Katrina to aid in relief efforts – without a contract to provide service – where they developed a communications system for the St. Bernard Parish Sheriff's Office. In recognition of their work, WWNS co-founders Walter Gray and Reginald Bailey were deputized by the Sheriff of St. Bernard Parish, and were eventually awarded a contract to provide the service.

2

4.      DynCorp International, LLC, is a large, international technical services company established under the laws of Delaware and headquartered at 3190 Fairview Park Drive, Suite 350, Falls Church, VA 22042. DynCorp's primary customers are civilian and military government agencies, for which it provides law enforcement training and support, security services, base operations, aviation services and logistics. In 2005-2006, DynCorp had approximately $2 billion in revenue.

5.      EDO Corporation is a New York corporation headquartered at 60 East 42nd Street, 42nd Floor, New York, New York 10165. EDO Corporation manufactures products for and provides engineering services to the defense, intelligence and commercial markets.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1981 and state law claims for defamation, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and violation of Va. Code Ann. § 18.2-499, with jurisdiction conferred upon this Court under 28 U.S.C. §§ 1331, 1332, 1343 and 1367.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because DynCorp transacted business, was found, or had agents in this district, and because a substantial part of events giving rise to WWNS's claims occurred, and a substantial portion of the property that is the subject of this action is situated in the District of Columbia.

8.      Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because EDO Corporation, having caused tortious injury in the District of Columbia, is subject to personal jurisdiction under District of Columbia Code § 13-423.

## FACTS

9.    DynCorp is one of the prime contractors for the U.S. State Department's civilian police ("CIVPOL") and Worldwide Personal Protective Services ("WPPS") programs in Iraq and Afghanistan.

10.    Although DynCorp has long had numerous contracts with the United States government, proposals for the prime contract in question here were submitted in 2003.

11.    In 2003, WWNS entered into a strategic partnership with DynCorp, which would eventually encompass subcontracts with DynCorp for work in both Iraq and Afghanistan.

12.    In preparation for its proposal to the U.S. State Department, DynCorp requested proposals from numerous potential subcontractors.

13.    Former DynCorp president and chief executive officer Stephen Cannon spearheaded DynCorp's effort to include small, minority-owned companies like WWNS in the proposal process.

14.    Recognizing the value of including an "8(a)" company in its proposal, DynCorp selected WWNS to be its information technology support subcontractor should it win the U.S. State Department prime contract.

15.    DynCorp asked WWNS to replace Darlington, Inc., a company that has since been acquired by EDO, as a subcontractor providing information technology support services to DynCorp, because Darlington's performance on other DynCorp projects had been unsatisfactory.

4

16.     In its application to become the U.S. State Department's prime contractor for programs in Iraq and Afghanistan, DynCorp specifically noted the participation of WWNS, an "8(a)" small, minority-owned company.

17.     DynCorp was commended by the U.S. State Department for its inclusion of a minority subcontractor in its proposal.

18.     Even before the formal contract process was complete, WWNS began providing DynCorp with services through a series of oral and written purchase orders.

19.     Work under what would become the CIVPOL program was originally administered under the Department of State Advisory Support Mission ("DASM"). DynCorp's DASM contract was converted into the CIVPOL program in 2004.

20.     DynCorp entered into a subcontract in 2004 with WWNS for work on the CIVPOL program ("the CIVPOL subcontract"). The term of the CIVPOL subcontract is one (1) year, with four one (1) year "options" to extend the subcontract. The base period lasted from February 18, 2004 through February 17, 2005. DynCorp exercised the first option period, which began on February 18, 2005 and expired on February 17, 2006, and the second option period, which began on February 18, 2006 and will expire on February 17, 2007.

21.     Under the terms of the CIVPOL subcontract, WWNS provided information technology, voice communications, video surveillance and technical service as part of DynCorp's operations in Iraq; WWNS continues to provide services to DynCorp in Afghanistan.

22.     DynCorp issued multiple written and oral Task Orders to WWNS under the subcontracts. The last of the CIVPOL Task Orders for WWNS's work in Iraq expired on August

11, 2006. The last of the Task Orders for WWNS's work in Afghanistan expires on October 9, 2006.

23.    DynCorp also entered into a subcontract for WPPS ("the WPPS subcontract") for work in Iraq. The original term of the WPPS subcontract was from November 12, 2004 through March 2, 2005; the subcontract was extended multiple times and eventually concluded on or around June 15, 2006, though WWNS's work on the WPPS project continued into July 2006.

24.    The CIVPOL and WPPS subcontracts are "Indefinite Delivery / Indefinite Quantity" contracts, under which DynCorp issues Task Orders for work it desires from WWNS.

25.    WWNS's CIVPOL work in Iraq involved support for thirty-one (31) different sites across six (6) regions of the country.

26.    In Afghanistan, WWNS supports twenty-nine (29) different facilities in twenty (20) locations.

27.    WWNS's performance under the subcontracts has been exemplary, and has often earned praise from DynCorp managers, U.S. State Department employees and other managers. For example:

    a.  On May 25, 2004, Ed Delk, DynCorp's Program Manager for CIVPOL in Iraq wrote to WWNS management, stating that DynCorp was "extremely pleased" with the "attitude, conduct, and performance" of WWNS employees. He continued, "These three young professionals are largely responsible for DynCorp receiving a recent compliment from senior officials of [the Coalition Provisional Authority] – a compliment forwarded to the U.S. [Department of State] and then back to us."

    b.  On October 14, 2004, Mike D. Savage, Deputy Communications Chief of the Coalition Police Assistance Training Team, wrote to Howard Gillard, WWNS's Operations Manager in Iraq, referring to a team of WWNS technicians who had

been dispatched to Basra for mission critical installations. Mr. Savage noted that WWNS employees had overcome difficulties "well beyond their control and influence" to complete the installations. He said WWNS "can be proud of their outstanding accomplishments here and their hard work. I will go on any mission anywhere with these fine men."

c.  On August 18, 2005, Leo Heatley, Regional Commander of the Multi-National Division-Central South, Babylon Region, Iraq presented a certificate of commendation to Wendell Wood, a WWNS technician, for "distinguishing himself during his service" in Iraq. Mr. Heatly stated that Mr. Wood had "worked long hours and accepted any challenge with unwavering dedication in a hostile and unforgiving environment," and had "earned the respect of his Subordinates, Supervisors, Peers and Iraqi Counterparts as his service to them and the U.S. Department of State exceeded expectations."

d.  On April 11, 2006, Lee W. Broussard, U.S. State Department Transportation Supervisor for the CIVPOL program in Iraq, wrote to WWNS employee Derrick Culbreath, stating that he was "very pleased with the job that the WWNS installment team did on our codan [radio] installs. Thank you and keep up the good work."

28.      WWNS's exemplary performance has taken place in spite of the huge logistical, administrative, management and security hurdles involved with operating in Iraq and Afghanistan, in addition to DynCorp's incompetence and racially-motivated, active obstruction of WWNS's performance.

29.      When problems or issues involving tasks assigned to WWNS have arisen, WWNS has worked to correct them immediately.

30.      DynCorp has accepted all of WWNS's completed work.

31.      In 2005, oversight of the CIVPOL and WPPS programs was assigned to Robert B. Rosenkranz, president of DynCorp's International Technical Services division.

7

32.    Mr. Rosenkranz immediately began implementing a plan to eliminate WWNS as a DynCorp subcontractor, and his assumption of office triggered an abrupt shift in DynCorp's treatment of WWNS, particularly WWNS's employees in Iraq.

33.    In November 2005, Mr. Rosenkranz installed Walter Merrick as DynCorp's head of the CIVPOL program in Iraq.

34.    Mr. Merrick was sent to Iraq with instructions to get rid of WWNS.

35.    In addition, DynCorp president and CEO Stephen Cannon resigned on or around July 17, 2006. Mr. Cannon was succeeded as president and CEO by DynCorp board member Herb Lanese.

36.    Mr. Cannon's departure from DynCorp left WWNS vulnerable to Mr. Rosenkranz's and DynCorp's discriminatory intent to demean and undermine WWNS's performance of its contractual obligations.

37.    Mr. Rosenkranz and DynCorp's attitude toward WWNS has manifested itself both through racist comments and through DynCorp's efforts to undermine WWNS's performance of its obligations under the subcontracts in Iraq and to blame WWNS for DynCorp's own failures.

38.    For example, DynCorp personnel commented to WWNS consultant Byron Taylor that WWNS was only hired as a subcontractor because it is a minority company. The acronym WWNS, according to DynCorp personnel, stood for "Where White Guys Never Stay."

39.    In addition, DynCorp actively hindered Mr. Taylor's efforts to do his job by excluding him from key planning meetings and withholding other mission-critical information.

8

40.    Due to the hostile environment he found there among DynCorp managers and employees, Mr. Taylor stopped working with WWNS and left Iraq in or around July 2006.

41.    DynCorp Information Technology Manager Leon De Beer[1] frequently complained to WWNS Deputy Country Manager Charlie Jones about the performance of WWNS employees Jon Johnson and William "Sunny" Hayes, two WWNS on-site managers in Iraq. Mr. De Beer claimed Messrs. Johnson and Hayes were not qualified managers and were hired only because they are African-American and are working for a "black company."

42.    Mr. De Beer frequently (approximately twice a week) told Mr. Jones that the issues faced by WWNS as a small, minority-owned company were similar to situations in his native South Africa: that one could not take a "native" out of the "bush" and educate him because this went against the "native" culture. Mr. De Beer further said, "When you take a poor 'native' and educate him, you've done him the greatest harm. It's a great crime to clothe and educate him." Mr. Jones understood Mr. De Beer to be referring to WWNS CEO Walter Gray. Mr. De Beer is a white South African.

43.    DynCorp employees have referred to African-American WWNS employees as "kaffirs" and to those who associate with them as "kaffir lovers."

44.    DynCorp personnel have referred to WWNS CEO Walter Gray as a "bush native."

45.    In the presence of WWNS Deputy Country Manager Charlie Jones, Mr. De Beer often referred to Mr. Gray as a "no good goddamn nigger."

---

[1] The exact spelling of Mr. De Beer's name is not presently known to WWNS; the correct form may be "De Beers."

9

46.    DynCorp also intentionally prevented WWNS from fulfilling its obligations under the subcontract, while at the same time casting blame upon WWNS for failures caused by DynCorp's own incompetence and/or discriminatory actions.

47.    Upon Mr. Merrick's arrival in Iraq in November 2005, DynCorp began refusing WWNS access to daily and weekly planning meetings, leaving WWNS without crucial information related to its assigned tasks.

48.    Mr. Merrick's arrival in Iraq also coincided with DynCorp's increased use of verbal directives, which, under the terms of the CIVPOL contract, must be confirmed in writing.

49.    DynCorp refused repeated requests by WWNS that it confirm verbal directives in writing as mandated by the CIVPOL contract.

50.    DynCorp's frequently changed its verbal directives, leaving WWNS unable to comply. DynCorp then deemed WWNS "uncooperative" because it did not comply with DynCorp's ever-changing verbal demands.

51.    For example, in or around 2005, DynCorp requested a technical proposal for Camp Shield in Iraq, home of the Baghdad Police College. DynCorp rejected WWNS's first proposal and requested another proposal employing used materials from other, completed projects – in spite of the CIVPOL contract's prohibition on the utilization of used materials. When WWNS suggested that such work would not be covered by existing task orders, it was told to "forget it." Nevertheless, DynCorp requested another technical proposal for the same project months later. WWNS submitted a proposal, but DynCorp would not authorize the project, despite knowing that WWNS was ready and willing to go forward once DynCorp authorized the

work. DynCorp blamed WWNS for the resulting delay to the commander of Camp Shield, although the delay was in fact the product of DynCorp's own inaction.

52.     Twenty (20) VSATs (satellite terminals) sat unused in a warehouse in Iraq, in spite of daily pleas from CIVPOL police officers for better communications, because, although WWNS had been directed to purchase the equipment, DynCorp refused to direct WWNS to install the equipment.

53.     Between December 2005 and July 2006, WWNS submitted four (4) separate requests to DynCorp for Department of Defense identification badges necessary for country-wide access for its employees in Iraq. Obtaining an identification badge is a precondition to working effectively throughout the country.

54.     Despite repeated assurance from DynCorp that the badge issue was being "taken care of," WWNS employees in Iraq were not provided proper identification, which hindered their ability to provide contractually-required service to CIVPOL locations outside of Baghdad.

55.     Although DynCorp orally admitted to WWNS that it was the cause of the badging problem, in its communications with the U.S. State Department, DynCorp blamed WWNS for this deficiency.

56.     As part of its effort to discredit WWNS, DynCorp commissioned from EDO – now in control of Darlington, the very company DynCorp had previously terminated due to unsatisfactory performance – a review of the "Codan" radio systems installed by WWNS in Iraq and Afghanistan.

11

57.    DynCorp commissioned this report from the Darlington division of EDO despite repeated warnings to Mr. Rosenkranz concerning Darlington's lack of impartiality and past performance issues.

58.    EDO's report, to which WWNS has never been granted access, is believed to have been sharply critical of WWNS.

59.    In response to WWNS's complaints that EDO's review was necessarily biased by its interest in regaining its position as a subcontractor to DynCorp, an independent review was commissioned from Full Spectrum Communications LLC ("Full Spectrum").

60.    Full Spectrum's report, completed in June 2006, rejected any notion promulgated by DynCorp or EDO that WWNS was "incompetent." In fact, Full Spectrum found that WWNS's communications technicians were "capable and qualified to operate and maintain the radios."

61.    The Full Spectrum report also noted that DynCorp's refusal to allow WWNS to stock spare parts for the radios precluded any proactive effort to maintain the radio networks.

62.    In or around 2005, DynCorp requested a proposal from WWNS for repair of the al-Sadeer Hotel's Internet system, which had been installed by a third party. WWNS submitted its proposal to Ed Delk, DynCorp's Deputy Program Manager for CIVPOL. Mr. Delk twice rejected the proposal, and told WWNS that it should use equipment WWNS had "lying around" rather than constructing a comprehensive solution. When told that his "solution" was ineffective, Mr. Delk responded, "I don't care." Despite its concerns, WWNS repaired the system as

12

instructed. When the system failed, as WWNS predicted it would, DynCorp blamed WWNS for the failure.

63.    In or around July and August 2006, DynCorp managers in Iraq told WWNS employees that the Iraq portion of the CIVPOL subcontract has been terminated and that WWNS employees "work for DynCorp now." This "order" was given and rescinded several times, and WWNS employees were restricted from entering their workspace in Iraq to conduct necessary maintenance and support operations.

64.    At the time DynCorp told WWNS employees that they "work for DynCorp now," DynCorp knew that the WWNS employees' contracts with WWNS were subject to termination by the employees only upon fifteen (15) days' written notice to WWNS.

65.    By July 2006, DynCorp was installing or expanding operations at three separate locations in Iraq. Despite being held accountable for providing information technology services in these locations, DynCorp gave WWNS almost none of the information necessary to complete the projects satisfactorily.

66.    During the same time period, DynCorp stopped authorizing WWNS to purchase spare parts from local vendors in Iraq, making it impossible to complete repairs and unnecessarily prolonging network downtime.

67.    DynCorp has, under force of arms, detained several WWNS employees and ordered that they be "deported" from Iraq.

13

68.    For example, on or about July 25, 2006, WWNS Deputy Country Manager Charlie Jones was confronted by a group of armed men from DynCorp, including Mr. De Beer and other DynCorp management, some wielding M-4 assault rifles and others with handguns.

69.    DynCorp told Mr. Jones he was "under arrest" and would be removed from Iraq.

70.    DynCorp personnel accompanied Mr. Jones to his room, where they confiscated the weapons DynCorp had issued to him, his Internet-phone, all but one of his identification badges, and a DynCorp-owned laptop computer containing WWNS proprietary information.

71.    Neither Mr. Jones nor WWNS management was told why DynCorp chose to "deport" him from Iraq.

72.    WWNS employee Mack McCorkindale was also ordered, on twenty-four hours' notice, to leave Iraq.

73.    The apparent reason for Mr. McCorkindale's "deportation" was his refusal to give to Mr. De Beer WWNS's proprietary employment information.

74.    Mr. De Beer sought WWNS's proprietary employment information in connection with DynCorp's effort to interfere with WWNS's contracts with WWNS's employees, the very same employees DynCorp claimed "worked for DynCorp now."

75.    On July 26, 2006, DynCorp issued a Change Order eliminating the positions of nine WWNS employees, including Mr. Jones, Program Manager Ben Posil; Communications Specialist Thomas Mahu; Administrative Specialist Ibtissam Mouomine; Communications Specialists Jason Spitler, Benjamin Bawidamann, and Sunny Hayes; Information Technology

14

Specialist Clarissa Bruce, and; Deputy Program Manager Derek Culbreath. All nine individuals were ordered to vacate the Baghdad Hotel immediately.

76.     On August 3, 2006, DynCorp formally notified WWNS that it would discontinue its relationship with WWNS in Iraq at the expiration of the current Task Order on August 11, 2006, and would not exercise its option to extend the subcontract on February 18, 2007.

77.     In addition to its efforts to undermine WWNS's performance of the WPPS and CIVPOL contracts, DynCorp has refused to complete negotiation of WWNS's subcontract for work on the Air Force Contract Augmentation Program III Contract ("AFCAP"), a ten-year, ten billion-dollar contract. The U.S. Air Force awarded one of the AFCAP prime contracts to DynCorp in or around November 2005.

78.     In preparation for DynCorp's proposal to the U.S. Air Force, it concluded a teaming agreement with WWNS.

79.     DynCorp's proposal to the U.S. Air Force mentioned that WWNS was a minority-owned company and would be one of DynCorp's subcontractors on the project.

80.     DynCorp's November 15, 2005, media release about the AFCAP award stated that WWNS was one of DynCorp's five "teaming partners."

81.     Despite WWNS's diligent efforts to finalize the AFCAP subcontract, DynCorp has refused to execute the subcontract.

15

82.     On or around January 24, 2006, DynCorp Contracts Manager Brion Ferratt sent a proposed subcontract to WWNS. After some negotiation, WWNS returned a signed copy of the AFCAP subcontract to DynCorp on or around April 3, 2006.

83.     On April 5, 2006, DynCorp notified WWNS that Contracts Administrator Keith Hartnell was replacing Mr. Ferratt as WWNS's primary contact at DynCorp for the AFCAP subcontract. Mr. Hartnell advised WWNS that several small changes needed to be made to the subcontract.

84.     WWNS was in the process of reviewing DynCorp's proposed changes to the AFCAP subcontract when DynCorp, on or around May 2, 2006, notified WWNS that Senior Subcontract Administrator Larry J. Darraugh was replacing Mr. Hartnell as WWNS's primary contact at DynCorp for the AFCAP contract.

85.     On or around June 21, 2006, WWNS sent a signed copy of the AFCAP subcontract to Mr. Darraugh at DynCorp.

86.     On or around June 30, 2006, DynCorp (through yet another point of contact, Contract Administrator Heather L. Achey) informed WWNS that the version of the AFCAP subcontract signed by WWNS on June 21, 2006 had not been "reviewed by DynCorp legal representatives," and that further delay would be necessary.

87.     Due to DynCorp's unjustified delaying tactics, the AFCAP subcontract with WWNS remains unexecuted today, even as DynCorp itself performs work for the U.S. Air Force under the prime contract.

16

88.    The WPPS and CIVPOL subcontracts between DynCorp and WWNS accounted for 95% of WWNS's annual revenue.

89.    DynCorp has replaced WWNS with EDO, the very company DynCorp terminated earlier because of problems with Darlington's performance on other projects.

90.    Neither EDO nor its subsidiary Darlington is a minority-own company, as is WWNS.

91.    Despite its assertions of WWNS "incompetence," DynCorp hired half of WWNS's employees in Iraq and Afghanistan to continue working on the CIVPOL program upon termination of WWNS's Task Order.

92.    Since the end of its relationship with WWNS, DynCorp has told WWNS employees and other third parties, including EDO, that WWNS "has filed for Chapter 11 protections."

93.    DynCorp published this statement to EDO employee Steve Appling, and possibly others, on or around August 20, 2006, knowing that it is false.

94.    In response to DynCorp's false statement concerning WWNS's financial status, EDO wrote by e-mail to at least one WWNS employee, "With this [Chapter 11 filing] in mind, I would request you immediately tender your resignation to WWNS and have a start date set [with EDO] ASAP."

95.    EDO employee Steve Appling published this statement, via e-mail, on or around August 20, 2006, to WWNS employee Gabe Johnson, knowing that it is false.

17

96.    As a result of DynCorp's false statement regarding WWNS's financial health, several WWNS employees have chosen to terminate prematurely their employment contracts with WWNS, thereby depriving WWNS of their technical skills.

97.    WWNS had no intention of laying off its employees at the conclusion of the subcontracts; WWNS planned to task those employees with other projects for other customers.

98.    For example, WWNS has been forced to turn down work for the U.S. Department of Defense in both Iraq and Afghanistan because, due to DynCorp's and EDO's actions, it does not have sufficient numbers of employees with relevant skills to complete the proposed projects.

99.    Dozens of former WWNS employees in Iraq and Afghanistan are now employed by DynCorp and/or EDO.

**COUNT I**

**Violation of 42 U.S.C. § 1981**

(against DynCorp)

100.    The allegations set forth in paragraphs 1-99 above are incorporated by reference as if fully set forth herein.

101.    As a minority-owned corporation that has been certified by the Small Business Administration under Section 8(a) of 13 C.F.R. part 124, WWNS is a member of a protected class.

102.    DynCorp was aware of WWNS's minority status and of the race of WWNS's principal owners.

18

103.    DynCorp's purported reasons for terminating its business relationship with WWNS are pretextual and a cover for DynCorp's discriminatory practices against persons of African descent and origin and companies affiliated with persons of African descent and origin.

104.    As part of its racially discriminatory intent and practices, and despite knowing of WWNS's interest, willingness and ability to perform under the terms of the CIVPOL and WPPS subcontracts, DynCorp repeatedly blamed WWNS for events beyond its control and ignored WWNS's prompt actions to remedy legitimate complaints.

105.    As a further part of its racially discriminatory intent and practices, and despite knowing of WWNS's interest, willingness and ability to perform under the terms of the CIVPOL and WPPS subcontracts, DynCorp repeatedly hindered WWNS's performance of its contractual obligations.

106.    As a further part of its racially discriminatory intent and practices, and despite knowing of WWNS's interest, willingness and ability to perform, DynCorp has refused to contract with WWNS, via new Task Orders, for further work under the CIVPOL and WPPS contracts; DynCorp has instead provided white-owned and operated companies with opportunities to contract for its ongoing work in Iraq and Afghanistan.

107.    As a further part of its racially discriminatory intent and practices, and despite knowing of WWNS's interest, willingness and ability to perform, DynCorp has refused to contract with WWNS for work on the AFCAP contract.

108.    DynCorp has engaged in the acts and conduct herein complained of intentionally, maliciously, and in wanton and reckless disregard for the rights of WWNS.

109.    As a direct and proximate cause of the wrongful acts, conduct and omissions of DynCorp, WWNS has suffered and sustained damages, continues to suffer damages, and will in the future suffer and sustain damages, in amounts to be proven at trial, including damages for past and future lost profits and/or earnings and consequential and incidental damages.

110.    DynCorp did not undertake to undermine and demean its white-owned subcontractors as it did with regard to WWNS.

111.    By creating, condoning, and perpetuating said discrimination, DynCorp has intentionally and with reckless indifference violated the Civil Rights Act of 1866, 42 U.S.C. § 1981.

112.    DynCorp's wrongful acts, conduct and omissions were willful and wanton and done with a reckless disregard for WWNS's rights, thereby entitling WWNS to an award of exemplary or punitive damages, in an amount to be proven at trial.

## COUNT II

### Defamation

(against DynCorp and EDO)

113.    The allegations set forth in paragraphs 1-112 above are incorporated by reference as if fully set forth herein.

114.    DynCorp and EDO have intentionally, and with actual malice, made false and slanderous statements of fact to impugn WWNS's financial stability and performance under the subcontracts.

115.    Alternatively, DynCorp and EDO have made false and slanderous statements of fact to impugn WWNS's financial stability and performance under the subcontracts with negligent disregard for the truth and failed to act with ordinary care with respect to whether the statements were false.

116.    These false statements made by DynCorp and EDO are defamatory *per se* as they have the tendency to injure WWNS in its trade, business, profession, or occupation and, as such, actual malice and damages are presumed and need not be proven by WWNS.

117.    The assertions of fact made by DynCorp and EDO are capable of being proven true or false.

118.    The defamatory statements made by DynCorp and EDO were published to third parties and were not privileged.

119.    As a direct and proximate result of DynCorp's and EDO's conduct, WWNS has suffered damage in its trade, profession and community standing in an amount to be proven at trial, but in excess of $75,000.

120.    WWNS has and will continue to suffer irreparable harm from DynCorp's conduct and the threat of future defamation.

121.    In doing the acts alleged herein, DynCorp and EDO acted with oppression, fraud, malice, and in conscious disregard of the rights of WWNS, so as to justify an award of exemplary and punitive damages, in an amount to be proven at trial, but in excess of $75,000.

## COUNT III

### Tortious Interference with Contract

(against DynCorp and EDO)

122.    The allegations set forth in paragraphs 1-121 above are incorporated by reference as if fully set forth herein.

123.    DynCorp and EDO knew of WWNS's existing contracts with WWNS's employees in Iraq and Afghanistan.

124.    Despite knowing of these existing contracts, DynCorp and EDO intentionally interfered with those contractual relationships by distributing and communicating to such employees material false information harmful to WWNS's reputation, in an attempt to convince WWNS's employees to end their employment with WWNS and/or breach their employment contracts with WWNS.

125.    As a direct and proximate result of DynCorp's and EDO's actions, WWNS was damaged, in an amount to be proven at trial but in excess of $75,000, due to the decision of certain WWNS employees to end their employment with WWNS and/or breach their employment contracts with WWNS, leaving WWNS without the technical expertise necessary to compete effectively for new business.

126.    Furthermore, as a direct and foreseeable consequence of DynCorp's and EDO's interference, WWNS's reputation in the industry has been permanently damaged, resulting in damages, in an amount to be proven at trial, but in excess of $75,000.

127.    In doing the acts alleged herein, DynCorp and EDO acted with oppression, fraud, malice, and in conscious disregard of the rights of WWNS, so as to justify an award of exemplary and punitive damages, in an amount to be proven at trial, but in excess of $75,000.

## COUNT IV

### Tortious Interference with Prospective Economic Advantage

(against DynCorp and EDO)

128.    The allegations set forth in paragraphs 1-127 above are incorporated by reference as if fully set forth herein.

129.    DynCorp and EDO knew of WWNS's ongoing business relationships with various customers and prospective customers.

130.    Despite knowing of these existing and prospective business relationships, DynCorp and EDO intentionally interfered with WWNS's prospective economic advantage from these relationships through its distribution and communication of material false information harmful to WWNS's reputation.

131.    As a direct and proximate result of DynCorp's and EDO's actions, WWNS was damaged, in an amount to be proven at trial, due to the decision of certain customers to cease conducting business with WWNS and/or to not do business with WWNS in the future, and the decision of certain prospective customers with whom WWNS had an ongoing relationship not to do business with WWNS.

132.    Furthermore, as a direct and foreseeable consequence of DynCorp's and EDO's interference, WWNS's reputation in the industry has been permanently damaged, resulting in damages, in an amount to be proven at trial, but in excess of $75,000.

23

133.   In doing the acts alleged herein, DynCorp and EDO acted with oppression, fraud, malice, and in conscious disregard of the rights of WWNS, so as to justify an award of exemplary and punitive damages, in an amount to be proven at trial, but in excess of $75,000.

### COUNT V

### Civil Conspiracy

(against DynCorp and EDO)

134.   The allegations set forth in paragraphs 1-133 above are incorporated by reference as if fully set forth herein.

135.   With the exclusion of Count I, DynCorp and EDO agreed to and acted together in a conspiracy to carry out the tortious acts alleged herein.

136.   As alleged herein, DynCorp and EDO have committed intentional and overt acts in furtherance of this conspiracy.

137.   As a direct and proximate result of these overt acts, WWNS has been damaged, in an amount to be determined at trial, but in excess of $75,000.

138.   In doing the acts alleged herein, DynCorp and EDO acted with oppression, fraud, malice, and in conscious disregard of the rights of WWNS, so as to justify an award of exemplary and punitive damages, in an amount to be proven at trial, but in excess of $75,000.

## COUNT VI

### Violation of Va. Code Ann. § 18.2-499 (Virginia Conspiracy Act)

(against DynCorp and EDO)

139.    The allegations set forth in paragraphs 1-138 above are incorporated by reference as if fully set forth herein.

140.    DynCorp and EDO have acted in concert for the purpose of willfully and maliciously injuring WWNS in its reputation, trade, business or profession, in violation of the Virginia Conspiracy Act.

141.    In furtherance of the conspiracy, DynCorp acted in whole or in part from its offices in the Commonwealth of Virginia.

142.    As a direct and proximate result of DynCorp's and EDO's actions, WWNS has suffered injury to its reputation, trade, business or profession and has been damaged in an amount to be proven at trial, but in excess of $75,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff WWNS respectfully requests that this Court award declaratory, injunctive and monetary relief as follows:

      a.  Declare that DynCorp's actions, as alleged herein, violate 42 U.S.C. § 1981;

      b.  Permanently enjoin DynCorp from engaging in discriminatory practices;

      c.  Permanently enjoin DynCorp and EDO from engaging in the tortious acts alleged herein;

      d.  Award monetary compensatory damages in an amount to be proven at trial;

      e.  Award exemplary and punitive damages in an amount to be proven at trial;

f.  Award treble damages, pursuant to Va. Code. Ann. § 18.2-500, for violation of Va. Code Ann. § 18.2-499;

g.  Award plaintiff costs and reasonable attorneys' fees;

h.  Award plaintiff pre- and post-judgment interest; and

i.  Award such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all Counts.

Dated:  October 5, 2006

Respectfully submitted,

_____/s/_____

Michele A. Roberts (D.C. Bar No. 337998)
Anthony T. Pierce (D.C. Bar No. 415263)
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: 202.887.4000
Facsimile:  202.887.4288

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WORLDWIDE NETWORK SERVICES, LLC | DYNCORP INTERNATIONAL, LLC |
| | EDO CORPORATION |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Wash.,DC | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Fairfax County |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY)  Virginia |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

//0c/

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michele A. Roberts & Anthony T. Pierce
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036   (202) 887-4000

CASE NUMBER  1:06CV01717

JUDGE: Richard J. Leon

DECK TYPE: Civil Rights (non-employment

DATE STAMP: 10/05/2006

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITE** FOR PLAI...

| | | | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
|---|---|---|---|---|---|
| Citizen of this state | ☐ 1 | ☐ 1 | | | |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

- ☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(2)

| ☐ G. *Habeas Corpus/ 2255*<br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ H. *Employment Discrimination*<br>☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ I. *FOIA/PRIVACY ACT*<br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ J. *Student Loan*<br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ K. *Labor/ERISA (non-employment)*<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ L. *Other Civil Rights (non-employment)*<br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ M. *Contract*<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ N. *Three-Judge Court*<br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Action for violation of 42 U.S.C. 1981 and for claims of defamation, tortious interference with contract, tortious interference with prospective business advantage, conspiracy, and violation of Va. Code Ann. 18.2-499

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction) ☐ YES ☐ NO    If yes, please complete related case form.

DATE Oct. 5, 2006    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.