**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| WORLDWIDE NETWORK SERVICES, ) | |
|  LLC ) | |
| ) | |
| ) | **Case No. 1:06cv01717** |
| Plaintiff, ) | **Judge:  Richard J. Leon** |
| ) | |
| v. ) | |
| ) | |
| DYNCORP INTERNATIONAL, LLC, ) | |
| ) | |
| ) | |
| and ) | |
| ) | |
| EDO CORPORATION ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**DEFENDANT DYNCORP INTERNATIONAL'S MOTION TO TRANSFER UNDER 28**
**U.S.C. § 1404(a) OR IN THE ALTERNATIVE DISMISS**
**UNDER FED R. CIV. P. 12(b)(3)**

Defendant DynCorp International, LLC ("DI") requests that the Court transfer under 28

U.S.C. § 1404(a) or, in the alternative, dismiss under F. Rule Civ. P 12(b)(3), the pending action

brought by Plaintiff Worldwide Network Services ("WWNS").  WWNS alleges that DI

committed various tortious acts and violated 42 U.S.C. § 1981, all in the context of performance

of two subcontracts for WWNS' provision of services in support of contracts between DI and the

U.S. Department of State.  The WWNS-DI subcontracts contain broad forum selection clauses

under which the parties agreed that any disputes relating to their business relationship would be

adjudicated, under one subcontract, in a court of competent jurisdiction in Virginia and, under

the other subcontract, through binding arbitration.  Despite WWNS' attempt to avoid these

contractually binding clauses by artfully pleading non-contractual causes of action, the Complaint makes clear that all of DI's alleged wrongful acts occurred within the context of the business relationship created by the subcontracts, and therefore are within the scope of the contractual forum selection clauses.

For the reasons set forth above and in the accompanying Memorandum, the Court should enforce the forum selection clauses in the WWNS-DI subcontracts and transfer this case to the U.S. District Court for the Eastern District of Virginia for a determination of which claims asserted in the Complaint should be arbitrated and which should be adjudicated in that court (or another court of competent jurisdiction in the Commonwealth of Virginia).  In the alternative, this Court should dismiss this action for improper venue under Fed. R. Civ. P. 12(b)(3).

Respectfully submitted,


/s/ George D. Ruttinger_____
George D. Ruttinger (Bar No. 214445)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Phone: 202-624-2670
Fax: 202-628-5116

Attorney for Defendant DynCorp
International LLC

November 13, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WORLDWIDE NETWORK SERVICES, LLC** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 1:06cv01717** **Judge: Richard J. Leon** |
| **v.** | ) ) | |
| **DYNCORP INTERNATIONAL, LLC,** | ) ) ) | |
| **and** | ) ) | |
| **EDO CORPORATION** | ) ) | |
| **Defendants.** | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT DYNCORP INTERNATIONAL'S MOTION TO TRANSFER UNDER 28 U.S.C. § 1404(a) OR IN THE ALTERNATIVE DISMISS UNDER FED R. CIV. P. 12(b)(3)**

George D. Ruttinger (Bar No. 214445)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Phone: 202-624-2670
Fax: 202-628-5116

Attorney for Defendant DynCorp
International LLC

November 13, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND OF CASE.................................................................................. 2

        A.      Factual Background........................................................................................ 2

                1.      The WPPS subcontract contains a forum selection clause in which
                        WWNS agreed to litigate "any dispute" in a Virginia court............................ 2

                2.      The CIVPOL subcontract contains an arbitration clause in which
                        WWNS agreed to arbitrate "any disputes arising out of or relating to"
                        the subcontract......................................................................................... 3

        B.      Procedural History and Asserted Causes of Action .............................................. 4

III.    THE WPPS FORUM SELECTION CLAUSE SHOULD BE ENFORCED AND
        THE PENDING ACTION TRANSFERRED UNDER 28 U.S.C. §1404(a) OR,
        IN THE ALTERNATIVE, DISMISSED UNDER FED. R. CIV. P. 12(b)(3)................. 7

        A.      Forum Selection Clauses are *Prima Facie* Valid. ............................................... 7

        B.      The WPPS Forum Selection Clause Should Be Enforced Under Either The
                § 1404(a) Motion For Convenience Transfer Or The Rule 12(b)(3) Motion
                To Dismiss For Improper Venue................................................................... 8

                1.      WWNS' asserted causes of action fall within the scope of the WPPS
                        forum selection clause. ....................................................................... 9

                        a.      The WPPS forum selection clause is broad.                          11

                        b.      The asserted statutory and tortious causes of action are within
                                the scope of the WPPS forum selection clause.                    12

                2.      The presence of a forum selection clause weighs heavily in favor of
                        transfer. .......................................................................................... 14

                3.      In the alternative, the pending action should be dismissed under Rule
                        12(b)(3) in order for the action to be re-filed in the correct forum. ............... 16

IV.     THE CIVPOL ARBITRATION CLAUSE ......................................................... 17

        A.      The Statutory And Tortious Causes Of Action Are Within The Scope Of
                The CIVPOL Arbitration Clause................................................................... 17

        B.      The Arbitration Should Be Enforced And The Action Transferred Or
                Dismissed So That A Virginia Court Can Determine Which Claims Are
                Arbitrable. .......................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

AT&T Tech. v. Communications Workers, 475 U.S. 643 (1986)............................18

Brown v. Dorsey & Whitney, 267 F.Supp.2d 61 (D.D.C. 2003)...............................17

Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190 (3d. Cir. 1983),
    cert. denied 464 U.S. 938 (1983).................................................................10

Crescent Int'l v. Avatar Communities, 857 F.2d 943 (3d Cir. 1988)..................9, 10

E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Brotherhood of Teamsters, 812 F.2d
    91 (3d Cir. 1987) ...................................................................................18

Genesco v. T. Kakiuchi & Co., 815 F.2d 840 (2d Cir. 1987)................................18

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) ...............................18

Jumara v. State Farm Ins., 55 F.3d 873 (3d Cir. 1995) ...............................14, 15, 16

Kroll v. Doctor's Assoc., 3 F.3d 1167 (7th Cir. 1993)..........................................19

L&L Construction Ass'n v. Slattery Skanska, 2006 WL 1102814 (D.D.C., March
    31, 2006) ....................................................................................8, 9, 15, 17

Lambert v. Kysar, 938 F.2d 1110 (1st Cir. 1993)................................................10

Lim v. Offshore Specialty Fabricators, 404 F.3d 989 (5th Cir. 2005) ......................14

M/S Bremen v. Zapata Off-Shore Company, 407 U.S. 1 (1972)............................7, 8

Manetti-Farrow v. Gucci, 858 F.2d 509 (9th Cir. 1988) .......................................9

Marra v. Papandreu, 216 F.3d 1119 (D.C. Cir. 2000) ...........................................8

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614 (1985)...........18

Oldroyd v. Elmira Sav. Bank, 134 F.3d 72 (2d Cir. 1998)..........................17, 18, 19

Paul Bus. Sys. v. Canon U.S.A., 240 Va. 337 (Va. 1990)..................................9, 15

Salovaara v. Jackson Nat'l Life Ins. Co., 246 F.3d 289 (3d Cir. 2001) .................9, 16

Shaw v. Natkin, 907 F.Supp 201 (MD La. 1995) ..............................................15

Sheraton Operating Group v. Just Corporate Travel, 984 F.Supp. 22 (D.D.C.1997) ...............15

Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960)....................18

Stewart Org. v. Ricoh Corp., 487 US 22 (1988) ............................................14, 15

Sweet Dreams Unlimited v. Dial-A-Mattress Int'l, 1 F.3d 639 (7th Cir. 1993)..........19

Terra Int'l v. Mississippi Chemical Corp., 119 F.3d 688 (8th Cir. 1997).........passim

<u>Thinket Ink Info. v. Sun Microsystems</u>, 368 F.3d 1053 (9th Cir. 2004)............................14, 19

<u>Vimar Seguros y Reaseguros v. M/V Sky Reefer</u>, 515 U.S. 528 (1995) .................................14

<u>Wyeth v. Cigna International Corp.</u>, 119 F.3d 1070 (3d Cir. 1997) .........................................10

**Statutes**

28 U.S.C. § 1332 ...............................................................................................................4

28 U.S.C. § 1404 .......................................................................................................passim

42 U.S.C. § 1981 .......................................................................................................passim

Va. Code Ann. § 18.2-499 .............................................................................................4, 15

**Rules**

FED. R. CIV. P. 12(b)(3)..............................................................................................passim

## I.   INTRODUCTION

Worldwide Network Services ("WWNS") has filed a Complaint alleging that defendant DynCorp International ("DI") committed various tortious acts and violated 42 U.S.C. § 1981, all in the context of performance of two subcontracts for WWNS' provision of services in support of contracts between DI and the U.S. Department of State.  The WWNS-DI subcontracts contain broad forum selection clauses under which the parties agreed that any disputes relating to their business relationship would be adjudicated, under one contract, in a court of competent jurisdiction in Virginia and, under the other contract, through binding arbitration.  WWNS has attempted to maneuver around these contractually binding clauses by artfully pleading only non-contractual causes of action.  However, it is clear from the face of the Complaint that all of DI's alleged wrongful acts were committed in the context of the business relationship between WWNS and DI created by their subcontracts.  Indeed, but for those subcontracts, none of the wrongs WWNS alleges would ever have occurred.

In the absence of any principled basis for plaintiff's selection of this Court as the forum for adjudicating its disputes with DI, it seems clear that the choice was motivated by the perception that a jury in this district would be sympathetic to WWNS and the claims it is asserting.  But federal courts have consistently held that (a) broad forum selection clauses, like those in this case, encompass all claims between the parties, including statutory and tort claims such as those alleged in this case; and (b) a party cannot forum shop by attempting to plead around any contract-based claims, as WWNS has attempted to do here.  In such cases, courts have routinely honored forum selection clauses by transferring the action to the contractually-specified forum under 28 U.S.C. § 1404(a).

Given that the statutory and tortious causes of action WWNS asserts against DI are within the scope of the forum selection and arbitration clauses, and that the causes of action are

based on alleged facts that took place under both subcontracts, the court should enforce the

forum selection clauses and transfer, or in the alternative dismiss, the action so that a court in the

agreed-upon jurisdiction, Virginia, can decide which claims asserted by WWNS should be

litigated and which claims are subject to arbitration.

## II.     BACKGROUND OF CASE

### A.     Factual Background

The allegations of the Complaint center on performance of two subcontracts between

WWNS and DI.  As described in the Complaint, the "CIVPOL subcontract" was entered into in

2004.  Under that subcontract, WWNS undertook to provide information technology, voice

communications, and other technical services in support of DI's operations for the State

Department in Iraq and Afghanistan.  (Complaint ¶¶ 20-21).   On January 18, 2005, DI and

WWNS executed another subcontract, the "WPPS subcontract", in support of DI's prime

contract to provide services to the U.S. State Department's Worldwide Personal Protective

Services program.  Under the terms of both subcontracts, WWNS was to provide communication

and information technology services to DI in Iraq and Afghanistan.  (Compl. ¶ 23).  Both

subcontracts were Indefinite Delivery /Indefinite Quantity ("IDIQ") contracts, under which DI

issued Task Orders for services as required.  (Compl. ¶ 24).

**1.     The WPPS subcontract contains a forum selection clause in which WWNS agreed to litigate "any dispute" in a Virginia court.**

The WPPS subcontract contains a forum selection clause in which WWNS agreed to

litigate "any dispute" in a Virginia state or federal court.  Paragraph 10.9.2 of the Disputes

Clause states:

> Either party may pursue litigation to resolve any dispute not
> covered by the preceding paragraph and not resolved after a
> mutual, good faith effort by the Parties.  Any such action shall be

2

filed only in a court of competent jurisdiction in the
Commonwealth of Virginia; provided, however, that the Parties
hereby expressly waive any rights to a trial by jury and agree that
any legal proceeding hereunder shall be tried by a judge without a
jury.  The Parties agree that the governing law applicable to any
such action under this Subcontract shall be the federal law of
government contracts, as interpreted by federal judicial bodies and
administrative boards of contract appeals.  To the extent federal
government contract law is not dispositive; the Parties agree that
the law of the State of Delaware shall govern.  Any such action by
the Subcontractor must be commenced within one (1) year from
the date of Contractor's final decision, if applicable. [italics added]
(Exhibit ["Ex."] 1 hereto).

The clause explicitly states that only those disputes covered by paragraph 10.9.1 are excluded

from the forum selection clause.  Paragraph 10.9.1 covers "any claims for adjustment in the

Subcontract for changes directed or required by the Government or additional costs that result

from acts or omission of the Government...".  None of the claims asserted in this action are

subject to paragraph 10.9.1.

> **2.    The CIVPOL  subcontract contains an arbitration clause in
> which WWNS agreed to arbitrate "any disputes arising out of
> or relating to" the subcontract.**

The CIVPOL subcontract contains an arbitration clause in which WWNS agreed to

arbitrate all disputes between the parties.  Paragraph 10.9.2 of the Disputes Clause states:

*Any disputes arising out of or relating to this Subcontract* and
which are not governed by the preceding paragraph and are not
resolved after a mutual, good faith effort *shall be settled by
arbitration* administered by the American Arbitration Association
under its Commercial Arbitration Rules in force at the time the
dispute arises, and judgment on the award rendered by the
arbitrator(s) may be entered in any court having jurisdiction
thereof.  [italics added]  (Ex. 2).

As with the WPPS subcontract, the CIVPOL subcontract explicitly excludes from arbitration

only those claims "for adjustment in the Subcontract for changes directed or required by the

Government or additional costs that result from acts or omission of the Government...".

3

## B.    Procedural History and Asserted Causes of Action

On October 5, 2006, WWNS filed its Complaint in this Court against DI and EDO

Corporation, another subcontractor to DI.[1]  In its Complaint, WWNS alleges that DI engaged in

discriminatory and tortious behaviors that undermined WWNS' ability to perform its obligations

under both the WPPS and CIVPOL subcontracts.  Based on these alleged discriminatory and

tortious behaviors, WWNS has pled numerous non-contractual causes of action in an apparent

effort to avoid the forum selection and arbitration clauses in the subcontracts.  These causes of

action include violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981), defamation, tortious

interference with contract, tortious interference with prospective economic advantage, civil

conspiracy, and violation of Va. Code Ann. § 18.2-499.

The Complaint contains numerous references to performance of the subcontracts, and to

alleged actions and inactions of DI under the subcontracts that supposedly damaged WWNS.  It

is clear from the face of the Complaint that (a) the wrongs about which WWNS is complaining

would not have occurred but for the contractual relationship between WWNS and DI; and (b) the

vast bulk of the tortious actions alleged by WWNS occurred in the context of contract

performance.  Examples of allegations directly tied to contract performance are:

- In 2005, a senior executive of DI "began implementing a plan to eliminate WWNS as a subcontractor."  (Compl. ¶ 32).

- A senior executive of DI sent Walter Merrick to Iraq "with instructions to get rid of WWNS."  (Compl. ¶ 33).

- DI's attitude towards WWNS "has manifested itself both through racist comments and *through DI's efforts to undermine WWNS's performance of*

---

[1] Although the Complaint alleges diversity jurisdiction under 28 U.S.C. § 1332, both
Plaintiff WWNS and Defendant DI are limited liability companies incorporated in Delaware.

*its contractual obligations under the subcontracts* and to blame WWNS for [DI's] own failures." [italics added]  (Compl. ¶ 37).

- DI allegedly made racist comments to a WWNS consultant, Byron Taylor, and "hindered his efforts to do his job by excluding him from key planning meetings and withholding other mission critical information." (Compl. ¶ 39).

- DI "*intentionally prevented WWNS from fulfilling its obligations under the subcontract,* while at the same time casting blame upon WWNS for failures caused by [DI's] own incompetence and/or discriminatory actions." [italics added]  (Compl. ¶ 46).

- DI's alleged failure to provide WWNS with DOD identification badges "hindered [WWNS'] ability to provide contractually-required service to CIVPOL locations outside of Baghdad."  (Compl. ¶ 54).

- In July/August 2006, DI managers in Iraq told WWNS employees that "the Iraq portion of the CIVPOL subcontract has been terminated and that WWNS employees 'work for [DI] now.'"  (Compl. ¶ 63).

WWNS' claim for violation of § 1981 also centers on alleged wrongful acts by DI in the context of the parties' contractual relationship.  Thus, DI alleges:

- "[DI's] purported reasons for terminating its business relationship with WWNS are pretextual…" (Compl. ¶ 103).

- "As part of its racially discriminatory intent and practices, and despite knowing of WWNS's *interest, willingness and ability to perform under the terms of the CIVPOL and WPPS subcontracts,* [DI] repeatedly blamed WWNS for events beyond its control…"  [italics added] (Compl. ¶ 104).

- "As a further part of its racially discriminatory intent and practices, …*[DI] repeatedly hindered WWNS's performance of its contractual obligations*" and "*has refused to contract with WWNS, via new Task Orders.*"  [italics added] (Compl. ¶ ¶ 105-106).

Similarly, WWNS' claims for conspiracy rest upon alleged concert of action between DI and co-defendant EDO Corporation, a firm that allegedly performed an unflattering study of WWNS' performance of the subcontracts and later was hired to replace WWNS.  (Compl. ¶ ¶ 56-59, 89-90).  The tortious interference claims are based upon alleged DI interference with the contracts between WWNS and its employees who were performing the subcontracts (Compl.

¶¶ 64, 91), including allegedly hiring half of the WWNS employees in Iraq and Afghanistan to work on the CIVPOL program. (Compl. ¶ 91). Finally, the defamation claim stems from DI's alleged false statements about "WWNS's financial stability and *performance under the subcontracts.*" [italics added] (Compl. ¶ 114).

WWNS itself has recognized in correspondence that its present claims stem from the parties' contractual relationship. In a letter dated October 4, 2006, just one day before the Complaint was filed, WWNS detailed monetary claims under the CIVPOL subcontract and said that it was "prepared to initiate arbitration under Clause 10.9.2 of the Subcontract if resolution is not possible." (Ex. 3 hereto). In support of its contract claims, WWNS recited many of the same facts alleged in the Complaint as a basis for these arbitrable claims. For example, WWNS stated that:

- After Mr. Merrick arrived in Iraq, DI "refused to allow WWNS personnel to attend daily and weekly planning and informational meetings. …and WWNS was compelled to operate in the dark with regard to specifics regarding its assigned tasks. " (Ex. 3 at 2-3; cf. Compl. ¶ 39).

- DI allegedly issued oral directions to WWNS, and refused to issue written directions as required by the contract. (Ex. 3 at 3; cf. Compl. ¶¶ 48-49).

- DI hindered WWNS' performance of its subcontract obligations by failing to cooperate in the process of obtaining identification badges for WWNS personnel. (Ex. 3 at 3; cf. Compl. ¶ 54).

- DI allegedly ordered key WWNS employees to leave Iraq, which "made any remaining performance under the [Purchase Orders] virtually impossible." (Exhibit 3 at 4; cf. Compl. ¶¶ 67-73).

Yet just one day after WWNS sent this letter to DI asserting claims for extra costs allegedly incurred under the CIVPOL subcontract and threatening to take the claims to arbitration under the arbitration clause of that subcontract, WWNS filed the Complaint in this Court characterizing the same alleged conduct of DI as torts and violations of § 1981.

In another letter sent on October 4, WWNS complained about alleged non-payment of claims under the WPPS subcontract and stated that WWNS was "prepared to pursue litigation under Clause 10.9.2 of the WPPS Subcontract if resolution is not possible."  (Ex. 4).  Clause 10.9.2 specifies that "any disputes" between the parties will be resolved by litigation in a court of competent jurisdiction in Virginia.

In an effort to enforce the forum selection clauses of the subcontracts and prevent the splitting of claims, on October 25, DI counsel wrote to WWNS counsel reminding them of the forum selection clauses in the WPPS and CIVPOL subcontracts and asking WWNS to withdraw the Complaint and re-file it in an appropriate, contractually agreed upon forum.  (Ex. 5).  By letter dated October 27, WWNS counsel declined to withdraw the Complaint, asserting that WWNS' discrimination and other tort claims "are independent of the subcontract."  (Ex. 6).

**III.    THE WPPS FORUM SELECTION CLAUSE SHOULD BE ENFORCED AND THE PENDING ACTION TRANSFERRED UNDER 28 U.S.C. §1404(a) OR, IN THE ALTERNATIVE, DISMISSED UNDER FED. R. CIV. P. 12(b)(3).**

**A.    Forum Selection Clauses are *Prima Facie* Valid.**

There is a well-established presumption favoring the enforcement of forum selection clauses.  In M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972), the Supreme Court held that forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances".  The presumption favoring the enforcement of forum selection clauses is based upon "ancient concepts of freedom of contract and reflects an appreciation of the expanding horizons of American contractors who seek business in all parts of the world".  Id. at 11.  The Court concluded that "the forum clause should control absent a strong showing that it should be set aside."  Id. at 15.

The <u>Bremen</u> Court held that the party resisting enforcement of a previously agreed upon forum selection clause must meet a heavy burden of proof to adequately explain why a forum selection clause should not be enforced. <u>Id</u>. at 10, 18; <u>see also</u> <u>L&L Constr. Ass'n v. Slattery Skanska</u>, 2006 WL 1102814, at *5 (D.D.C., March 31, 2006). "…[I]t should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." <u>M/S Bremen</u>, 407 U.S. at 18. Unless the resisting party can show that the enforcement of a forum selection clause is unfair, unjust, or unreasonable, that it contravenes a strong public policy of the forum in which the suit is brought, or that enforcement would deprive the plaintiff of his day in court, the forum selection clause should be enforced. <u>Id</u>. at 15; <u>L&L Constr. Ass'n</u>, 2006 WL 1102814, at *5.

As is apparent below, the forum selection clause in the WPPS contract is both valid and enforceable. WWNS has not alleged, nor is it able to allege, sufficient facts to overcome the presumption favoring the enforcement of the forum selection clause.

**B.     The WPPS Forum Selection Clause Should Be Enforced Under Either The § 1404(a) Motion For Convenience Transfer Or The Rule 12(b)(3) Motion To Dismiss For Improper Venue.**

When an action is improperly filed in a forum different from the forum specified in a forum selection clause, the party moving to enforce the forum selection clause may do so under 28 U.S.C. § 1404(a). <u>Marra v. Papandreu</u>, 216 F.3d 1119, 1123 (D.C. Cir. 2000); <u>L&L Constr.</u>

Ass'n, 2006 WL 1102814, at *2.[2]  When a forum selection clause specifies a non-federal forum,

such as when both state and federal courts are designated, a motion to dismiss under Federal

Rule of Civil Procedure 12(b)(3) for improper venue is appropriate.  Salovaara v. Jackson Nat'l

Life Ins. Co., 246 F.3d 289, 297-98 (3d Cir. 2001).[3]  In the present case, the WPPS forum

selection clause allows actions to be brought in either state or federal courts in Virginia.  Hence,

enforcement of the forum selection clause is appropriate under either § 1404(a) or Rule 12(b)(3).

> 1.    **WWNS' asserted causes of action fall within the scope of the
>        WPPS forum selection clause.**

The first step in an analysis to transfer, or in the alternative, dismiss an action due to the

presence of a forum selection clause is for the court to determine that the forum selection clause

encompasses the asserted causes of action.  L&L Constr. Ass'n, 2006 WL 1102814, at *10. It is

well-established that the scope of a forum selection clause encompasses non-contractual causes

of action.  Terra Int'l v. Mississippi Chemical Corp., 119 F.3d 688, 693 (8th Cir. 1997); see also

Manetti-Farrow v. Gucci, 858 F.2d 509 (9th Cir. 1988) (holding that the forum selection clause

encompassed tort claims); Crescent Int'l v. Avatar Communities, 857 F.2d 943 (3d Cir. 1988)

(holding that the forum selection clause applied to claims of fraud, unfair competition, tortious

interference, and RICO violations); Paul Bus. Sys. v. Canon U.S.A., 240 Va. 337 (Va. 1990)

(holding that defamation, intentional interference with contractual and economic relations, and

conspiracy to injure reputation and business were within the scope of the forum selection clause).

---

[2]      28 U.S.C. § 1404(a) states, "For the convenience of parties and witnesses, in the
interest of justice, a district court may transfer any civil action to any other district or division
where it might have been brought."

[3]      Rule 12(b)(3) states, "Every defense, in law or fact, to a claim for relief in any
pleading, whether a claim, counter-claim, cross-claim, or third-party claim shall be asserted in
the responsive pleading thereto if one is required, except that the following defenses may at the
option of the pleader be made by motion:…(3) improper venue".

Strategic or artfully drawn pleadings will not work to circumvent an otherwise applicable forum selection clause. Terra, 119 F.3d at 695. As the court in Crescent Int'l stated, "[p]leading alternate non-contractual theories is not alone enough to avoid a forum selection clause". 857 F.2d at 945. The court goes on to note that narrowly interpreting forum selection clauses runs the risk of allowing parties to avoid "a forum selection clause by simply pleading non-contractual claims" and that adopting this position "runs counter to the law favoring forum selection clauses". Id.

Determining whether non-contractual causes of action are within the scope of a forum selection clause is a case-specific analysis that depends on the actual language used in the forum selection clause. Wyeth v. Cigna Int'l Corp., 119 F.3d 1070, 1075 (3d Cir. 1997). However, several courts have offered general guidance regarding the circumstances in which forum selection clauses will apply to tort claims. Terra, 119 F.3d at 694. In determining whether tort claims are within the scope of a broad forum selection clause, the Third Circuit looks at whether the tort claims "ultimately depend on the existence of a contractual relationship" between the parties. Id., citing Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 203 (3d. Cir. 1983), cert. denied 464 U.S. 938 (1983). If so, the tort claims are covered by the forum selection clause. Id. The First Circuit looks to see whether the contract-related tort claims involve the same operative facts as a parallel claim for breach of contract. If they do, then the tort claims "should be heard in the forum selected by the contracting parties". Id., citing Lambert v. Kysar, 938 F.2d 1110, 1121-22 (1st Cir. 1993).

Thus, in Terra Int'l v. Mississippi Chemical Corp., Terra and Mississippi Chemical were parties to a contract under which Mississippi Chemical licensed ammonium nitrate neutralizer technology for use in a Terra plant in Iowa. The license agreement specified

that "any dispute or disputes arising between the parties hereunder" would be resolved in the U.S. District Court for the Southern District of Mississippi. When Terra's plant suffered an explosion, Terra brought a product liability claim against Mississippi Chemical in federal court in Iowa, and claimed that the forum selection clause of the license agreement did not apply to its tort claim. On appeal of the district court's decision to transfer the case to Mississippi, the Eighth Circuit held that the district court had erred in concluding that the word "hereunder" modified "parties" rather than "disputes," and interpreted the forum selection clause as applying "only to disputes arising under the license agreement." Terra, 119 F.3d at 693. The court nevertheless held that the parties' contractual selection of forum encompassed Terra's product liability claim because that claim (a) would not have arisen but for the licensing agreement and (b) arose from the same operative facts as a claim for breach of the agreement. Id. at 693-95. As discussed below, the clauses in the CIVPOL and WPPS subcontracts are much broader than the forum selection clause in Terra, encompassing, respectively, all disputes "arising out of or relating to" the contract and "any disputes" between the parties.

### a. The WPPS forum selection clause is broad.

The scope of the WPPS forum selection clause is not limited to any class or type of dispute. Rather, it states that "any dispute" may be litigated, and "any such action" may be brought in a court of competent jurisdiction in Virginia. WWNS and DI explicitly excluded from the forum selection clause only those disputes covered by Paragraph 10.9.1.[4] Paragraph 10.9.1. does not cover any of the asserted causes of action. Instead, these are subject to the forum selection clause.

---

[4]    Paragraph 10.9.1 of the Disputes Clause covers those claims "for adjustment in the Subcontract for changes directed or required by the Government or additional costs that result from acts or omission of the Government".

**b.    The asserted statutory and tortious causes of action are within the scope of the WPPS forum selection clause.**

An examination of WWNS' complaint shows that the statutory and tortious causes of action asserted against DI flow directly from the contractual relationship between the parties. Under the subcontracts, WWNS agreed to provide communication and information technology services to DI. WWNS asserts that DI's alleged discriminatory and tortious behaviors undermined its ability to perform these contractual duties.

Throughout its complaint, WWNS refers to its WPPS and CIVPOL subcontracts. For example, in Paragraphs 31-32 of the Complaint, WWNS states that Mr. Robert Rosenkranz, president of DI's international technical services division, implemented "a plan to eliminate WWNS as a [DI] subcontractor." Mr. Rosenkranz and DI had "a discriminatory intent to demean and undermine WWNS's performance of its contractual obligations" (Compl. ¶ 36). This intent "manifested itself both through racist comments and through DI's efforts to undermine WWNS's performance of its obligations under the subcontracts in Iraq" (Compl. ¶ 37). Various actions that allegedly were part of DI's efforts to undermine WWNS' performance under the subcontracts include excluding WWNS management "from key planning meetings and withholding other mission-critical information" (Compl. ¶ 39), "refusing WWNS access to daily and weekly planning meetings leaving WWNS without crucial information related to its assigned tasks" (Compl. ¶ 47), and not giving WWNS enough "information necessary to complete the projects satisfactorily" (Compl. ¶ 65). In addition, WWNS alleges that DI prevented WWNS from purchasing spare parts from local vendors in Iraq "making it impossible to complete repairs and unnecessarily prolonging network downtime" (Compl. ¶ 66).

WWNS alleges that DI's wrongful actions resulted in WWNS employees leaving WWNS, creating a manpower shortage that hindered WWNS' ability to perform its contractual

12

duties.  For example, DI threatened to "deport" several WWNS employees in an effort "to interfere with WWNS's contracts with WWNS's employees" (Compl. ¶ ¶ 67, 74).  WWNS states that these actions were done to "undermine WWNS's performance of the WPPS and CIVPOL contracts" (Compl. ¶ 77).  As a result of these allegedly racist comments and efforts to undermine WWNS' performance,  WWNS managers and employees terminated their employment contracts with WWNS, "thereby depriving WWNS of their technical skills", and leaving WWNS with insufficient numbers of employees "with relevant skills to complete proposed projects" (Compl. ¶ ¶ 40, 96, 98).

WWNS' continuous references to its inability to adequately perform its contractual duties due to DI's alleged wrongful behavior make clear that the statutory and tortious causes of action WWNS asserts "ultimately depend on the existence of a contractual relationship between the parties." Terra , 119 F.3d at 694.  In addition,  the "same operative facts" which are the basis for the tort claims would also be the same operative facts in a parallel claim for breach of contract. Id.  Indeed, WWNS' October 4, 2006 letters to DI, dated the day before the Complaint was filed in this action, asserted monetary claims for breach of contract, and threatened litigation and arbitration under the contractual forum selection clauses, based on many of the same actions and inactions of DI alleged in the Complaint as bases for WWNS' tort claims.  (See Exs. 3, 4; pp. 6-7 supra).

Even though WWNS did not bring a breach of contract action, it cannot avoid the forum selection clause by strategically pleading only non-contractual causes of action.  Here, the non-contractual causes of action ultimately depend on the existence of a contractual relationship. WWNS and DI have a business relationship based upon the subcontracts; without the subcontracts, WWNS would not have provided services to DI and the alleged causes of action

13

would not have arisen.  See, e.g., Terra , 119 F.3d at 694-95.  The non-contractual causes of action that WWNS asserts clearly are not independent of the subcontract and, therefore, are subject to the forum selection clause.

Nor can WWNS avoid its forum selections by pleading a statutory claim of racial discrimination under 42 U.S.C. § 1981.  As detailed above, the factual underpinnings of that claim are plainly alleged actions by DI in the performance of its subcontracts with WWNS.  In Count I alleging violation of § 1981, WWNS states that "[a]s part of its racially discriminatory intent and practices, … [DI] repeatedly hindered WWNS's performance of its contractual obligations" and "has refused to contract with WWNS, via new Task Orders …"  (Compl. ¶¶ 105-106).  In similar circumstances, the Ninth Circuit affirmed a district court decision enforcing a broad forum selection clause and sending the plaintiff corporation's claims under § 1981 to arbitration.  Thinket Ink Info. v. Sun Microsystems, 368 F.3d 1053, 1060 (9th Cir. 2004).[5]

## 2.    The presence of a forum selection clause weighs heavily in favor of transfer.

Federal law governs the effect given to a contractual forum selection clause in a § 1404(a) motion to transfer.  Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Jumara v. State Farm Ins., 55 F.3d 873, 877 (3d Cir. 1995).  In deciding whether to transfer the action to another forum, the court determines if the action might have been brought in another forum.  If so, the court then considers the convenience of the parties, the convenience of the witnesses, and the interests of justice in deciding whether to transfer.  Jumara, 55 F.3d at 879; L&L Constr. Ass'n v.

---

[5]    Arbitration clauses are properly classified as a subset of forum selection clauses, and a similar analysis governs the enforceability of arbitration clauses.  See Lim v. Offshore Specialty Fabricators, 404 F.3d 989, 902 (5th Cir. 2005) ("foreign arbitration clauses are deemed a 'subset of foreign forum selection clauses in general'" (quoting Vimar Seguros y Reaseguros v. M/V Sky Reefer, 515 U.S. 528, 534 (1995)).

<u>Slattery Skanska</u>, 2006 WL 1102814, at *3 (D.D.C., March 31, 2006).  However, a court does not limit the analysis to these three factors enumerated in § 1404(a), but considers all factors relevant to the case, such as the presence of a forum selection clause.  <u>Id</u>.

A forum selection clause is a "significant factor that figures centrally in the district court's calculus" of whether to transfer under § 1404(a).  <u>Stewart Org.</u>, 487 U.S. at 29; <u>Jumara</u>, 55 F.3d at 880; <u>Sheraton Operating Group v. Just Corporate Travel</u>, 984 F. Supp. 22, 26 (D.D.C.1997).  If the other relevant factors are roughly equal, the presence of a forum selection clause tips the balance in favor of transfer to the designated forum.  <u>Shaw v. Natkin</u>, 907 F.Supp. 201, 205 (M.D. La. 1995).

The presence of the valid and enforceable WPPS forum selection clause strongly weighs in favor of transferring the current action to a court of competent jurisdiction in Virginia, presumptively the U.S. District Court for the Eastern District of Virginia.  First, both state and federal court in Virginia are forums in which this action might have been brought.  DI is headquartered in Falls Church, Virginia, and Virginia courts have personal jurisdiction over it. Second, WWNS has effectively conceded the Virginia focus of its Complaint by asserting a claim under the Virginia Conspiracy Act, Va. Code Ann. § 18.2-499.[6]  Third, and most importantly, WWNS already agreed to a litigate "any dispute" in Virginia, with the explicit exception of disputes covered by Paragraph 10.9.1 of the Disputes Clause.  WWNS' asserted statutory and tortious causes of action are not disputes covered under Paragraph 10.9.1, but, as explained above, are within the scope of the WPPS forum selection clause.  The WPPS forum

---

[6]    In <u>Paul Bus. Sys., Inc. v. Canon U.S.A.</u>, 240 Va. 337, 397 S.E. 2d 804 (1990), the Virginia Supreme Court held that a claim under the Virginia Conspiracy Act was covered by the forum selection clause in the parties' dealership agreements because "this action flows directly from the several dealership agreements," which formed the basis for the parties' business relationship.  <u>Id</u>., 240 Va. at 343.

selection clause encompasses these statutory and tortious causes of action. Therefore, as "a manifestation of the parties' preferences as to a convenient forum" the WPPS forum selection clause is entitled to substantial consideration. <u>Jumara</u>, 55 F.3d at 870-80.

Given the close proximity of the forums in this case (D.C. and Virginia), the convenience factors are roughly equal. The only factor favoring DC is that WWNS is located here. But this fact has little to do with the disputes in this case, which center on subcontracts that were performed predominantly in Iraq and Afghanistan. In these circumstances, the presence of the WPPS forum selection clause tips the balance heavily in favor of transfer.

**3.    In the alternative, the pending action should be dismissed under Rule 12(b)(3) in order for the action to be re-filed in the correct forum.**

A forum selection clause may be enforced through a motion to dismiss under Rule 12(b)(3). A Rule 12(b)(3) motion to dismiss is appropriate when a non-federal forum is specified in the forum selection clause. When a non-federal forum is specified, the district court may dismiss the action so it can be re-filed in the correct forum. <u>Salovaara v. Jackson Nat'l Life Ins. Co.</u>, 246 F.3d 289, 297-98 (3d Cir. 2001). Moving under § 1404(a) as well as under Rule 12(b)(3) does not abrogate a district court's authority to dismiss under Rule 12(b)(3). <u>Id</u>. at 298-300. Furthermore, there is nothing that precludes a district court from considering § 1404(a) factors to determine whether transferring is preferable to dismissing the action. <u>Id</u>.

The WPPS forum selection clause specifies that "any dispute" is to be litigated in a court of competent jurisdiction in Virginia. As discussed above, the broad scope of the forum selection clause encompasses the statutory and tortious causes of action WWNS has asserted against DI. WWNS has not challenged, nor can it successfully challenge, the validity of the WPPS forum selection clause. The forum selection clause was freely negotiated and agreed upon by WWNS and DI, two commercial entities. WWNS does not, nor can it, argue that the

16

forum selection clause is unfair, unreasonable, or unconscionable. Enforcing the clause will not violate the public policy of the current forum, which favors enforcement of forum selection clauses absent a strong showing by WWNS as to why the forum selection clause should not be enforced. L&L Constr. Ass'n, 2006 WL 1102814, at *5. Nor will dismissing this action so that it can be re-filed and tried in a Virginia state or federal court deprive WWNS of its day in court. The Court should enforce the agreement between DI and WWNS to litigate "any dispute" in a court of competent jurisdiction in Virginia, and either transfer or dismiss the action so that WWNS can re-file in the correct forum.

## IV. THE CIVPOL ARBITRATION CLAUSE

The CIVPOL subcontract contains an arbitration clause mandating arbitration for "any disputes arising out of or relating to this subcontract." Just as WWNS cannot avoid the forum selection clause by strategically pleading only non-contractual causes of action, neither can WWNS avoid the CIVPOL arbitration clause by artful pleading. Given that the causes of action are based on facts arising from both the WPPS and CIVPOL subcontracts, the pending action should be transferred under § 1404(a) or dismissed under Rule 12(b)(3) so that a Virginia court can decide which claims are arbitrable and which claims are to be litigated.[7]

### A. The Statutory And Tortious Causes Of Action Are Within The Scope Of The CIVPOL Arbitration Clause.

In analyzing an arbitration clause, the court determines whether the present dispute comes within the scope of the arbitration clause. Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 76-77 (2d Cir. 1998); E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Brotherhood of Teamsters, 812

---

[7]     Courts allow Rule 12(b) motions to be used to enforce valid arbitration clauses. A court may convert a 12(b) motion to dismiss into a motion to compel arbitration; it may transfer the case to another forum under 1404(a); or it may stay the proceedings until arbitration is complete. Brown v. Dorsey & Whitney, 267 F. Supp. 2d 61 (D.D.C. 2003).

F.2d 91, 95 (3d Cir. 1987).  The court focuses on the factual allegations, not the legal causes of action, in determining whether a dispute is within the scope of the arbitration clause.  Genesco v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).  The presumption of arbitrability is stronger where the arbitration clause is broad.  AT&T Tech. v. Communications Workers, 475 U.S. 643, 650 (1986).

Classification of the clause as "broad" or "narrow" dictates the breadth of the clause's coverage.  Broad clauses reach disputes that "touch matters" within the contract containing the arbitration clause.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 624-25 n.13 (1985).   If allegations "touch matters" covered by the parties' contracts, then those claims must be arbitrated whatever the legal labels attached to them.  Oldroyd, 134 F.3d at 76-77.  A valid arbitration clause cannot be avoided by asserting statutory or tort claims.  Id. at 76-77; Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991); Mitsubishi, 473 U.S. at 636-37.

As with forum selection clauses, the party challenging enforcement of the arbitration clause has the burden of proof.  The challenging party must prove that the dispute falls outside of the scope of the agreement.  However, in the absence of an express provision excluding a particular grievance, only the most forceful evidence of a purpose to exclude the claim from arbitration will prevail.  Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584-85 (1960).

The arbitration clause in the CIVPOL subcontract is very broad and encompasses the statutory and tortious causes of action that WWNS asserts.  The arbitration clause states that "[a]ny disputes arising out of or relating to" this subcontract and which are not covered by Paragraph 10.9.1 of the Disputes Clause must be arbitrated.  Courts have consistently held that arbitration clauses with "arising out of or relating to" language are broad clauses that can

encompass both statutory and tortious claims, including § 1981 claims.  <u>Oldroyd</u>, 134 F.3d at 76;

<u>Thinket Ink Info. v. Sun Microsystems</u>, 368 F.3d 1053, 1060 (9th Cir. 2004).  In <u>Thinket Ink</u>, the

court held that the § 1981 racial discrimination claim was subject to an arbitration clause which

stated that "[a]ny and all disputes or controversies whether of law or fact or any nature

whatsoever arising from or respecting this Agreement" were to be arbitrated.  368 F.3d at 1056.

Similarly, defamation, tortious interference, and conspiracy claims have all been held to be

arbitrable under contractual arbitration clauses.  <u>Kroll v. Doctor's Assoc</u>., 3 F.3d 1167, 1170 (7th

Cir. 1993); <u>Sweet Dreams Unlimited v. Dial-A-Mattress Int'l</u>, 1 F.3d 639, 643 (7th Cir. 1993).

  The causes of action WWNS asserts in its complaint against DI are within the scope of

the CIVPOL arbitration clause.  First, as discussed above, the asserted causes of action are not

independent of the subcontract.  Throughout the complaint, WWNS states that DI's

discriminatory and tortious actions undermined WWNS' performance of its contractual

obligations.  For example, WWNS alleges that DI did not give WWNS employees the proper

identification badges "which hindered their ability to provide contractually-required service to

CIVPOL locations outside of Baghdad" (Compl. ¶ 54), and that DI then blamed WWNS for

these deficiencies.  In addition, WWNS states that due to DI's allegedly false statements about

the status of the CIVPOL subcontract and its defamatory statements about the financial health of

WWNS to WWNS' employees, WWNS' employees terminated their employment with WWNS,

leaving WWNS without the skilled employees it needed to complete current and proposed

projects.  Many of these same WWNS' employees were subsequently hired by DI "to continue

working on the CIVPOL program" (Compl. ¶ ¶ 63, 91, 99).

**B.    The Arbitration Should Be Enforced And The Action Transferred Or Dismissed So That A Virginia Court Can Determine Which Claims Are Arbitrable.**

It is clear from the complaint that the non-contractual causes of action "touch matters" covered by the parties' contracts, namely WWNS' inability to adequately perform its contractual duties due to the alleged discriminatory and tortious behavior of DI.  The causes of action are not independent of the subcontract, but rather arise out of and relate to the CIVPOL subcontract. Given that the asserted causes of action are based on facts arising under both the WPPS and CIVPOL subcontracts, the court should transfer or dismiss the pending action so that a court of competent jurisdiction in Virginia can decide which claims are to be litigated under the WPPS subcontract and which claims are to be arbitrated under the CIVPOL subcontract.

Respectfully submitted,


/s/ George D. Ruttinger_____
George D. Ruttinger (Bar No. 214445)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Phone: 202-624-2670
Fax: 202-628-5116

Attorney for Defendant DynCorp
International LLC

November 13, 2006

2882101

20

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 13, 2006, a copy of the foregoing Motion to Transfer Under

28 U.S.C. § 1404(a) or in the Alternative Dismiss Under Fed. R. Civ. P. 12(b)(3) was filed

electronically.  I understand that notice of this filing will be sent to all parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.


<u>/s/George D. Ruttinger</u>

George D. Ruttinger

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____  )
                                          )
**WORLDWIDE NETWORK SERVICES,**           )
 **LLC**                                  )
                                          )
                                          )     **Case No. 1:06cv01717**
              **Plaintiff,**              )     **Judge:  Richard J. Leon**
                                          )
         **v.**                           )
                                          )
**DYNCORP INTERNATIONAL, LLC,**           )
                                          )
                                          )
              **and**                     )
                                          )
**EDO CORPORATION**                       )
                                          )
              **Defendants.**             )
_____  )


**[PROPOSED] ORDER**


        This matter having come before this Court on the Motion of Defendant DynCorp

International to Transfer under 28 U.S.C. § 1404(a) or in the Alternative Dismiss under Fed. R.

Civ. P. 12(b)(3), and the Court having considered the Memoranda submitted by the parties in

support and in opposition to said Motion, and having heard oral argument thereon, it is hereby

        **ORDERED**, that Defendant's Motion is **GRANTED.**  Pursuant to 28 U.S.C. §  1404(a),

this action is transferred to case to the U.S. District Court for the Eastern District of Virginia for

a determination of which claims asserted in the Complaint should be arbitrated and which should

be adjudicated in that court (or another court of competent jurisdiction in the Commonwealth of

Virginia).  [Alternate: Pursuant to Fed. R. Civ. P. 12(b)(3), this action is dismissed for lack of proper venue.]


_____
The Honorable Richard J. Leon
United States District Judge

DATED: _____

SUBCONTRACT

NUMBER

WWNS04-002-WPPS

Between


**DynCorp International,**
**8445 Freeport Parkway, Suite 400**
**Irving, TX 75063**


And


**Worldwide Network Services, LLC.**
**1900 M Street, NW, Suite 500**
**Washington, DC 20036**



This Subcontract is entered into by and between:

(1)   **DYNCORP INTERNATIONAL LLC,** a Limited Liability Company established under the laws of Delaware and whose registered address is at 8445 Freeport Parkway, Suite 400, Irving, Texas 75630(hereinafter called DynCorp or Buyer); and

(2)   **WORLDWIDE NETWORK SERVICES, LLC.,** a Limited Liability Company established under the laws of Delaware whose address is 1900 M Street , NW, Suite 500, Washington, DC (hereinafter called WWNS or Subcontractor).

(3)   **DynCorp and WWNS** may be herein referred to individually as the "Party" or collectively as the "Parties".

This is an Indefinite Delivery/Indefinite Quantity Subcontract issued in support of the Buyer's Prime Contract S-LMAQM-00-D-0027, Worldwide Personal Protective Services Program (WPPS) with the United States Department of State.

## THE PARTIES HERETO AGREE

### ARTICLE 1.
### SUBCONTRACT TERM, EFFECTIVITY, AND CONTENT

The term of this Subcontract is November 12, 2004 through March 2, 2005.

This Subcontract consists of these Articles and Exhibits A through C, attached hereto.

> Exhibit A-Statement of Work
> Exhibit B-CLIN Schedule
> Exhibit C-WPPS Flow-Down Requirements

### ARTICLE 2.
### CONTRACT VALUE

Values will be established for individual Task Order or Purchase Order/s as they are issued. For the purpose of this Subcontract it is understood that the term Task Order and Purchase Order are interchangeable and mean the same. Task Orders may be negotiated, awarded, and issued as Firm Fixed Price, Time & Material, Fixed Rate, Cost Reimbursable, or a combination of types. Buyer is obligated to pay for only the amounts stated on each individual Task Order issued under this Subcontract.



## ARTICLE 3.
## ORDER OF PRECEDENCE

Any inconsistency in this Subcontract shall be resolved by giving precedence in the following order:

A. The Articles
B. The Task Order/s
C. The Statement of Work
D. Flow Downs

## ARTICLE 4.
## INTERPRETATION OF SUBCONTRACT

4.1     The Subcontractor represents that prior to executing this Subcontract, it performed a reasonable review of the Subcontract Agreement, and has brought to Buyer's attention all ambiguities, discrepancies, inconsistencies, or conflicts in or between any of the technical or contractual provisions (collectively, "ambiguities"), which were discovered during that review.

4.2     The Parties agree to attempt in good faith to resolve any ambiguities that are discovered subsequent to the execution of this Subcontract, prior to invoking the Disputes Clause at Article 10.9.

## ARTICLE 5.
## SUBCONTRACTOR CONTACTS WITH BUYER'S
## CUSTOMER AND OTHER SUBCONTRACTORS

Buyer shall be responsible for all liaison and communications with its customer and other subcontractors for the term of this Subcontract. The Subcontractor shall not communicate with Buyer's customer or other subcontractors regarding this Subcontract unless otherwise expressly authorized in writing by the Buyer. If the Subcontractor receives a request for information regarding this Subcontract from Buyer's customer or other subcontractors, the Subcontractor is to notify the Buyer immediately.

## ARTICLE 6.
## REQUIREMENTS

6.1     This is an Indefinite Delivery/Indefinite Quantity Subcontract for which Task Orders will be issued defining the types, quantities, and performance periods of the work described in Exhibit A. These services and commodities shall be provided in accordance with all local, state, federal and international laws that may be applicable to such services and commodities. Prices for labor, materials, supplies and services shall be negotiated separately for each Task Order.

6.2     Delivery or performance shall be made only as authorized by Task Orders issued in



accordance with Article 7, "ORDERING", of this Subcontract. The Subcontractor shall furnish to Buyer those services specified in Exhibit A "Statement of Work" and called for by the issuance of Task Orders in accordance with the ORDERING article of this Subcontract. Buyer may issue Task Orders requiring delivery of services on multiple performance schedules.

6.3     Buyer will order from the Subcontractor services and supplies as required to perform the work in Exhibit A. Buyer is not obligated to place any orders under this Subcontract.

**ARTICLE 7.**
**ORDERING**

7.1     All services to be furnished under this Subcontract shall be ordered by issuance of written Task Orders by the authorized individuals listed below:

**Tim Crawley, Senior Director, Contract Management, CONUS**
**Mark Stewart, Senior Director, Purchasing, CONUS**
**Drew Watson, Program Director, WPPS Program Director, CONUS**
**Mike Davis, Business Manager, WPPS Program**
**Mike Bermudez, Project Manager, OCONUS**
**Roger Tripp, Project Manager, OCONUS**
**Tom Woodyard, Project Manager, OCONUS**

Or other persons designated by the DynCorp Vice President, Business Administration:

If the Subcontractor accepts orders or directions from other than the authorized individuals listed above, it does so at its own risk. Payment will be made only for services performed pursuant to the specific direction of the authorized individuals listed above. Accordingly, concurrent with or prior to the issuance of Task Orders, Buyer shall provide Subcontractor with a writing that identifies those individual(s) who have been designated as indicated above. Subcontractor shall be entitled to rely on such designation until Buyer shall revoke same, in a writing delivered to Subcontractor's representative designated in Arrticle 15.3.

7.2     All Task Orders issued under this Subcontract shall be subject to the terms and conditions of this Subcontract and its exhibits.

7.3     Buyer will issue a Statement of Work (SOW) for each Task Order. Subcontractor shall provide a separate proposal for each SOW. Subcontractor shall identify the effort in accordance with the exhibit B "CLIN Schedule". Individual Task Orders may also establish SubCLINs to further define cost elements. The Subcontractor's proposal shall include an invoicing schedule for Task Orders that are Firm Fixed Price. The parties' agreement to any rates, costs, or fees for one SOW or Task Order shall not be deemed to constitute agreement to the same rates, costs or fees for any other SOW or Task Order. Upon completion of



negotiations, Task Orders shall be issued at a value of the Firm Fixed Price or the Not To Exceed (NTE) for Cost type elements. Issuance of the Task Order shall constitute authorization for the Subcontractor to proceed with the work defined therein.

7.4    If mailed, sent electronically, or faxed, a Task Order is considered "issued" when Buyer deposits the Task Order in the mail or the Subcontractor receives the faxed or electronic copy. In all cases in which a Task Order is issued by mail, Buyer shall simultaneously transmit a faxed copy of the Task Order to the person designated to receive notices for Subcontractor under Article 15.3.

7.5    Task Orders may be issued verbally by authorized individuals and be confirmed in writing No Later Than (NLT) 5 work days following the verbal order. In the case of verbal Task Orders, the Task Order is considered "issued" when the Subcontractor receives the Task Order number verbally from the authorized individual. Subcontractor shall be entitled to stop work on any oral Task Order if it has not received written confirmation of the verbal order within five (5) work days.

7.6    Any Task Order issued during the term of this Subcontract and not completed within the Subcontract term shall be completed by the Subcontractor within the time specified in the Task Order. This Subcontract shall govern the Subcontractor's and Buyer's rights and obligations with respect to that Task Order to the same extent as if the Task Order were completed during the term of the Subcontract.

### ARTICLE 8.
### OPTION TO EXTEND THE TERM OF THE CONTRACT

DynCorp may require continued performance of any services within the limits and at the rates specified in the contract. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. DynCorp may exercise the option by written notice to the Subcontractor within 14 days of contract expiration.

### ARTICLE 9.
### TERMINATION

9.1    **Termination for Convenience.** Buyer reserves the right, at any time, in its own best interest, and without liability, to terminate this Subcontract or any order issued hereunder, in whole or in part, by written notice of termination for convenience to Subcontractor. Subcontractor shall submit a claim for equitable adjustment within thirty (30) business days of receipt of the termination notice. If the termination involves only services, Buyer shall be obligated to pay only for services performed through the termination date, plus reasonable costs of complying with the termination notice, including without limitation, payment for all outstanding orders placed prior to Subcontractor's receipt of the termination notice that could not be canceled, any associated cancellation charges, restocking charges, etc., plus reasonable

administrative costs to prepare the claim. Subcontractor shall provide Buyer supporting information necessary to document the reasonableness of Subcontractor's claim.

9.2  **Termination for Default.** Buyer may, without liability, and in addition to any other rights or remedies provided herein or by law, terminate this Subcontract or any order issued hereunder, in whole or in part by written notice of default if Subcontractor: (a) fails to deliver the supplies or perform the services within the time specified; (b) fails to make sufficient progress with the work, thereby endangering completion of performance within the time specified; or (c) fails to comply with any of the other instructions, terms, or conditions of the Subcontract. Buyer's right to terminate for default may be exercised if Subcontractor does not cure the failure within ten (10) business days after receiving Buyer's notice of such failure. If the default cannot be cured within 10 business days through no fault of Subcontractor, the Parties may seek other solutions and Subcontractor will not be subject to termination for default. If Buyer terminates this Subcontract in whole or in part, Buyer may purchase similar supplies or services from others and Subcontractor shall be liable for any additional costs above the original price for the terminated supplies/services. Provided, however, that Subcontractor's liability shall be conditioned on Buyer's exercise of good faith, reasonable effort to purchase such similar supplies or services at the same price and upon the same terms. In the event of a partial termination, Subcontractor shall continue the work not terminated. Subcontractor shall not be liable for any additional costs if failure to perform arises from causes beyond Subcontractor's or Subcontractor's subcontractor's control and without fault or negligence of either of them; provided, however, that the supplies/services to be furnished by Subcontractor's subcontractor (at any tier) were not obtainable from others in time for the Subcontractor to meet the delivery requirements; and, if the failure upon which the termination for default was premised arose from such causes, the termination shall be converted to one for convenience. Buyer shall pay Subcontractor the order price for any completed supplies/services delivered and accepted. Buyer and Subcontractor shall agree on the amount of payment for manufacturing materials delivered and accepted by the Buyer. Buyer may withhold from any payments due Subcontractor, a sum necessary in order to protect Buyer against any liability or expenses due to the termination for default, not to exceed 15% of the payment due. Subcontractor shall provide any supporting information necessary to document the reasonableness of Subcontractor's termination for default claim.

9.3  Subcontractor may, without liability, and in addition to any other rights or remedies provided herein or by law, terminate this Subcontract or any order issued hereunder, in whole or in part by written notice of default if Buyer: (a) fails to pay invoices in accordance with the terms of the Subcontract; or (b) materially fails to comply with any other material terms or conditions of the Subcontract. Subcontractor's right to terminate for default may be exercised if Buyer does not cure the default within ten (10) business days after receiving Subcontractor's notice of such failure.



## ARTICLE 10.
## GENERAL TERMS AND CONDITIONS

10.1   **Applicable Law.** Except as otherwise provided herein, this Subcontract shall be governed by and construed in accordance with the laws of the state of Delaware.

10.2   **Compliance with Laws.** The Parties warrant and certify that in the performance of this Subcontract, they will comply with all applicable statutes, rules, regulations, and orders of the federal, state or local governments applicable hereto. This includes compliance with Arms Export Control Act and the Export Administration Regulations. Further this includes any and all provisions included in the International Traffic in Arms Regulation (ITAR), specifically part 121, 123, and 126.1. On a task order by task order basis, the Parties will agree on which one of them shall be responsible for obtaining any export licenses required for performance of that particular task order. Subcontractor agrees to indemnify Buyer against any loss, costs, damage, or liability incurred by reason of Subcontractor's violation of this Section; and Buyer agrees to indemnify Subcontractor against any loss, costs, damage or liability incurred by reason of Buyer violating this section

10.3   **Ethical Standards of Conduct.**

10.3.1   Subcontractor hereby represents that it has neither received nor given any gifts or gratuities, nor participated in any other unethical conduct as defined in the Procurement Integrity Provisions of the Office of Federal Procurement Policy (OFPP) Act, in connection with this Subcontract. If, at any time, Buyer determines that Subcontractor is in violation of the foregoing representation, Buyer may cancel this Subcontract upon written notice to Subcontractor and Buyer shall have no further obligation to Subcontractor beyond payment for services and supplies delivered through the date of termination. The parties hereto further agree that any breach of this representation by Subcontractor shall be a material breach of each and every Subcontract between Buyer and Subcontractor and Buyer shall have, in addition to all contractual remedies, all remedies available at law or in equity.

10.3.2   Subcontractor hereby represents and warrants that it will faithfully perform its services in a fully professional manner and shall not engage in any activity or course of conduct that would be reasonably likely to bring the name of Buyer into disrepute, or cause Buyer or its affiliates to be in violation of or subject to loss or reduction of benefits under any law or regulation of the United States of America.

10.3.3   Specifically, but not by way of limitation of the foregoing, Subcontractor hereby agrees and warrants that:

10.3.3.1 Subcontractor will perform in accordance with all applicable laws, including the U.S. Foreign Corrupt Practices Act, and Subcontractor shall make no payments, gifts, or other disbursements of any type in connection with the performance of the Subcontract which are contrary to the laws of the United States, Subcontractor's country, or the

16 February 2004


DynCorp
WWNS

designated foreign country;

10.3.3.2    Except for (a) Subcontractor's assignment of its rights to any payments or claims in connection with financing arrangements between Subcontractor and a financial institution, or (b) Subcontractor's payments to its own subcontractors and suppliers, no person, firm, or entity other than Subcontractor has or will have the right to any fees paid or payable to Subcontractor under this Subcontract by virtue of any agreement, promise or understanding with Subcontractor;

10.3.3.3    If so requested by Buyer, Subcontractor agrees to communicate to auditors and/or counsel of Buyer that they have faithfully observed and have not violated any provision of this Article 10.3.3.

10.3.3.4    Violation of this paragraph shall constitute grounds for withholding payment(s) due the Subcontractor and shall constitute grounds for termination of this Subcontract.

10.4    **Assignment/Subcontracting**. Subcontractor shall not assign this Subcontract, or any rights, interest, or payments, or the performance of any of its duties under this Subcontract without the prior written consent of Buyer, provided, however, that such consent shall not be required with respect to Subcontractor's assignment of its rights to any payments or claims in connection with financing arrangements between Subcontractor and a financial institution. Except for standard commercial items, raw materials, or other supplies identified in Subcontractor's proposal as procured from others, Subcontractor shall not subcontract the complete or any substantial portion of the work without the prior written consent of Buyer. Any attempted or purported assignment/subcontracting by Subcontractor without Buyer's prior written consent in violation of the terms of this paragraph shall be void and not binding upon Buyer.

10.5.    **Information Disclosed to Buyer**. Any information or knowledge Subcontractor discloses to Buyer regarding this Subcontract shall not be deemed confidential or proprietary unless expressly agreed upon by the parties in writing. Any such unpatented information or knowledge shall be acquired by Buyer free of any restrictions.

10.6    **Warranty of Supplies/Services**. Subcontractor warrants that all supplies/services furnished under this Subcontract shall conform to the Buyer's specifications or other description and will be of good material and workmanship and free of defects. Subcontractor further warrants that the supplies/services will meet Subcontractor's published specifications and standards, will be new (not used or reconditioned), merchantable and suitable for the purpose intended.    These warranties shall survive inspection, acceptance, and payment. Supplies/services that do not conform to the above warranties may, at any time within the manufacturers warranty period, be rejected and returned to Subcontractor, at Subcontractor's expense, for correction or replacement according to the manufacturers warranty provision. If Subcontractor does not correct or replace same within ten (10) business days of Subcontractor's receipt of Buyer's rejection, Buyer may correct or replace



the nonconforming supplies/services at Subcontractor's expense. The forgoing warranties are in addition to all other warranties expressed or implied by law.

10.7    **Price Warranty.** Subcontractor warrants that the price (s) charged for the supplies/services specified in this Subcontract are equal to or better than the selling price (s) Subcontractor charges its most favored customer for the same or substantially similar items, whether sold to the Buyer or to any other purchaser, taking into account the quantity purchased and the terms and conditions of sale.

10.8    **Changes.** By written modification, Buyer may, from time to time, order work suspension or make changes in specifications to services furnished by Subcontractor. If any such change causes an increase or decrease in the price of this Subcontract or in the time required for its performance, Subcontractor shall promptly notify Buyer thereof and submit its proposal for adjustment within 20 business days after the change is made. However, nothing in this provision shall excuse Subcontractor from proceeding immediately with the modification as changed. Whether made pursuant to this provision or by mutual agreement, changes shall not be binding upon Buyer except when specifically confirmed in writing by Buyer. Information, advice, approvals, or instructions given by Buyer's technical personnel or other representative shall be deemed expressions of personal opinions only and shall not affect Buyer's and Subcontractor's rights and obligations hereunder unless set forth in writing and signed by Buyer's authorized representative and which expressly states that it constitutes an amendment or change to this Subcontract

10.9    **Disputes.**

10.9.1 Subcontractor shall submit any claims for adjustment in the Subcontract for changes directed or required by the Government or additional costs that result from acts or omission of the Government in writing in such time so that Buyer shall have a reasonable amount of time to review the claims and submit it to the Government, all as the Prime Contract may require to permit Buyer to comply with the applicable provisions of the Prime Contract with respect to submission of claims by Buyer to Government. Buyer shall process such claims as provided in the Prime Contract. Subcontract adjustments shall be made only to the extent that Buyer obtains adjustments from the Government, and the amount of the Subcontract adjustment shall be equal to and not exceed Subcontractor's allocable share of the adjustment to the Prime Contract by the Government. Nothing in this article 10.9.1 shall be deemed to permit or allow the Subcontractor to take direction from the Government without Buyer's prior consent, nor shall it be deemed to create any privities between Subcontractor and the Government.

10.9.2 Either Party may pursue litigation to resolve any dispute not covered by the preceding paragraph and not resolved after a mutual, good faith effort by the Parties. Any such action shall be filed only in a court of competent jurisdiction in the Commonwealth of Virginia; provided, however, that the Parties hereby expressly waive any rights to a trial by jury and agree that any legal proceeding hereunder shall be tried by a judge without a



jury. The Parties agree that the governing law applicable to any such action under this Subcontract shall be the federal law of government contracts, as interpreted by federal judicial bodies and administrative boards of contract appeals. To the extent federal government contract law is not dispositive; the Parties agree that the law of the State of Delaware shall govern. Any such action by the Subcontractor must be commenced within one (1) year from the date of Contractor's final decision, if applicable.

10.9.3 Notwithstanding any claim, dispute or other matter in question, Subcontractor shall continue to perform Subcontract Work, and Buyer shall continue to make payments due for all sums that are not in dispute.

10.10   **Stop-Work Order**. Buyer may, at any time, by written notice to Subcontractor, stop all or any part of the work hereunder for up to ninety (90) calendar days. Upon receiving a stop-work order, Subcontractor shall immediately comply with its terms and take all reasonable steps to avoid incurring any additional costs allocable to such work. If the stop work order results in an increase in price or schedule, the Subcontractor shall be entitled to recover such increased price and extension of the schedule, and must submit a claim for equitable adjustment within thirty (30) calendar days after the resumption of work or, if there is no resumption of work after 90 days, then no later than one hundred twenty (120) calendar days from the date on which Subcontractor received notice of the stop work order.

10.11   **Permits, Fees, and Licenses**. Except as may be otherwise provided for in the Task Order, Subcontractor shall obtain and pay for all permits, fees, and licenses required for the performance of its own work at no additional charge to Buyer.

10.12   **Failure to Comply**. If Subcontractor fails to comply with any of the Subcontract or Task Order requirements, Buyer may exercise its option to terminate for default or invoke applicable warranties for nonconformance. In lieu of this, however, Buyer may waive the Subcontractor deficiency, and shall waive the deficiency if it is not material. In return for waiver of a material deficiency, Subcontractor agrees to negotiate an equitable reduction in the Task Order price.

10.13   **Delivery**. Subcontractor agrees that time is of the essence in the performance of work under this Subcontract. Deliveries shall be strictly in accordance with the Task Order delivery schedule. Subcontractor agrees to advise Buyer, as soon as possible, of any delays in meeting the Task Order delivery schedule and the reasons therefore. If a delay is due to causes beyond Subcontractor's control and, when applicable, its subcontractor's control, and without fault or negligence of either of them, the Parties may seek other solutions and Subcontractor will not be subject to termination for default. If the delay is due to Subcontractor's or its subcontractor's failure, and the failure is not cured within ten (10) business days after Subcontractor's receipt of Buyer's notice thereof, Buyer may, in its sole discretion, accept a revised delivery schedule, reduce the task order price commensurate with the delivery failure, or proceed in accordance with Article 9.2.



10.14 **Public Release of Information**. No public release of information, news release, announcement, advertisement, denial or confirmation of this Subcontract or the subject matter hereof, shall be made without Buyer's prior written approval; provided, however, that Buyer's approval shall not be required for release of information necessary to the performance of Subcontractor's duties hereunder, to support Subcontractor's application for financing, or to Subcontractor's attorneys or accountants.

10.15 **Insolvency.** If Subcontractor ceases to conduct normal business operations (including inability to meet its obligations), or if any proceedings under bankruptcy or insolvency laws are brought by or against Subcontractor, or a receiver for Subcontractor is appointed or applied for, or Subcontractor makes an assignment for the benefit of creditors, Buyer may terminate this Subcontract, without liability, except for deliveries previously made and for supplies completed and subsequently delivered in accordance with the terms of the Subcontract. In the event of Subcontractor's insolvency, Buyer shall have the right to procure the balance of any Task Order under this Subcontract from others without liability.

10.16 **Insurance**.

Types of Insurance Required:

Defense Base Act: The Defense Base Act applies to this procurement. The Contractor is required to comply with Section I clause 52.228-03, Workers' Compensation Insurance (Defense Base Act). (See also Section H clause, Waiver of Defense Base Act Insurance Requirements for Local and Third Country Nationals Employed on Overseas Contracts.)

**See Exhibit C-WPPS Flow-Down Requirements**

10.18 **Organizational Conflict of Interest**.

10.18.1    The Subcontractor warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which would give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, or that the Subcontractor has disclosed all such relevant information.

10.18.2    The Subcontractor agrees that if an actual or potential organizational conflict of interest is discovered after award, the Subcontractor will make a full disclosure in writing to the Buyer. This disclosure shall include a description of actions, which the Subcontractor has taken or proposes to take to avoid or mitigate the actual or potential conflict.

10.18.3    If the Subcontractor was aware of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the Buyer, the Buyer may terminate the



Subcontract for default.

10.18.4    The Subcontractor shall insert the substance of this clause, including this article 10.18, in all subcontracts.

10.19  **Safeguarding of Information**. The Subcontractor and its employees shall exercise the utmost discretion in regard to all matters relating to their duties and functions. They shall not communicate to any person any information known to them by reason of their performance of services under this contract, which has not been made public, except in the necessary performance of their duties or upon written authorization of the Buyer. All documents and records (including photographs) generated during the performance of work under this Subcontract shall be for the sole use of and become the exclusive property of the Buyer. Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film or photograph concerning any aspect of work performed under this contract shall be published or disseminated through any media without the prior written authorization of the Buyer. These obligations do not cease upon the expiration or termination of this contract. The Subcontractor shall include the substance of this provision in all contracts of employment and in all subcontracts hereunder.

## ARTICLE 11.
## PAYMENT AND INVOICING

11.1    The Subcontractor shall be paid for performance hereunder in accordance with the terms of payment of this Subcontract, upon submission of proper invoices and Buyer approval. The payment terms are Net 15 days after both (a) Buyer receipt of Subcontractor invoice and (b) delivery of acceptable services (see Article 12 herein).

11.2    Each Task Order shall be invoiced in accordance with the terms and payment schedule established in the Task Order. The parties' agreement to any rates, terms, costs or fees for one Task Order shall not be deemed to constitute agreement to the same rates, costs or fees for any other Task Order.

11.3    The Subcontractor shall invoice monthly and separately against each Task Order issued.       Each    invoice shall reference the Subcontract and Task Order number, applicable CLIN,    quantity provided, rate per labor classification, total current invoice amount, and cumulative     billings to date. The Buyer shall review the submitted invoice and I/A/W 11.6 determine if the invoice is acceptable. If the Buyer determines that the Invoice does not meet the requirements of this Article, the Parties shall deal in good faith to correct the invoice and resolve any discrepancies and minimize any delays in processing the invoice for payment.

11.4    The original and one (1) copy of each invoice shall be submitted by mail and facsimile for approval and payment to the following:

DynCorp
WWNS

DynCorp International
WPPS PMO
1127 International Parkway
Falmouth, VA 22406
Attn: Debra Roberts
And

One (1) copy of each invoice shall be submitted by fax or mail for approval to the designated representative for acceptance of services as identified in the Task Order.

11.5   Terms of payment are net 15 days. Payments shall be made electronically to Subcontractor's account, and shall be deemed "paid" when received in the account:

Worldwide Network Services
1900 M Street, NW
Suite 500
Washington DC 20036
Washington First Bank
Account # 04001176
ABA# 054001699

11.6   Discrepancies in invoices may result in a delay of payment pending resolution of discrepancy(s).  However, discrepancies not identified and relayed to WWNS within 5 work days of receipt by DynCorp may be deemed to be acceptable.

### ARTICLE 12.
### ACCEPTANCE

Acceptance of services on each Task Order shall be made by the Program Manager or Business Manager, or their designated representatives as stated in each individual Task Order.

### ARTICLE 13.
### SEVERABILITY

If any provision or portion thereof of this Subcontract is held to be invalid under any applicable statute or rule of law, it shall be, to that extent, deemed omitted without invalidating the remaining portions of this Subcontract.

### ARTICLE 14.
### WAIVER

Any failure on either party's part to carry out any condition, requirement, term or part of this

subcontract shall not act as a waiver with respect to any recurrence of such failure, or with respect to a failure to carry out any other condition, term or part. The Buyer shall not be deemed to have waived any condition, requirement, term or part hereof unless such waiver is in writing.

## ARTICLE 15.
## MODIFICATIONS AND NOTICES

15.1   No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this Subcontract. Sole authority to issue change orders and modifications to this Subcontract is vested in the authorized negotiators designated in paragraph 15.2. below:

15.2   Authorized Negotiators:  Mike Thorne, Vice President, Business Administration
                                Tim Crawley, Senior Director, Contract Management

15.3   Any notices to be furnished by either party shall be sent as follows:

**To Buyer:**

DynCorp International LLC
1127 International Parkway
Falmouth, VA 22406
Attention: Mike Davis, Business Manager
Phone Number: 757-387-0012
Fax Number: TBP
Email Address: mike.davis@dyncorp.com

**To Subcontractor:**

Worldwide Network Services, Inc.
1900 M Street NW, Suite 500
Washington, DC  20036
Attn:  Reginald S. Bailey, Sr., Vice President
Phone Number: 202-293-0852
Fax Number: 202-293-0872
Email Address: rbailey@wwns.net

Either party may change its address for notice by providing written notice to the other party, in accordance with this sub article.

## ARTICLE 16.
## SUBCONTRACT CLAUSES

EXHIBIT C incorporates and includes government flow-down clauses by reference, with the same force and effect as if they were given in full text. Whenever the word "U.S. Government" is stated



as the Buyer, substitute the word "DynCorp" or "Buyer". For the word "Contracting Officer", substitute "Buyer" or "Buyer's Representative". Whenever the word "Contractor" is stated as the Seller, substitute the word "WWNS" or "Subcontractor".

## ARTICLE 17.
## ENTIRE AGREEMENT

This Subcontract constitutes the entire agreement between Buyer and Subcontractor regarding this procurement and supersedes all previous written or oral agreements and commitments. Except as expressly incorporated herein (see Exhibit A), no terms or conditions of sale set forth in Subcontractor's proposal or acknowledgment shall be included as a part hereof, nor shall any prior course of dealing, custom, or usage in the trade supersede or modify any Task Order provisions. Any subsequent additions, deletions or modifications to this agreement shall not be binding upon the parties unless same are mutually agreed upon and incorporated herein in writing.

IN WITNESS HEREOF, the parties hereto have executed this Indefinite Delivery/Indefinite Quantity Subcontract as of the dates set forth below:

**DynCorp International LLC**

By: _(signature)_

Name: Timothy J. Cramley

Title: Senior Director, Contract Management

Date: 1/18/2005

**Worldwide Network Services, LLC**

By: _(signature)_

Name: Reginald S. Bailey, Sr.

Title: Vice President

Date: 1/18/2005

# Exhibit A
# Statement of Work

The Subcontractor shall provide communication and IT services to the BUYER in the area of performance to include Iraq and surrounding areas. The Subcontractor's responsibilities under this Subcontract may include, but are not limited to, the following areas of performance:

A.  IT Services:

    1.    Internet Connection
        a.  Backbone VSAT Network (Equipment per Attachment A)
        b.  Network Cabinets
        c.  Cisco Routers
        d.  Firewall, Nomadix Universal Subscriber Gateway II, Management Server, Laptop Management Computers, Cisco 24 port Data Switch, Patch Panels
        e.  KVM 8 Port Switch, Back-batteries.
        f.  An Inverter nor Petrol is not needed at this time; however future considerations of Task Orders these items may be included.
        g.  Cisco IP Phone 7905 and Cisco IP Conference Station 7936 h.  Other IT services as contained and negotiated in Task Orders or Purchase Orders

    2.    Facility Infrastructure
        a.  IT Hardware,
        b.  Laptops Procurement
        c.  Portable Printers
        d.  Laptops Procurement
        e.  Portable Printers
        f.  Cabling, Spare Cartridges, Flash (256) Memory Cards, UPS for each computer
        g.  Wireless Network Hardware Procurement
        h.  Installation

    3.    Voice over IP
        a.  Hardware Procurement
        b.  Software
        c.  Bandwidth
        d.  Installation and Implementation
        e.  Recurring costs based upon usage

B.  Voice Communications:

    1.    Radio Network
        a.  VHF, (Base to Hand-Held Usage)
            i. Equipment procurement
            ii.    Project Design

DynCorp 
WWNS

    iii.  Installation

  b. HF, (Base to Base & Base to Vehicle Usage) Long distant carrier
    i. Equipment Procurement
    ii.  Project Design
    iii.  Installation
    iv.  Integration & Crossover from VHF to HF Communications
  c. Engineering, Design & Implementation

 2. Thuraya Mobile Phones
  a. Mobile Phones
  b. Base Phones (to work inside buildings)
  c. Equipment procurement
  d. Monthly recurring usage

C.  Compound Video Surveillance:

 1.  Hardware
 2.  Software
 3.  Integration
 4.  Installation
 5.  Repair

D. Technical services as required.

E. In-Country Regional Repair Facilities

 1. Computers and communication equipment
  a. Six (6) day a week walk-in repair and replacement facility
  b. Emergency 24/7 repair capability on site



**SUBCONTRACT**

**NUMBER**

**WWNS04-001-CIV**

Between


**DynCorp International,**
**A CSC Company**
**One Ridgmar Centre**
**6500 West Freeway, Suite 600**
**Fort Worth, TX 76116**


**And**


**Worldwide Network Services, Inc.**
**1130 Connecticut Ave. NW, Suite 425**
**Washington, DC  20036**

DynCorp
WWNS



This Subcontract is entered into by and between:

(1) **DYNCORP INTERNATIONAL LLC,** a wholly owned subsidiary of CSC established under the laws of Delaware and whose registered address is at One Ridgmar Centre, 6500 West Freeway, Fort Worth, Texas 76116 (hereinafter called DynCorp or Buyer); and

(2) **WORLDWIDE NETWORK SERVICES, INC.,** a company incorporated under the laws of Delaware whose address is 1130 Connecticut Ave. NW, Suite 425, Washington, DC (hereinafter called WWNS or Subcontractor).

(3) **DynCorp and WWNS** may be herein referred to individually as the "Party" or collectively as the "Parties".

This is an Indefinite Delivery/Indefinite Quantity Subcontract issued in support of the Buyer's Prime Contract S-LMAQM-04-0030, Civilian Police Program (CIVPOL) with the United States Department of State.

**THE PARTIES HERETO AGREE**

**ARTICLE 1.**
**SUBCONTRACT TERM, EFFECTIVITY, AND CONTENT**

The term of this Subcontract is one base period of one (1) year, with four one year Option(s):

| | |
|---|---|
| Base Period: | 18 February 2004 through 17 February 2005 |
| Option Periods: | |
| 1 | 18 February 2005 through 17 February 2006 |
| 2 | 18 February 2006 through 17 February 2007 |
| 3 | 18 February 2007 through 17 February 2008 |
| 4 | 18 February 2008 through 17 February 2009 |

This Subcontract consists of these Articles and Exhibits A through C, attached hereto.

> Exhibit A-Statement of Work
> Exhibit B-CLIN Schedule
> Exhibit C-CIVPOL Flow-Down Requirements

DynCorp 
WWNS

## ARTICLE 2.
## CONTRACT VALUE

Values will be established for individual Task Orders as they are issued. Task Orders may be negotiated, awarded, and issued as Firm Fixed Price, Time & Material, Fixed Rate, Cost Reimbursable, or a combination of types. Buyer is obligated to pay for only the amounts stated on each individual Task Order issued under this Subcontract.

## ARTICLE 3.
## ORDER OF PRECEDENCE

Any inconsistency in this Subcontract shall be resolved by giving precedence in the following order:

A. The Articles
B. The Task Order/s
C. The Statement of Work

## ARTICLE 4.
## INTERPRETATION OF SUBCONTRACT

4.1    It shall be the obligation of the Subcontractor to exercise due diligence to discover and to bring to the attention of the Buyer, at the earliest possible time, any ambiguities, discrepancies, inconsistencies, or conflicts in or between any of the technical or contractual provisions hereof.

4.2    Any ambiguity, discrepancy, inconsistency or conflict in or between any of the technical or contractual provisions hereof shall be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to the intentions of the parties at the time of subcontracting.

## ARTICLE 5.
## SUBCONTRACTOR CONTACTS WITH BUYER'S
## CUSTOMER AND OTHER SUBCONTRACTORS

Buyer shall be responsible for all liaison and communications with its customer and other subcontractors for the term of this Subcontract. The Subcontractor shall not communicate with Buyer's customer or other subcontractors regarding this Subcontract unless otherwise expressly authorized in writing by the Buyer. If the Subcontractor receives a request for information regarding this Subcontract from Buyer's customer or other subcontractors, the Subcontractor is to notify the Buyer immediately.

## ARTICLE 6.
## REQUIREMENTS

6.1    This is an Indefinite Delivery/Indefinite Quantity Subcontract for which Task Orders will be issued defining the types, quantities, and performance periods of the work described in Exhibit A. These services and commodities shall be provided in accordance with all local, state, federal and international laws that may be applicable to such services and commodities. Prices for labor, materials, supplies and services shall be negotiated separately for each Task Order.

6.2    Delivery or performance shall be made only as authorized by Task Orders issued in accordance with Article 7, "ORDERING", of this Subcontract. The Subcontractor shall furnish to Buyer those services specified in Exhibit A "Statement of Work" and called for by the issuance of Task Orders in accordance with the ORDERING article of this Subcontract. Buyer may issue Task Orders requiring delivery of services on multiple performance schedules.

6.3    Buyer will order from the Subcontractor services and supplies as required to perform the work in Exhibit A. Buyer is not obligated to place any orders under this Subcontract.

## ARTICLE 7.
## ORDERING

7.1    All services to be furnished under this Subcontract shall be ordered by issuance of written Task Orders by the authorized individuals listed below:

**Sr. Director, Contract Administration, Timothy J. Crawley**
**Manager, Contract Administration, David M. Moore**
**Business Manager, Phil Warr**

Or other persons designated by the DynCorp Vice President, Contract Administration:

If the Subcontractor accepts orders or directions from other than the authorized individuals listed above, it does so at its own risk. Payment will be made only for services performed pursuant to the specific direction of the authorized individuals listed above. Accordingly, concurrent with or prior to the issuance of Task Orders, Buyer shall provide Subcontractor with a writing that identifies those individual(s) who have been designated as indicated above. Subcontractor shall be entitled to rely on such designation until Buyer shall revoke same, in writing.

7.2    All Task Orders issued under this Subcontract shall be subject to the terms and conditions of this Subcontract and its exhibits.

7.3    Buyer will issue a Statement of Work (SOW) for each Task Order. Subcontractor shall provide a separate proposal for each SOW. Subcontractor shall identify the effort in accordance with the exhibit B "CLIN Schedule". Individual Task Orders may also establish SubCLINs to further define cost elements. The Subcontractor's proposal shall include an invoicing schedule

for Task Orders that are Firm Fixed Price. The parties' agreement to any rates, costs, or fees for one SOW or Task Order shall not be deemed to constitute agreement to the same rates, costs or fees for any other SOW or Task Order. Upon completion of negotiations, Task Orders shall be issued at a value of the Firm Fixed Price or the Not To Exceed (NTE) for Cost type elements, the final negotiated price for that order. Issuance of the Task Order shall constitute authorization for the Subcontractor to proceed with the work defined therein.

7.4    If mailed, sent electronically, or faxed, a Task Order is considered "issued" when Buyer deposits the Task Order in the mail or the Subcontractor receives the faxed or electronic copy.

7.5    Task Orders may be issued verbally by authorized individuals and be confirmed in writing. In the case of verbal Task Orders, the Task Order is considered "issued" when the Subcontractor receives the Task Order number verbally from the authorized individual.

7.6  Any Task Order issued during the term of this Subcontract and not completed within the Subcontract term shall be completed by the Subcontractor within the time specified in the Task Order. This Subcontract shall govern the Subcontractor's and Buyer's rights and obligations with respect to that Task Order to the same extent as if the Task Order were completed during the term of the Subcontract.


## ARTICLE 8.
## OPTION TO EXTEND THE TERM OF THE CONTRACT

This Subcontract may be extended at the option of the Buyer for one or more of the option periods specified in Article 1 upon preliminary written notice to the Subcontractor at least 15 business days prior to expiration of the current performance period. The preliminary notice of intent to exercise the Option does not obligate Buyer to actually exercise the Option. The Subcontractor agrees to continue performance of work under this Subcontract for the option periods and any other Subcontract extensions pursuant to the same terms and conditions of this Subcontract.


## ARTICLE 9.
## TERMINATION

9.1 **Termination for Convenience.** Buyer reserves the right, at any time, in its own best interest, and without liability, to terminate this Subcontract or any order issued thereunder, in whole or in part, by written notice of termination for convenience to Subcontractor. Subcontractor shall submit a claim for equitable adjustment within thirty (30) business days of receipt of the termination notice. If the termination involves only services, Buyer shall be obligated to pay only for services performed through the termination date, plus reasonable costs of complying with the termination notice, including without limitation, payment for all outstanding orders placed prior to Subcontractor's receipt of the termination notice that could not be canceled, any associated cancellation charges, restocking charges, etc., plus reasonable administrative costs to

prepare the claim. Subcontractor shall provide Buyer any supporting information necessary to document the reasonableness of Subcontractor's claim.

9.2 **Termination for Default.** Buyer may, without liability, and in addition to any other rights or remedies provided herein or by law, terminate this Subcontract or any order issued thereunder, in whole or in part by written notice of default if Subcontractor: (a) fails to deliver the supplies or perform the services within the time specified; (b) fails to make sufficient progress with the work, thereby endangering completion of performance within the time specified; or (c) fails to comply with any of the other material instructions, terms, or conditions of the Subcontract. Buyer's right to terminate for default may be exercised if Subcontractor does not cure the failure within ten (10) business days after receiving Buyer's notice of such failure. If the default cannot be cured within 10 business days through no fault of Subcontractor, the Parties may seek other solutions and Subcontractor will not be subject to termination for default. If Buyer terminates this Subcontract in whole or in part, Buyer may purchase similar supplies or services from others and Subcontractor shall be liable for any additional costs above the original price for the terminated supplies/services. Provided, however, that Subcontractor's liability shall be conditioned on Buyer's exercise of good faith, reasonable effort to purchase such similar supplies or services at the same price and upon the same terms. In the event of a partial termination, Subcontractor shall continue the work not terminated. Subcontractor shall not be liable for any additional costs if failure to perform arises from causes beyond Subcontractor's or Subcontractor's subcontractor's control and without fault or negligence of either of them; provided, however, that the supplies/services to be furnished by Subcontractor's subcontractor (at any tier) were not obtainable from others in time for the Subcontractor to meet the delivery requirements; and, if the failure upon which the termination for default was premised arose from such causes, the termination shall be converted to one for convenience. Buyer shall pay Subcontractor the order price for any completed supplies/services delivered and accepted. Buyer and Subcontractor shall agree on the amount of payment for manufacturing materials delivered and accepted by the Buyer. Buyer may withhold from any payments due Subcontractor, a sum necessary in order to protect Buyer against any liability or expenses due to the termination for default, not to exceed 15% of the payment due. Subcontractor shall provide any supporting information necessary to document the reasonableness of Subcontractor's termination for default claim.

## ARTICLE 10.
## GENERAL TERMS AND CONDITIONS

10.1    **Applicable Law.** This Subcontract shall be governed by and construed in accordance with the laws of the state of Delaware.

10.2    **Compliance with Laws.** Subcontractor warrants and certifies that in the performance of this Subcontract, it will comply with all applicable statutes, rules, regulations, and orders of the federal, state or local governments applicable hereto. Subcontractor agrees to indemnify Buyer against any loss, costs, damage, or liability incurred by reason of Subcontractor's violation of this

Section.

## 10.3   Ethical Standards of Conduct.

10.3.1     Subcontractor hereby represents that it has neither received nor given any gifts or gratuities, nor participated in any other unethical conduct as defined in the Procurement Integrity Provisions of the Office of Federal Procurement Policy (OFPP) Act, in connection with this Subcontract.  If, at any time, Buyer determines that Subcontractor is in violation of the foregoing representation, Buyer may cancel this Subcontract upon written notice to Subcontractor and Buyer shall have no further obligation to Subcontractor beyond payment for services and supplies delivered through the date of termination.  The parties hereto further agree that any breach of this representation by Subcontractor shall be a material breach of each and every Subcontract between Buyer and Subcontractor and Buyer shall have, in addition to all contractual remedies, all remedies available at law or in equity.

10.3.2     Subcontractor hereby represents and warrants that it will faithfully perform its services in a fully professional manner and shall not engage in any activity or course of conduct that would be reasonably likely to bring the name of Buyer into disrepute, or cause Buyer or its affiliates to be in violation of or subject to loss or reduction of benefits under any law or regulation of the United States of America.

10.3.3     Specifically, but not by way of limitation of the foregoing, Subcontractor hereby agrees and warrants that:

10.3.3.1 Subcontractor will perform in accordance with all applicable laws, including the U.S. Foreign Corrupt Practices Act, and Subcontractor shall make no payments, gifts, or other disbursements of any type in connection with the performance of the Subcontract which are contrary to the laws of the United States, Subcontractor's country, or the designated foreign country;

10.3.3.2     Except for Subcontractor's assignment of its rights to any payments or claims in connection with financing arrangements between Subcontractor and a financial institution, no person, firm, or entity other than Subcontractor has or will have the right to any fees paid or payable to Subcontractor under this Subcontract by virtue of any agreement, promise or understanding with Subcontractor;

10.3.3.3     If so requested by Buyer, Subcontractor agrees to communicate to auditors and/or counsel of Buyer that they have faithfully observed and have not violated any provision of this Article 10.3.3.

10.3.3.4     Violation of this paragraph shall constitute grounds for withholding payment(s) due the Subcontractor and shall constitute grounds for termination of this Subcontract.

10.4 **Assignment/Subcontracting**. Subcontractor shall not assign this Subcontract, or any rights, interest, or payments, or the performance of any of its duties under this Subcontract without the prior written consent of Buyer, provided, however, that such consent shall not be required with respect to Subcontractor's assignment of its rights to any payments or claims in connection with financing arrangements between Subcontractor and a financial institution. except for standard commercial items, raw materials, or other supplies identified in Subcontractor's proposal as procured from others, Subcontractor shall not subcontract the complete or any substantial portion of the work without the prior written consent of Buyer. Any attempted or purported assignment/subcontracting by Subcontractor without Buyer's prior written consent in violation of the terms of this paragraph shall be void and not binding upon Buyer.

10.5. **Information Disclosed to Buyer**. Any information or knowledge Subcontractor discloses to Buyer regarding this Subcontract shall not be deemed confidential or proprietary unless expressly agreed upon by the parties in writing. Any such unpatented information or knowledge shall be acquired by Buyer free of any restrictions.

10.6 **Warranty of Supplies/Services**. Subcontractor warrants that all supplies/services furnished under this Subcontract shall conform to the Buyer's specifications or other description and will be of good material and workmanship and free of defects. Subcontractor further warrants that the supplies/services will meet Subcontractor's published specifications and standards, will be new (not used or reconditioned), merchantable and suitable for the purpose intended and specified by Buyer. These warranties shall survive inspection, acceptance, and payment. Supplies/services that do not conform to the above warranties may, at any time within twenty-four (24) months after delivery to Buyer, be rejected and returned to Subcontractor, at Subcontractor's expense, for correction or replacement. If Subcontractor does not correct or replace same within ten (10) business days of Subcontractor's receipt of Buyer's rejection, Buyer may correct or replace the nonconforming supplies/services at Subcontractor's expense. The forgoing warranties are in addition to all other warranties expressed or implied by law including incidental or consequential damages.

10.7 **Price Warranty**. Subcontractor warrants that the price(s) charged for the supplies/services specified in this Subcontract are equal to or better than the selling price(s) Subcontractor charges its most favored customer for the same or substantially similar items, whether sold to the Government or to any other purchaser, taking into account the quantity purchased and terms and conditions of sale. Subcontractor further agrees that in the event of an announced priced reduction prior to complete shipment of supplies or performance of services, said price reduction shall be passed on to Buyer for supplies remaining to be shipped or services still to be performed.

10.8 **Changes**. By written modification, Buyer may, from time to time, order work suspension or make changes in specifications to services furnished by Subcontractor. If any such change causes an increase or decrease in the price of this Subcontract or in the time required for its performance, Subcontractor shall promptly notify Buyer thereof and submit its proposal for adjustment within 20 business days after the change is made. However, nothing in this provision shall excuse Subcontractor from proceeding immediately with the modification as changed.

Whether made pursuant to this provision or by mutual agreement, changes shall not be binding upon Buyer except when specifically confirmed in writing by Buyer. Information, advice, approvals, or instructions given by Buyer's technical personnel or other representative shall be deemed expressions of personal opinions only and shall not affect Buyer's and Subcontractor's rights and obligations hereunder unless set forth in writing and signed by Buyer's authorized representative and which expressly states that it constitutes an amendment or change to this Subcontract

10.9    **Disputes.**

10.9.1 Subcontractor shall submit any claims for adjustment in the Subcontract for changes directed or required by the Government or additional costs that result from acts or omission of the Government in writing in such time so that Buyer shall have a reasonable amount of time to review the claims and submit it to the Government, all as the Prime Contract may require to permit Buyer to comply with the applicable provisions of the Prime Contract with respect to submission of claims by Buyer to Government. Buyer shall process such claims as projected in the Prime Contract. Subcontract adjustments shall be made only to the extent that Buyer obtains adjustments from the Government, and the amount of the Subcontract adjustment shall be equal to and not exceed Subcontractor's allocable share of the adjustment to the Prime Contract by the Government. Nothing in this article 10.9.1 shall be deemed to permit or allow the Subcontractor to take direction from the Government without Buyer's prior consent, nor shall it be deemed to create any privity between Subcontractor and the Government.

10.9.2 Any disputes arising out of or relating to this Subcontract and which are not covered by the preceding paragraph and are not resolved after a mutual, good faith effort shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules in force at the time the dispute arises, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

10.9.3 Notwithstanding any claim, dispute or other matter in question, Subcontractor shall continue to perform Subcontract Work, and Buyer shall continue to make payments due for all sums that are not in dispute.

10.10   **Stop-Work Order**. Buyer may, at any time, by written notice to Subcontractor, stop all or any part of the work hereunder for up to ninety (90) calendar days. Upon receiving a stop-work order, Subcontractor shall immediately comply with its terms and take all reasonable steps to avoid incurring any additional costs allocable to such work. If the stop work order results in an increase in price or schedule, the Subcontractor shall be entitled to recover such increased price and extension of the schedule, and must submit a claim for equitable adjustment within thirty (30) calendar days after the resumption of work or, if absent such resumption, the thirtieth calendar after its receipt of the stop work notice.

10.11 **Permits, Fees, and Licenses**. Except as may be otherwise provided for in the Task Order, Subcontractor shall obtain and pay for all permits, fees, and licenses required for the work at no additional charge to Buyer.

10.12 **Failure to Comply**. If Subcontractor fails to comply with any of the Subcontract or Task Order requirements, Buyer may exercise its option to terminate for default or invoke applicable warranties for nonconformance. In lieu of this, however, Buyer may waive the Subcontractor deficiency. In return therefore, Subcontractor agrees to negotiate an equitable reduction in the Task Order price in such instance.

10.13 **Delivery**. Subcontractor agrees that time is of the essence in the performance of work under this Subcontract. Deliveries shall be strictly in accordance with the Task Order delivery schedule. Subcontractor agrees to advise Buyer, as soon as possible, of any delays in meeting the Task Order delivery schedule and the reasons therefore. If a delay is due to causes beyond Subcontractor's control and, when applicable, its subcontractor's control, and without fault or negligence of either of them, Buyer may, as its sole discretion, either adjust the delivery schedule or terminate the Task Order for convenience. If the delay is due to Subcontractor's or its subcontractor's failure, and the failure is not cured within ten (10) business days after Subcontractor's receipt of Buyer's notice thereof, Buyer may, at its sole discretion, either accept a revised delivery schedule and an equitable reduction in the Task Order price or terminate the Task Order for default.

10.14 **Public Release of Information**. No public release of information, news release, announcement, advertisement, denial or confirmation of this Subcontract or the subject matter hereof, shall be made without Buyer's prior written approval; provided, however, that Buyer's approval shall not be required for release of information necessary to the performance of Subcontractor's duties hereunder, to support Subcontractor's application for financing, or to Subcontractor's attorneys or accountants.

10.15 **Insolvency.** If Subcontractor ceases to conduct normal business operations (including inability to meet its obligations), or if any proceedings under bankruptcy or insolvency laws are brought by or against Subcontractor, or a receiver for Subcontractor is appointed or applied for, or Subcontractor makes an assignment for the benefit of creditors, Buyer may terminate this Subcontract, without liability, except for deliveries previously made and for supplies completed and subsequently delivered in accordance with the terms of the Subcontract. In the event of Subcontractor's insolvency, Buyer shall have the right to procure the balance of any Task Order under this Subcontract from others without liability.


10.16 **Insurance.**

Types of Insurance Required:

**See Exhibit C-CIVPOL Flow-Down Requirements**


WWNS04-001                                   Page 10 of 44                          DynCorp
16 February 2004                                                                    WWNS

10.17 **Certificate of Insurance.** The Subcontractor shall furnish the Buyer with a current certificate of insurance as evidence of the insurance required. In addition, the Subcontractor shall furnish evidence of a commitment by the insurance carrier to notify the Buyer in writing of any material change, expiration or cancellation of any of the insurance policies required not less than thirty (30) calendar days before such change, expiration or cancellation is effective. When coverage is provided by self-insurance, the Subcontractor shall not change or decrease the coverage without the Buyer's approval.

10.18 **Organizational Conflict of Interest.**

    10.18.1    The Subcontractor warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which would give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, or that the Subcontractor has disclosed all such relevant information.

    10.18.2    The Subcontractor agrees that if an actual or potential organizational conflict of interest is discovered after award, the Subcontractor will make a full disclosure in writing to the Buyer. This disclosure shall include a description of actions, which the Subcontractor has taken or proposes to take to avoid or mitigate the actual or potential conflict.

    10.18.3    If the Subcontractor was aware of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the Buyer, the Buyer may terminate the Subcontract for default.

    10.18.4    The Subcontractor shall insert the substance of this clause, including this article 10.18, in all subcontracts.

10.19 **Safeguarding of Information.** The Subcontractor and its employees shall exercise the utmost discretion in regard to all matters relating to their duties and functions. They shall not communicate to any person any information known to them by reason of their performance of services under this contract, which has not been made public, except in the necessary performance of their duties or upon written authorization of the Buyer. All documents and records (including photographs) generated during the performance of work under this Subcontract shall be for the sole use of and become the exclusive property of the Buyer. Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film or photograph concerning any aspect of work performed under this contract shall be published or disseminated through any media without the prior written authorization of the Buyer. These obligations do not cease upon the expiration or termination of this contract. The Subcontractor shall include the substance of this provision in all contracts of employment and in all subcontracts hereunder.

## ARTICLE 11.
## PAYMENT AND INVOICING

11.1    The Subcontractor shall be paid for performance hereunder in accordance with the terms of payment of this Subcontract, upon submission of proper invoices and Buyer approval.  The payment terms are Net 45 days from (a) Buyer receipt of Subcontractor invoice and (b) delivery of acceptable services (see Article 12 herein).

11.2    Each Task Order shall be invoiced in accordance with the terms and payment schedule established in the Task Order.  The parties' agreement to any rates, terms, costs or fees for one Task Order shall not be deemed to constitute agreement to the same rates, costs or fees for any other Task Order.

11.3    The Subcontractor shall invoice monthly and separately against each Task Order issued. ·Each invoice shall reference the Subcontract and Task Order number, applicable CLIN, quantity provided, rate per labor classification, total current invoice amount, and cumulative billings to date.

11.4    The original and one (1) copy of each invoice shall be submitted by mail for approval to the following:

> DynCorp International FZ-LLC
> Bldg. No. 15, Suite 105
> P.O. Box 500367
> Dubai Internet City, UAE
> Attn: Sanjay Wadhwani

> And

One (1) copy of each invoice shall be submitted by fax or mail for approval to the designated representative for acceptance of services as identified in the Task Order

11.5    Terms of payment are net 45 days. Payments shall be made electronically to Subcontractor's account, and shall be deemed "paid" when received in the account:

> Worldwide Network Services
> 1130 Connecticut Ave. NW Suite 125
> Washington DC 20036
> Branch - Citibank, Washington DC
> Account # 15236137
> ABA# 254070116

WWNS04-001                          Page 12 of 44
16 February 2004


DynCorp
WWNS

11.6   Discrepancies in invoices may result in a delay of payment pending resolution of discrepancy(s).

## ARTICLE 12.
## ACCEPTANCE

Acceptance of services on each Task Order shall be made by the Program Manager or Business Manager, or their designated representatives.

## ARTICLE 13.
## SEVERABILITY

If any provision or portion thereof of this Subcontract is held to be invalid under any applicable statute or rule of law, it shall be, to that extent, deemed omitted without invalidating the remaining portions of this Subcontract.

## ARTICLE 14.
## WAIVER

Any failure on either party's part to carry out any condition, requirement, term or part of this subcontract shall not act as a waiver with respect to any recurrence of such failure, or with respect to a failure to carry out any other condition, term or part.  The Buyer shall not be deemed to have waived any condition, requirement, term or part hereof unless such waiver is in writing.

## ARTICLE 15.
## MODIFICATIONS AND NOTICES

15.1          No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this Subcontract.  Sole authority to issue change orders and modifications to this Subcontract is vested in the authorized negotiators designated in paragraph 15.2. below.

15.2   Authorized Negotiators:  Vice President, Business Management, Michael J. Thorne
                                Sr. Director, Contracts Administration, Timothy J. Crawley

15.3  Any notices to be furnished by either party shall be sent as follows:

**To Buyer:**

DynCorp International LLC
8445 Freeport Parkway, Suite 400
Irving, TX 75063-2522
Attention: Contract Manager CIVPOL

**To Subcontractor:**

Worldwide Network Services, Inc.
1130 Connecticut Ave NW, Suite 425
Washington, DC  20036
Attn:  Walter Gray, President


Either party may change its address for notice by providing written notice to the other party, in accordance with this sub article.


## ARTICLE 16.
## SUBCONTRACT CLAUSES

EXHIBIT C incorporates and includes government flow-down clauses by reference, with the same force and effect as if they were given in full text.  Whenever the word "U.S. Government" is stated as the Buyer, substitute the word "DynCorp" or "Buyer".  For the word "Contracting Officer", substitute "Buyer" or "Buyer's Representative".  Whenever the word "Contractor" is stated as the Seller, substitute the word "WWNS" or "Subcontractor".


## ARTICLE 17.
## ENTIRE AGREEMENT

This Subcontract constitutes the entire agreement between Buyer and Subcontractor regarding this procurement and supersedes all previous written or oral agreements and commitments. No terms or conditions of sale set forth in Subcontractor's quotation or acknowledgment shall be included as a part hereof, nor shall any prior course of dealing, custom, or usage in the trade supersede or modify any Task Order provisions.  Any subsequent additions, deletions or modifications to this agreement shall not be binding upon the parties unless same are mutually agreed upon and incorporated herein in writing.

DynCorp
WWNS 

IN WITNESS HEREOF, the parties hereto have executed this Indefinite Delivery/Indefinite Quantity Subcontract as of the dates set forth below:

**DynCorp International LLC**

By: _____

Name: Timothy J. Crawley

Title:  Sr. Director, Contracts Admin.

Date:  12 November 2004

**Worldwide Network Services, Inc.**

By: _____

Name:  Walter Gray

Title:  President

Date: 12 November 2004

DynCorp
WWNS

# Exhibit A
# Statement of Work

The Subcontractor shall provide communication and IT services to the BUYER in the area of performance to include Iraq and surrounding areas. The Subcontractor's responsibilities under this Subcontract may include, but are not limited to, the following areas of performance:

A. IT Services:

1. Internet Connection
   a. VSAT Equipment Procurement
   b. Bandwidth
      i. Initial connection costs
      ii. Monthly reoccurring costs
   c. Installation

2. Facility Infrastructure
   a. IT Hardware,
   b. Laptops Procurement
   c. Portable Printers
   d. Laptops Procurement
   e. Portable Printers
   f. Cabling, Spare Cartridges, Flash (256) Memory Cards, UPS for each computer
   g. Wireless Network Hardware Procurement
   h. Installation

3. Voice over IP
   a. Hardware Procurement
   b. Software
   c. Bandwidth
   d. Installation and Implementation
   e. Recurring costs based upon usage

B. Voice Communications:

1. Radio Network
   a. VHF, (Base to Hand-Held Usage)
      i. Equipment procurement
      ii. Project Design
      iii. Installation

   b. HF, (Base to Base & Base to Vehicle Usage) Long distant carrier
      i. Equipment Procurement
      ii. Project Design

                    iii.      Installation

                    iv.      Integration & Crossover from VHF to HF Communications

    c.  Engineering, Design & Implementation

2.    Thuraya Mobile Phones
    a.  Mobile Phones
    b.  Base Phones (to work inside buildings)
    c.  Equipment procurement
    d.  Monthly recurring usage

## C.  Compound Video Surveillance:

1.    Hardware
2.    Software
3.    Integration
4.    Installation
5.    Repair

## D. Technical services as required.

## E. In-Country Regional Repair Facilities

1.  Computers and communication equipment
    a.  Six (6) day a week walk-in repair and replacement facility
    b.  Emergency 24/7 repair capability on site



Empowering You in a Changing World

October 4, 2006

**By Electronic Mail and Federal Express**

DynCorp International LLC
8445 Freeport Parkway, Suite 400
Irving, TX 75063
ATTN: Dion Duarte, CivPol Contracts Administrator

RE:        Claim Under Subcontract No. WWNS04-001-CIV
           Worldwide Network Services, LLC

Ladies and Gentlemen:

This letter constitutes a claim arising under and relating to the referenced subcontract agreement
("CIVPOL Subcontract") between Worldwide Network Services, LLC ("WWNS") and DynCorp
International, LLC ("DI"). WWNS seeks a good faith, mutual effort to resolve the issues raised
in this claim, but is prepared to initiate arbitration under Clause 10.9.2 of the Subcontract if
resolution is not possible.

<u>Breach of Contract Claim</u>

The following actions and inactions by DI constitute material breaches of the Subcontract and
the task orders/purchase orders ("PO"s) issued under the Subcontract.

      A.      Failure to make payment

      DynCorp has failed and refused to make payment on the invoices listed on Exhibit 1,
each of which was properly submitted by WWNS, and covers work properly performed by
WWNS under the purchase orders issued by DynCorp. DynCorp has provided no explanation
for its refusal to make payment, and WWNS is aware of none. Payment on each of these
invoices is substantially past due. DynCorp's actions constitute a material breach of the
Subcontract and the POs, causing damage to WWNS in the amount of $6,095,254.22.



*Empowering You in a Changing World*

B.  Bad Faith Constructive Termination; Violation of Covenant of Good Faith and Fair Dealing

For the time period beginning February 11, 2006, DynCorp issued purchase orders to WWNS for technical support services, third-party services, materials and equipment in connection with a number of CIVPOL programs.  More particularly, DynCorp issued the following purchase orders (among others):

| | | |
|---|---|---|
| AEF 5001AP | AEF 5001BP | AEF 5001CP |
| AEF 5156P | APP 5082P | APP 5237P |
| APP 5083P | CPAPP 002 | CPAPP 004 |
| CPAPP 005 | CPPEP 014 | CPPEP 015 |
| PEP 5055P | PEP 5056P | AWL 5048P |
| AWL 5045P | CPAWL 005 | CPIR 8025P |
| CPIR 7157P | CPIR 8018P | CPIR 8017P |
| WRA 007 | | |

These purchase orders were generally follow-ons to previous POs for the same technical support and third party services, and similar materials/equipment.  The performance period of these POs as extended was February 11, 2006 through August 11, 2006, or, in the case of certain work in Afghanistan, through September and/or October 9.[1]

While WWNS was still performing under the previous POs in Iraq, (i.e., the period from August 11, 2005 through February 11, 2006), DynCorp made two significant personnel changes that turned out to have major consequences.  First, Dyncorp replaced Ms. Patricia Hicks, the DynCorp IT Director in Iraq, with Mr. Leon DeBeers.  On information and belief, Mr. DeBeers' background was in providing physical security; he had previously served as a policeman in South Africa. Second, in November 2005, Dyncorp assigned Mr. Walter Merrick to serve as the DynCorp Project Manager for CIVPOL in Iraq.

It is apparent to WWNS that Mr. Merrick was sent to Iraq with specific instructions to "get rid of WWNS."  Mr. Merrick was assisted in this effort by other DynCorp employees, including but not limited to Mr. DeBeers.  The actions taken by Mr. Merrick, Mr. DeBeers and others during the period November 2005 through August 2006 were clearly intended to prevent WWNS from properly performing under its contracts.  WWNS believes that these actions were taken in order to deflect responsibility for DI's own failures and deficiencies in the eyes of the State Department and/or to justify a default termination of WWNS.[2]  For example:

- Once Mr. Merrick arrived in Iraq in November 2005, Dyncorp refused to allow WWNS personnel to attend daily and weekly planning and informational meetings. Prior to Mr. Merrick's arrival, WWNS personnel had been invited to attend, and did participate in such meetings.  The result of Mr. Merrick's edict was that WWNS was

---

[1]    In general, the initial purchase orders were issued for a one-month period.  Thereafter, they were extended on a month-by-month basis, retroactively.

[2] Additionally, WWNS believes that DynCorp took certain actions due to racial animus toward WWNS and its co-founders.  To that end, WWNS has filed a complaint in the District Court for the District of Columbia alleging, *inter alia*, violation of 42 U.S.C. § 1981.



barred from participating in planning relating to the work that had been assigned to WWNS; in addition, WWNS had no knowledge concerning the planning, if any, that had occurred concerning its assignments. Without this information, WWNS *could not* efficiently or effectively satisfy the needs of the mission, and WWNS was compelled to operate in the dark with regard to specifics regarding its assigned tasks.

• Upon Mr. Merrick's arrival in Iraq, DynCorp's previously occasional practice of issuing oral directions rather than written directions as required under the contract, became routine. After November 2005, Mr. DeBeers frequently issued oral directions, and frequently orally changed directions; then, when WWNS attempted to take action based on those oral directions, Mr. DeBeers issued new directions or denied that he had issued any directions at all. Faced with this Dyncorp conduct, WWNS repeatedly attempted to insist that DI provide written directions as a follow-up to its oral directions, as required under the contract. DI not only rebuffed these legitimate WWNS efforts, but also unreasonably deemed WWNS' failure to take action based on oral directions to be "uncooperative" and "irresponsible." The result of DI's refusal to issue directions in writing was that WWNS was often forced to perform work at its own risk – a risk that has now become a reality.

• DynCorp failed to provide the most fundamental level of cooperation in obtaining badges for WWNS personnel. Such badges are required for all personnel in order to gain access to any worksite in Iraq. As a subcontractor, WWNS literally could not obtain the necessary badges for its personnel without the active cooperation of DynCorp; however, such cooperation was completely absent after November 2005. From that point on, DI typically reported that WWNS' applications for badges and renewals were "lost," or were "tied up in the system," or had been "filled out incorrectly." Moreover, such badges as were eventually issued, effectively prevented WWNS personnel from performing their jobs. For example, the new badges improperly restricted WWNS personnel to the International Zone, even though they were required by contract to travel all over Iraq; or the badges were good for less than a week, at which point those individuals had to begin the lengthy badging process all over again.

Notwithstanding DI's responsibility for WWNS' inability to obtain necessary badges, both Mr. Merrick and Mr. DeBeers constantly accused WWNS of failing to properly perform. They also, unjustifiably and without basis, blamed WWNS when IPLOs at the FOBs complained about a lack of proper communications and IT support, even though they well knew that the fault was not WWNS'.

• By July 2006, the only remaining WWNS personnel who had valid badges were American citizens and a couple of New Zealanders. DynCorp then -- abruptly and without explanation -- directed WWNS to remove these individuals from Iraq. In at least three cases, DI issued this directive at the point of a gun, after DI had placed these individuals under house arrest, again with no explanation. By way of example only and without limitation, Dyncorp ordered one of these individuals, Mack McCorkindale, a New Zealand citizen, to leave Iraq on 24 hours' notice. This order was issued because, when Mr. DeBeers demanded to see all of WWNS' employment



*Empowering You in a Changing World*

agreements with its employees, Mr. McCorkindale explained that these agreements were proprietary to WWNS and that Mr. DeBeers would have to speak to the WWNS home office in order to see them. When Mr. DeBeers asked him on what authority he was refusing Mr. DeBeers' request, Mr. McCorkindale explained that he worked for WWNS and that he had an obligation to protect confidential WWNS information. This apparently so incensed Mr. DeBeers that he ordered Mr. McCorkindale to leave Iraq within 24 hours.

- The arbitrary and abrupt DI-ordered departure of these WWNS employees from Iraq left WWNS without any supervisory-level personnel in Iraq, and made any remaining performance under the POs virtually impossible. Although WWNS repeatedly instructed its remaining employees to continue to try to do their jobs, most individuals were unable to do so, due to lack of supervision, lack of badges, or because, in view of DI's treatment of other WWNS employees, they took steps on their own to leave Iraq.

- On or about August 2, DynCorp orally notified all remaining WWNS personnel in Iraq (a) that WWNS was to cease providing all services under the PO; and (b) that from that point forward WWNS personnel were barred from their business offices within the DynCorp facility. Counsel for WWNS immediately attempted to contact counsel for DynCorp by telephone to obtain an explanation for these actions, but counsel for DynCorp did not respond. Counsel for WWNS submitted a written request for confirmation that the contract had been terminated. DynCorp personnel responded with a letter announcing that WWNS was in breach because its personnel were improperly stopping work, an assertion that would have been laughable under the circumstances if its consequences were not so serious.

These actions, and others, by DynCorp constitute a knowing, material and willful violation of the covenant of good faith and fair dealing that is fundamental to every contract. These actions, and others, also constituted a bad faith and wrongful constructive termination of the purchase orders and Subcontract agreement.

This wrongful conduct was replicated in connection with WWNS' work on the CIVPOL program in Afghanistan. In Afghanistan as in Iraq, DI's actions and inactions frustrated WWNS' efforts to perform and impeded WWNS' ability to meet its contractual obligations.

WWNS has been damaged by these actions in an amount no less than $6,095,254.22.

### Theft and Conversion – Personal Property

As noted above, DI directed a number of WWNS employees to leave Iraq abruptly in July and early August 2006. At gunpoint, DI's security personnel directed these WWNS employees to turn over their badges, weapons, armor and body protection, and equipment. WWNS employees did so, but informed the DI security personnel that certain equipment, including the equipment listed on Exhibit 2, were the property of WWNS and did not belong to DI. The DI personnel nevertheless, at gunpoint, took the equipment that belonged to WWNS. That equipment has not been returned.



*Empowering You in a Changing World*

DI has thus stolen and converted equipment belonging to WWNS. WWNS has been damaged in the estimated amount of $80,712.00, the value of the equipment that were stolen by DI and converted.

********************

In accordance with the terms of the parties' subcontract agreement, WWNS seeks an immediate opportunity to participate in a good faith discussion of this claim. Your failure to respond in writing within ten (10) calendar days of receipt of this letter will be regarded as a refusal to comply with the requirements of Clause 10.9.2 of the CIVPOL Subcontract, such that WWNS will be entitled to proceed directly to arbitration.

Very truly yours,

Walter L. Gray, President
Worldwide Network Services, LLC

cc:    Michele Roberts, Esq.
       Patricia H. Wittie, Esq.
       Richard Cashon
       Helena Tyrone

 **WWNS**
Worldwide Network Services, LLC

*Empowering You in a Changing World*

## EXHIBIT 1

## SEE ATTACHEMENT

Date:
Date to Age by: 10/02/2006
Customer Account: DYNCORP  DynCorp International LLC

VWINS LLC
Accounts Receivable Aging Report
10/02/2006

| DYNCORP PO# | | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|---|
| AEP0001AP | DYNCORP | INV-1414 | 6/14/2006 | 0.00 | 0.00 | 0.00 | 111,174.22 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1418 | 6/15/2006 | 0.00 | 0.00 | 0.00 | 9,273.33 | 9,273.33 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1429 | 7/3/2006 | 0.00 | 0.00 | 111,174.22 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1449 | 7/5/2006 | 0.00 | 0.00 | 111,174.22 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1453 | 7/6/2006 | 0.00 | 0.00 | 2,433.14 | 0.00 | 2,433.14 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1449 | 7/11/2006 | 0.00 | 0.00 | 1,606.34 | 0.00 | 1,606.34 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1454 | 8/2/2006 | 0.00 | 111,174.22 | 0.00 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1561 | 8/17/2006 | 0.00 | 5,786.42 | 0.00 | 0.00 | 5,786.42 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1569 | 8/17/2006 | 0.00 | 111,174.22 | 0.00 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1589 | 9/6/2006 | 111,174.22 | 0.00 | 0.00 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1594 | 9/21/2006 | 111,174.22 | 0.00 | 0.00 | 0.00 | 111,174.22 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1617 | 9/29/2006 | 3,341.83 | 0.00 | 0.00 | 0.00 | 3,341.83 | CIVPOL-ASF | AFGHANISTAN |
| AER0001AP | DYNCORP | INV-1621 | 9/29/2006 | 1,185.84 | 0.00 | 0.00 | 0.00 | 1,185.84 | CIVPOL-ASF | AFGHANISTAN |
| AEP0001AP | DYNCORP | INV-1453 | 7/2/2006 | 0.00 | 0.00 | 318,351.90 | 0.00 | 318,351.90 | CIVPOL-ASF | AFGHANISTAN |
| AEP001CP | DYNCORP | INV-1440 | 7/5/2006 | 0.00 | 0.00 | 869.06 | 0.00 | 869.06 | CIVPOL-ASF | AFGHANISTAN |
| AEP001CP | DYNCORP | INV-1502A | 6/19/2006 | 0.00 | 0.00 | 6,884.09 | 0.00 | 6,884.09 | CIVPOL-ASF | AFGHANISTAN |
| AEP001CP | DYNCORP | INV-50931 | 6/9/2006 | 0.00 | 0.00 | 4,109.89 | 0.00 | 4,109.89 | CIVPOL-ASF | AFGHANISTAN |
| AEP001RP | DYNCORP | INV-1597 | 7/11/2006 | 0.00 | 0.00 | 156.19 | 0.00 | 156.19 | CIVPOL-ASF | AFGHANISTAN |
| AEP001RP | DYNCORP | INV-1480 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 845.66 | 845.66 | CIVPOL-ASF | AFGHANISTAN |
| AEP001RP | DYNCORP | INV-1399 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 345.38 | 345.38 | CIVPOL-ASF | AFGHANISTAN |
| AEP15/9P | DYNCORP | INV-1236 | 4/6/2006 | 0.00 | 0.00 | 0.00 | 49,491.07 | 49,491.07 | CIVPOL-ASF | AFGHANISTAN |
| AEP15/9P | DYNCORP | INV-1328 | 6/12/2006 | 0.00 | 0.00 | 79,507.82 | 0.00 | 79,507.82 | CIVPOL-ASF | AFGHANISTAN |
| AEP515P | DYNCORP | INV-1401 | 6/13/2006 | 0.00 | 0.00 | 2,762.85 | 0.00 | 2,762.85 | CIVPOL-ASF | AFGHANISTAN |
| AEP513P | DYNCORP | INV-1438 | 7/2/2006 | 0.00 | 0.00 | 52,773.81 | 0.00 | 52,773.81 | CIVPOL-ANP | AFGHANISTAN |
| AEP536P | DYNCORP | INV-1489 | 7/11/2006 | 0.00 | 0.00 | 2,808.57 | 0.00 | 2,808.57 | CIVPOL-ANP | AFGHANISTAN |
| AEP536P | DYNCORP | INV-1428 | 6/22/2006 | 0.00 | 0.00 | 0.00 | 2,070.54 | 2,070.54 | CIVPOL-ANP | AFGHANISTAN |
| APP233P | DYNCORP | INV-1457 | 7/11/2006 | 0.00 | 0.00 | 22,567.47 | 0.00 | 22,567.47 | CIVPOL-ANP | AFGHANISTAN |
| APP233P | DYNCORP | INV-1482 | 11/22/2006 | 0.00 | 0.00 | 145,221.11 | 0.00 | 145,221.11 | CIVPOL-ANP | AFGHANISTAN |
| APP0052P | DYNCORP | INV-4772 | 11/22/2006 | 0.00 | 0.00 | 0.00 | -145,221.10 | -145,221.10 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP044 | DYNCORP | INV-0820 | 6/14/2006 | 0.00 | 0.00 | 0.00 | -49,489.32 | -49,489.32 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-1421 | 7/2/2006 | 0.00 | 146,221.11 | 0.00 | 145,221.11 | 145,221.11 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-0820 | 7/2/2006 | 0.00 | 145,221.11 | 0.00 | 0.00 | 145,221.11 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-0822 | 7/5/2006 | 0.00 | 0.00 | 145,221.11 | 0.00 | 145,221.11 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-0824 | 8/2/2006 | 0.00 | 0.00 | 6,511.64 | 0.00 | 6,511.64 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-0826 | 8/17/2006 | 0.00 | 0.00 | 7,191.46 | 11,440.17 | 11,440.17 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-4824 | 8/2/2006 | 0.00 | 0.00 | 7,191.46 | 0.00 | 7,191.46 | CIVPOL-APPMOI | AFGHANISTAN |
| CPAPP002 | DYNCORP | INV-0826 | 8/17/2006 | 0.00 | 145,221.11 | 0.00 | 0.00 | 145,221.11 | CIVPOL-APPMOI | AFGHANISTAN |

C:\Documents and Settings\willemjj\Documents\WINS\Confidential\CONFIDENTIAL AND PRIVILEGED ATTORNEY\CONFIDENTIAL-WINS LLC-DIPO2-CIVPOL-INVOICES-Final-DynCorp-NAAR Aging Response Oct 2, 2006-10.02.2006

10/2/2006 at 4:34 PM

**WWINS LLC**
**Accounts Receivable Aging Report**

| Date: | 10/02/2006 | | | | | | | | | 10/02/2006 |
| Date to Age by: 10/02/2006 | | | | | | | | | | |
| Customer Account: DYNCORP  DynCorp International LLC | | | | | | | | | | |

| DYNCORP PO# | | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|---|
| CPAP002 | DYNCORP | INV-0827 | 9/8/2006 | 145,224.11 | 0.00 | 0.00 | 0.00 | 145,224.11 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-0584 | 9/17/2006 | 0.00 | 17,848.80 | 0.00 | 0.00 | 17,848.80 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-0622 | 9/29/2006 | 14,111.01 | 0.00 | 0.00 | 0.00 | 14,111.01 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP006 | DYNCORP | INV-0519 | 8/3/2006 | 0.00 | 0.00 | 0.00 | 217,550.276 | 217,550.276 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP006 | DYNCORP | INV-0408 | 7/11/2006 | 0.00 | 0.00 | 215,400.00 | 0.00 | 215,400.00 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP005 | DYNCORP | INV-0625 | 8/2/2006 | 0.00 | 217,550.276 | 0.00 | 0.00 | 217,550.276 | CNPOL_APPMOI | AFGHANISTAN |
| CPAP004 | DYNCORP | INV-12048 | 8/28/2006 | 0.00 | 31,482.60 | 0.00 | 0.00 | 31,482.60 | CNPOL_APPMOI | AFGHANISTAN |
| CPBPW14 | DYNCORP | INV-1590 | 9/5/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| CPBPW14 | DYNCORP | INV-1571 | 8/17/2006 | 0.00 | 4,328.05 | 0.00 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| CPFPW14 | DYNCORP | INV-1482 | 7/5/2006 | 0.00 | 0.00 | 4,328.05 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| CPFPW14 | DYNCORP | INV-1480 | 7/5/2006 | 0.00 | 0.00 | 4,328.05 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| CPFPW14 | DYNCORP | INV-1458 | 7/11/2006 | 0.00 | 0.00 | 5,995.51 | 0.00 | 5,995.51 | CNPOL_PEP | AFGHANISTAN |
| CPFPW15 | DYNCORP | INV-1473 | 7/11/2006 | 0.00 | 0.00 | 2,851.70 | 0.00 | 2,851.70 | CNPOL_PEP | AFGHANISTAN |
| CPFPW14 | DYNCORP | INV-1605 | 9/26/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1595 | 9/21/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1597 | 9/21/2006 | 17,350.57 | 0.00 | 0.00 | 0.00 | 17,350.57 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1598 | 8/21/2006 | 17,350.57 | 0.00 | 0.00 | 0.00 | 17,350.57 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1600 | 8/21/2006 | 0.00 | 285,062.34 | 0.00 | 0.00 | 285,062.34 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1594 | 9/7/2006 | 88,449.70 | 0.00 | 0.00 | 0.00 | 88,449.70 | CNPOL_PEP | AFGHANISTAN |
| PEP005P | DYNCORP | INV-1592 | 8/31/2006 | 7,855.72 | 0.00 | 0.00 | 0.00 | 7,855.72 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1826 | 10/12/2006 | 17,350.57 | 0.00 | 0.00 | 0.00 | 17,350.57 | CNPOL_PEP | AFGHANISTAN |
| PEP006P | DYNCORP | INV-1599 | 9/21/2006 | 17,350.57 | 0.00 | 0.00 | 0.00 | 17,350.57 | CNPOL_PEP | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1391A | 8/28/2006 | 0.00 | 658.26 | 0.00 | 0.00 | 658.26 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1407 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 13,957.19 | 13,957.19 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1412 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 11,531.54 | 11,531.54 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1413 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 5,974.39 | 5,974.39 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1425 | 6/22/2006 | 0.00 | 0.00 | 0.00 | 2,470.87 | 2,470.87 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1523 | 7/21/2006 | 0.00 | 0.00 | 392.21 | 0.00 | 392.21 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_004P | DYNCORP | INV-1522 | 7/21/2006 | 0.00 | 0.00 | 0.00 | 3,482.40 | 3,482.40 | CNPOL_WET_LEASE | AFGHANISTAN |
| AMK_005P | DYNCORP | INV-1416 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 9,773.91 | 9,773.91 | CNPOL_WET_LEASE | AFGHANISTAN |
| CPMM_005 | DYNCORP | INV-1422 | 6/16/2006 | 0.00 | 0.00 | 0.00 | 1,307.36 | 1,307.36 | CNPOL_WET_LEASE | AFGHANISTAN |
| CPMM_005 | DYNCORP | INV-1451 | 7/2/2006 | 0.00 | 0.00 | 9,773.91 | 0.00 | 9,773.91 | CNPOL_WET_LEASE | AFGHANISTAN |
| CPMM_005 | DYNCORP | INV-1451 | 7/5/2006 | 0.00 | 0.00 | 9,773.91 | 0.00 | 9,773.91 | CNPOL_WET_LEASE | AFGHANISTAN |

Date: 10/02/2006

WWINS LLC
Accounts Receivable Aging Report

10/02/2006

Customer Account: DYNCORP DynCorp International LLC

| DYNCORP PO# | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|
| CPAML005 | DYNCORP | INV-1466 | 7/6/2006 | 0.00 | 0.00 | 0.00 | 653.58 | 653.58 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1485 | 7/11/2006 | 0.00 | 0.00 | 0.00 | 653.58 | 653.58 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1495 | 8/2/2006 | 0.00 | $773.01 | 0.00 | 0.00 | 9,773.01 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1566 | 8/17/2006 | 0.00 | 1,307.72 | 0.00 | 0.00 | 1,307.72 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1570 | 8/17/2006 | 0.00 | 9,773.01 | 0.00 | 0.00 | 9,773.01 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1591 | 9/7/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1596 | 9/21/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1619 | 9/29/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1623 | 9/29/2006 | 1,307.36 | 0.00 | 0.00 | 0.00 | 1,307.36 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1624 | 9/29/2006 | 653.58 | 0.00 | 0.00 | 0.00 | 653.58 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1392 | 5/22/2006 | 0.00 | 0.00 | 0.00 | 9,890.03 | 9,890.03 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1455 | 7/3/2006 | 0.00 | 0.00 | 9,860.61 | 0.00 | 9,860.61 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1544 | 8/2/2006 | 0.00 | 9,860.03 | 0.00 | 0.00 | 9,860.03 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1538 | 9/7/2006 | 9,890.03 | 0.00 | 0.00 | 0.00 | 9,890.03 | CHPOL WET LEASE | AFGHANISTAN |
| CPAML005 | DYNCORP | INV-1665 | 9/29/2006 | 9,890.03 | 0.00 | 0.00 | 0.00 | 9,890.03 | CHPOL WET LEASE | AFGHANISTAN |
| CPELAP0.000 | DYNCORP | INV-0701 | 8/23/2006 | 42,096.67 | 0.00 | 0.00 | 0.00 | 42,096.67 | CHEPIAP | AFGHANISTAN |
| | | | | 1,047,388.91 | 1,043,076.53 | 1,196,658.09 | 240,416.16 | 3,520,536.59 | | AFGHANISTAN Total |
| CVPLIRQ,IRQUMSO0000 | DYNCORP | INV-1285 | 3/30/2006 | 0.00 | 0.00 | 0.00 | 42,317.87 | 42,317.87 | CHPOL IRAQ | IRAQ |
| CVPLIRQ,IRQUMSO0000 | DYNCORP | INV-1277 | 4/21/2006 | 0.00 | 0.00 | 0.00 | 63.37 | 63.37 | CHPOL IRAQ | IRAQ |
| CVPLIRQ,IRQUMSO0000 | DYNCORP | INV-1296B | 6/25/2006 | 0.00 | 8,667.74 | 0.00 | 0.00 | 8,667.74 | CHPOL IRAQ | IRAQ |
| CP260025P | DYNCORP | INV-1474 | 7/11/2006 | 0.00 | 0.00 | 100,462.01 | 0.00 | 100,462.01 | CHPOL IRAQ | IRAQ |
| CP260025P | DYNCORP | INV-075 | 5/2/2006 | 0.00 | 0.00 | 9,737.38 | 0.00 | 9,737.38 | CHPOL IRAQ | IRAQ |
| CP260025P | DYNCORP | INV-1522 | 9/29/2006 | 45,995.43 | 0.00 | 0.00 | 0.00 | 45,995.43 | CHPOL IRAQ | IRAQ |
| CP680025P | DYNCORP | INV-1623 | 9/29/2006 | 38,619.78 | 0.00 | 0.00 | 0.00 | 38,619.78 | CHPOL IRAQ | IRAQ |
| CP680025P | DYNCORP | INV-1623 | 9/29/2006 | 27,886.10 | 0.00 | 0.00 | 0.00 | 27,886.10 | CHPOL IRAQ | IRAQ |
| CP680025P | DYNCORP | INV-1630 | 9/29/2006 | 59,883.56 | 0.00 | 0.00 | 0.00 | 59,883.56 | CHPOL IRAQ | IRAQ |
| CP680025P | DYNCORP | INV-1631 | 9/29/2006 | -174,123.01 | 0.00 | 0.00 | 0.00 | -174,123.01 | CHPOL IRAQ | IRAQ |
| CP680025P | DYNCORP | INV-1632 | 9/29/2006 | 58,734.03 | 0.00 | 0.00 | 0.00 | 58,734.03 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1521 | 7/21/2006 | 0.00 | 0.00 | 11,145.16 | 0.00 | 11,145.16 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1402 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 36,791.06 | 36,791.06 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1402 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 2,968.44 | 2,968.44 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1327 | 5/30/2006 | 0.00 | 0.00 | 0.00 | 31,236.67 | 31,236.67 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1303 | 5/4/2006 | 0.00 | 0.00 | 0.00 | 4,991.48 | 4,991.48 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1407 | 6/13/2006 | 0.00 | 0.00 | 4,828.04 | 0.00 | 4,828.04 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1327 | 5/30/2006 | 0.00 | 0.00 | 9,152.97 | 0.00 | 9,152.97 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1521 | 7/21/2006 | 0.00 | 0.00 | 5,916.52 | 0.00 | 5,916.52 | CHPOL IRAQ | IRAQ |
| CPR071SFP | DYNCORP | INV-1328 | 5/30/2006 | 0.00 | 0.00 | 0.00 | 58,324.59 | 58,324.59 | CHPOL IRAQ | IRAQ |

Date: 10/02/2006

**WINNS LLC**
**Accounts Receivable Aging Report**

11/02/2006

Date to Age by: 10/02/2006

Customer Account: DYNCORP DynCorp International LLC

**DYNCORP-PGS**

| | | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|---|
| CPBXX025P | DYNCORP | INV-1633 | 10/2/2006 | 17,525.19 | 0.00 | 0.00 | 0.00 | 17,525.19 | CHPOL RAQ | RAQ |
| CPBXX030P | DYNCORP | INV-1534 | 10/2/2006 | 23,477.11 | 0.00 | 0.00 | 0.00 | 23,477.11 | CHPOL RAQ | RAQ |
| CPBXX029P | DYNCORP | INV-1617 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 316,522.22 | 316,522.22 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1620 | 8/15/2006 | 0.00 | 0.00 | 0.00 | 16,242.76 | 16,242.76 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1432 | 7/3/2006 | 0.00 | 0.00 | 0.00 | 316,522.22 | 316,522.22 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1452 | 7/26/2006 | 0.00 | 0.00 | 0.00 | 317,417.92 | 317,417.92 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1454 | 7/8/2006 | 0.00 | 0.00 | 0.00 | 12,067.68 | 12,067.68 | RAQ |  |
| CPBXX018P | DYNCORP | INV-1465 | 7/11/2006 | 0.00 | 0.00 | 0.00 | 12,067.68 | 12,067.68 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1494 | 8/20/2006 | 0.00 | 316,522.22 | 0.00 | 0.00 | 316,522.22 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1555 | 8/16/2006 | 0.00 | 5,375.56 | 0.00 | 0.00 | 5,375.56 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1556 | 8/16/2006 | 0.00 | 7,334.26 | 0.00 | 0.00 | 7,334.26 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1557 | 8/16/2006 | 0.00 | 9,882.26 | 0.00 | 0.00 | 9,882.26 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1558 | 8/16/2006 | 0.00 | 1,914.26 | 0.00 | 0.00 | 1,914.26 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1559 | 8/16/2006 | 0.00 | 220,485.56 | 0.00 | 0.00 | 220,485.56 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1560 | 8/16/2006 | 0.00 | 24,173.32 | 0.00 | 0.00 | 24,173.32 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1561 | 8/16/2006 | 0.00 | 9,288.36 | 0.00 | 0.00 | 9,288.36 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1562 | 8/17/2006 | 0.00 | 4,056.38 | 0.00 | 0.00 | 4,056.38 | CHPOL RAQ | RAQ |
| CPBXX018P | DYNCORP | INV-1563 | 8/17/2006 | 0.00 | 756.79 | 0.00 | 0.00 | 756.79 | RAQ |  |
| CPBXX018P | DYNCORP | INV-1567 | 8/17/2006 | 0.00 | 4,272.92 | 0.00 | 0.00 | 4,272.92 | CHPOL RAQ | RAQ |
| CPBXX030P | DYNCORP | INV-1599 | 8/17/2006 | 0.00 | 3,914.40 | 0.00 | 0.00 | 3,914.40 | CHPOL RAQ | RAQ |
| CPBXX007P | DYNCORP | INV-1637 | 7/3/2006 | 0.00 | 0.00 | 325,546.41 | 0.00 | 325,546.41 | CHPOL RAQ | RAQ |
| CPBXX007P | DYNCORP | INV-1585 | 8/3/2006 | 0.00 | 115,446.21 | 0.00 | 0.00 | 115,446.21 | CHPOL RAQ | RAQ |
| CVPL_IRQ_AQUAERCONN | DYNCORP | INV-1284 | 4/11/2006 | 0.00 | 0.00 | 0.00 | 38,910.76 | 38,910.76 | CHPOL RAQ | RAQ |
| WRAQ07 | DYNCORP | INV-1254 | 5/28/2006 | 0.00 | 0.00 | 0.00 | 128.13 | 128.13 | RAQ |  |
| WRAQ07 | DYNCORP | INV-1312 | 5/8/2006 | 0.00 | 0.00 | 0.00 | 812.15 | 812.15 | WRA |  |
| | | | | 173,082.19 | 798,548.59 | 1,773,999.46 | 2,307,201.03 | 6,108,466.44 | | |
| | | | | 173,082.19 | 798,548.59 | 1,773,999.46 | 2,307,201.03 | 6,108,466.44 | | |
| | | | | | | | 802,885.55 | 2,565,006.98 | IRAQ Total |  |
| | | | | | | | | 812.15 | WRA |  |
| | | | | 173,082.19 | 798,548.59 | 1,773,999.46 | 2,307,201.03 | 6,108,466.44 | Grand Total |  |

CVDocuments and Settings\confidentiality Documents\Rus\WVColdization\DCPA\DENTAL AND PRNLAGED-PAT WITTEG
COMPOSIT\LAWINIS LLC\WRPAID CHPOL INVOICES-FINAL-Options In\AR Aging Reports Oct 2, 2006-10.02.2006

10/2/2006 at 5:39 PM



Empowering You in a Changing World

## EXHIBIT 2

List of WWNS Property Stolen by DynCorp

| Description of Property | Quantity | Total Estimated Value | Remarks – Where the Equipment Was Located |
|---|---|---|---|
| Panasonic ToughBook 34 | 1 | $2,748.00 | Iraq |
| Panasonic Toughbook 29 | 1 | $3,245.00 | Iraq |
| 2110 Homeland Security Package (Codan HF Manpack) | 1 | $6,323.00 | Iraq |
| 2110 Homeland Security Package (Codan HF Manpack) | 1 | $6,323.00 | Afghanistan |
| Broadband dipole antenna (2-30 MHz) | 1 | $460.00 | Iraq |
| Broadband dipole antenna (2-30 MHz) | 1 | $460.00 | Afghanistan |
| System Programmer CD | 1 | $176.00 | Iraq |
| System Programmer CD | 1 | $176.00 | Afhanistan |
| Iridium 9505-A (includes AC travel charger) | 2 | $2700.00 | Iraq |
| Data Kit | 2 | $390.00 | Iraq |
| Fixed Mast antenna | 2 | $370.00 | Iraq |
| 10 meter cable kit | 2 | $380.00 | Iraq |
| 1000 minute card | 2 | 1,980.00 | Iraq |
| Cisco 7960 Phone | 2 | $1,100.00 | Iraq |
| Cisco ATA phone | 1 | $300.00 | Iraq |
| Power Cube and cord | 10 | $200.00 | Iraq |
| Poweredge 2850 2GB | 1 | $2438.00 | Iraq |
| Poweredge 2850 1GB | 1 | $2237.00 | Iraq |
| Windows Small Business Server (standard) | 1 | $455.00 | Iraq |
| Windows Small Business Server (Cal) | 7 | $2,821.00 | Iraq |
| Windows Small Business server (standard 2003 ENG disk kit) | 1 | $23.00 | Iraq |
| Codan Programming cables | 15 | $407.00 | Iraq |
| Spectrum Analyzer | 2 | $30,000.00 | Iraq |
| Spectrum Analyzer | 1 | $15,000.00 | Afghanistan |
| | TOTAL | $80,712.00 | |

1900 M Street NW, Suite 500, Washington, DC 20036
Phone: 202-293-0852, Fax: 202-293-0872

 **WWNS**
Worldwide Network Services, LLC

*Empowering You in a Changing World*

**EXHIBIT 2**

List of WWNS Property Stolen by DynCorp

| Description of Property | Quantity | Total Estimated Value | Remarks – Where the Equipment Was Located |
|---|---|---|---|
| Panasonic ToughBook 34 | 1 | $2,748.00 | Iraq |
| Panasonic Toughbook 29 | 1 | $3,245.00 | Iraq |
| 2110 Homeland Security Package (Codan HF Manpack) | 1 | $6,323.00 | Iraq |
| 2110 Homeland Security Package (Codan HF Manpack) | 1 | $6,323.00 | Afghanistan |
| Broadband dipole antenna (2-30 MHz) | 1 | $460.00 | Iraq |
| Broadband dipole antenna (2-30 MHz) | 1 | $460.00 | Afghanistan |
| System Programmer CD | 1 | $176.00 | Iraq |
| System Programmer CD | 1 | $176.00 | Afhanistan |
| Iridium 9505-A (includes AC travel charger) | 2 | $2700.00 | Iraq |
| Data Kit | 2 | $390.00 | Iraq |
| Fixed Mast antenna | 2 | $370.00 | Iraq |
| 10 meter cable kit | 2 | $380.00 | Iraq |
| 1000 minute card | 2 | 1,980.00 | Iraq |
| Cisco 7960 Phone | 2 | $1,100.00 | Iraq |
| Cisco ATA phone | 1 | $300.00 | Iraq |
| Power Cube and cord | 10 | $200.00 | Iraq |
| Poweredge 2850 2GB | 1 | $2438.00 | Iraq |
| Poweredge 2850 1GB | 1 | $2237.00 | Iraq |
| Windows Small Business Server (standard) | 1 | $455.00 | Iraq |
| Windows Small Business Server (Cal) | 7 | $2,821.00 | Iraq |
| Windows Small Business server (standard 2003 ENG disk kit) | 1 | $23.00 | Iraq |
| Codan Programming cables | 15 | $407.00 | Iraq |
| Spectrum Analyzer | 2 | $30,000.00 | Iraq |
| Spectrum Analyzer | 1 | $15,000.00 | Afghanistan |
| | **TOTAL** | **$80,712.00** | |



*Empowering You in a Changing World*

October 4, 2006

**By Electronic Mail and Federal Express**

DynCorp International LLC
1127 International Parkway
Suite 287
Fredericksburg, VA  22406
ATTN:  Mike Davis, Director of Business Operations, WPPS

DynCorp International LLC
8445 Freeport Parkway, Suite 400
Irving, TX  75063
ATTN:  Helena Tyrone, Contracts Administration

RE:        Subcontract No. WWNS04-002-WPPS
           Worldwide Network Services, LLC

Mr. Davis and Ms. Tyrone:

This letter constitutes a claim arising under and relating to the referenced subcontract agreement ("WPPS Subcontract") between Worldwide Network Services, LLC ("WWNS") and DynCorp International, LLC ("DI").  WWNS seeks a good faith, mutual effort to resolve the issues raised in this claim, but is prepared to pursue litigation under Clause 10.9.2 of the WPPS Subcontract if resolution is not possible.

We ask that you respond within ten days of receipt of this letter.

**Summary of Claim**

The claim is based on DI's unjustified refusal to make payment in accordance with the terms of the WPPS Subcontract for services properly performed and materials and equipment properly delivered.

**Failure to Make Payment**

Under the terms of the WPPS Subcontract, DI is to issue purchase orders (sometimes referred to as task orders) for specified labor, materials, equipment, or third-party services.  Over the term of the WPPS Subcontract DI issued two formal written Purchase Orders as well as multiple oral notices to proceed.[1]  WWNS fully performed under each of the POs and oral directions, but has not been paid for invoices totaling $684,556.06.

---

[1]        The oral notices to proceed were generally confirmed in emails and other correspondence between the Parties.  Despite these written confirmations, DI did not issue formal purchase orders other than WPPSI0560 and WPPS 0822.

**WWNS**
Worldwide Network Services, LLC

*Empowering You in a Changing World*

The Parties' agreed payment procedures are set forth at Article 11 of their Subcontract agreement. In particular, Article 11.1 states that payment is to be made "net 15 days" after DI receipt of an invoice and delivery of acceptable services. Article 11.3 states:

> 11.3 The Subcontractor [WWNS] shall invoice monthly and separately against each Task Order issued. Each invoice shall reference the Subcontract and Task Order number, applicable CLIN, quantity provided, rate per labor classification, total current invoice amount, and cumulative billings to date. **The Buyer [DI] shall review the submitted invoice and I/A/W [in accordance with] 11.6** determine if the invoice is acceptable. If the Buyer determines that the Invoice does not meet the requirements of this Article, the Parties shall deal in good faith to correct the invoice and resolve any discrepancies and minimize any delays in processing the invoice for payment. [Emphasis added.]

Article 11.6 states:

> Discrepancies in invoices may result in a delay of payment pending resolution of discrepancy(s). However, discrepancies not identified and relayed to WWNS within 5 work days of receipt by DynCorp may be deemed to be acceptable.

WWNS has submitted the following invoices for payment. DI has raised no objections to these invoices, and has identified no discrepancies in any of them, but WWNS has not been paid and payment is substantially overdue:

| Inv. No. | Date of Invoice | Due Date for Payment | Number of Days Past Due[2] | Amount |
|---|---|---|---|---|
| 1261 | 4/7/06 | April22, 2006 | 161 | $ 73,681.98 |
| 1262 | 4/21/06 | May 5, 2006 | 148 | $ 2,395.95 |
| 1267 | 4/11/06 | April26, 2006 | 157 | $ 6,863.59 |
| 1214 | 5/03/06 | May 18, 2006 | 135 | $ 95,522.83 |
| 1325 | 5/05/06 | May 20, 2006 | 133 | $ 81,214.62 |
| 1347 | 5/15/06 | May 30, 2006 | 123 | $ 42,092.62 |
| 1353 | 5/16/06 | May 31, 2006 | 122 | $ 2,651.02 |
| 1358 | 5/16/06 | May 31, 2006 | 122 | $ 2,584.98 |
| 1368 | 5/30/06 | June 14, 2006 | 108 | $ 42,092.62 |
| 1383 | 6/02/06 | June 17, 2006 | 105 | $ 95,522.83 |
| 1385 | 6/07/06 | June 22, 2006 | 100 | $ 31,899.34 |
| 1404 | 6/13/06 | June 28, 2006 | 94 | $ 302.13 |
| 1418 | 6/14/06 | June 29, 2006 | 93 | $ 42,092.62 |
| 1423 | 6/15/06 | June 30, 2006 | 92 | $ 1,307.36 |
| 1424 | 6/22/06 | July 7, 2006 | 85 | $ 468.03 |
| 1456 | 7/06/06 | July 21, 2006 | 71 | $ 326.84 |
| 1487 | 7/11/06 | July 26, 2006 | 66 | $ 390.90 |

[2] As of September 30, 2006.



| 1573 | 8/22/06 | Sept. 7, 2006 | 23 | $ 29,670.95 |
| 1574 | 8/22/06 | Sept. 7, 2006 | 23 | $ 48,249.40 |
| 1575 | 8/22/06 | Sept. 7, 2006 | 23 | $  8,396.71 |
| 1576 | 8/22/06 | Sept. 7, 2006 | 23 | $ 18,302.90 |
| 1577 | 8/22/06 | Sept. 7, 2006 | 23 | $ 39,220.50 |
| 1578 | 8/22/06 | Sept. 7, 2006 | 23 | $  6,536.75 |
| 1579 | 8/22/06 | Sept. 7, 2006 | 23 | $  3,648.26 |
| 1580 | 8/22/06 | Sept. 7, 2006 | 23 | $  3,647.90 |
| 1581 | 8/22/06 | Sept. 7, 2006 | 23 | $  3,648.17 |
| 1582 | 8/22/06 | Sept. 7, 2006 | 23 | $  1,824.26 |
| | | | | |
| **Total** | | | | **$ 684,556.06** |

WWNS fully performed the work, and purchased and delivered the equipment and services covered by these invoices. As the dates in this table make clear, payment is long past due under the 15-day payment terms set out in the WPPS Subcontract. Moreover, DI has never identified "discrepancies" in any of these invoices.

DI's has materially breached the WPPS Subcontract by its failure to make payment in accordance with the terms of the Subcontract, and that breach lacks any legal or factual justification. WWNS seeks damages in the amount of $ 684,556.06 as reflected in the above invoices, plus interest.

### Violation of Covenant of Good Faith and Fair Dealing

Every party to a contract owes the other a duty to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. DynCorp knowingly and intentionally violated this covenant of good faith and fair dealing under the WPPS subcontract agreement in the following respects, among others:

- DynCorp failed to issue timely written purchase orders, as required by the terms of the written subcontract agreement.

- When WWNS objected that no written purchase orders were being issued by DynCorp, DynCorp personnel said, "Just get the work done and we'll do the paperwork later." In most cases the paperwork never got done, leaving WWNS at risk.

- Instead of providing clear written direction to WWNS as to the scope of work WWNS was obligated to perform, DynCorp issued either incomplete or ambiguous written directions, or oral directions that were repeatedly changed or contradicted by subsequent oral directions, all of which hindered WWNS in its performance.

- DynCorp required WWNS to perform in accordance with time tables that WWNS could not meet because DynCorp's other subcontractors failed to complete their work in a timely manner; and then blamed WWNS for failing to complete its work on time, all of which hindered WWNS in its performance.



*Empowering You in a Changing World*

- DynCorp repeatedly blamed WWNS and WWNS' personnel for performance-related problems that sourced from DynCorp's own actions and inactions; and DynCorp did this in the presence of DynCorp's customer and its other subcontractors, so that, based on DynCorp's false accusations about WWNS' performance, both the customer and the other subcontractors refused to cooperate with WWNS and hindered WWNS in performing its work.

WWNS has been damaged by DynCorp's violation of the covenant of good faith and fair dealing in an amount no less than $684,556.06.

In accordance with the terms of the WPPS Subcontract, WWNS seeks an immediate good faith effort to resolve this claim. Your failure to respond in writing within ten (10) calendar days of receipt of this letter will be regarded as a refusal to comply with the requirements of Clause 10.9.2 of the WPPS Subcontract, such that WWNS will be entitled to proceed directly to litigation.

Very truly yours,

Walter L. Gray, President
Worldwide Network Services, LLC

cc:   Michele Roberts, Esq.
      Patricia H. Wittie, Esq.
      James Crawley
      Richard Cashon
      Mitch Laney

Date: 10/03/2006    IWWNS LLC    10/03/2006

Accounts Receivable Aging Report

Date to Age by: 10/03/2006

Customer Account: DYNCORP  DynCorp International LLC

| DYNCORP PO# | | Invoice Number | Inv Date | Current | DAYS 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|---|
| AEF000AP | DYNCORP | INV-4414 | 6/14/2006 | 0.00 | 0.00 | 0.00 | 111,174.22 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4418 | 6/15/2006 | 0.00 | 0.00 | 0.00 | 9,273.32 | 9,273.32 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4426 | 7/3/2006 | 0.00 | 0.00 | 0.00 | 111,174.22 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4449 | 7/5/2006 | 0.00 | 0.00 | 111,174.22 | 0.00 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4453 | 7/6/2006 | 0.00 | 0.00 | 2,433.14 | 0.00 | 2,433.14 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4484 | 7/11/2006 | 0.00 | 0.00 | 1,528.24 | 0.00 | 1,528.24 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-4491 | 8/2/2006 | 0.00 | 0.00 | 111,174.22 | 0.00 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5595 | 8/17/2006 | 0.00 | 57,654.42 | 0.00 | 0.00 | 5,755.42 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5595 | 8/17/2006 | 0.00 | 111,174.22 | 0.00 | 0.00 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5598 | 9/5/2006 | 111,174.22 | 0.00 | 0.00 | 0.00 | 111,174.22 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5617 | 9/21/2006 | 111,174.22 | 0.00 | 0.00 | 0.00 | 3,347.03 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5630 | 9/29/2006 | 3,355.03 | 0.00 | 0.00 | 0.00 | 1,158.39 | CIVPOL AEF | AFGHANISTAN |
| AEF000AP | DYNCORP | INV-5631 | 9/29/2006 | 1,158.84 | 0.00 | 0.00 | 0.00 | 3,440.00 | CIVPOL AEF | AFGHANISTAN |
| AEF000CP | DYNCORP | INV-5633A | 9/21/2006 | 0.00 | 0.00 | 0.00 | 318,561.98 | 318,561.98 | CIVPOL AEF | AFGHANISTAN |
| AEF000CP | DYNCORP | INV-5655 | 7/2/2006 | 0.00 | 0.00 | 899.96 | 899.96 | 899.96 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5660 | 7/5/2006 | 0.00 | 0.00 | 8,584.08 | 8,584.08 | 8,584.08 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5661 | 8/2/2006 | 0.00 | 0.00 | 0.00 | 2,109.69 | 2,109.69 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5657 | 6/9/2006 | 0.00 | 0.00 | 335.19 | 4,109.69 | 335.19 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5659 | 7/11/2006 | 0.00 | 0.00 | 825.09 | 825.09 | 825.09 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5668 | 7/11/2006 | 0.00 | 243.32 | 0.00 | 0.00 | 243.32 | CIVPOL AEF | AFGHANISTAN |
| AEF000EP | DYNCORP | INV-5695 | 3/9/2006 | 0.00 | 0.00 | 0.00 | 49,451.87 | 49,451.87 | CIVPOL AEF | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5420 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 79,867.28 | 79,867.28 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5403 | 6/13/2006 | 0.00 | 0.00 | 0.00 | 3,760.82 | 3,760.82 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5408 | 7/6/2006 | 0.00 | 0.00 | 82,773.81 | 82,773.81 | 82,773.81 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5406 | 7/11/2006 | 0.00 | 0.00 | 2,803.87 | 2,803.87 | 2,803.87 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5426 | 6/2/2006 | 0.00 | 0.00 | 2,073.04 | 22,876.94 | 2,073.04 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5421 | 7/11/2006 | 0.00 | 0.00 | 22,567.47 | 22,567.47 | 22,567.47 | CIVPOL ANP | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-5450 | 11/23/2005 | 0.00 | 0.00 | 0.00 | 494,486.32 | 494,486.32 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-4772 | 12/28/2005 | 0.00 | 0.00 | 0.00 | -145,231.19 | -145,231.19 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-4617 | 6/14/2006 | 0.00 | 0.00 | 0.00 | 145,231.51 | 145,231.51 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-4619 | 7/5/2006 | 0.00 | 0.00 | 145,231.51 | 145,231.51 | 145,231.51 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP000 | DYNCORP | INV-4623 | 7/5/2006 | 0.00 | 143,231.51 | 0.00 | 0.00 | 143,231.51 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-5424 | 7/6/2006 | 0.00 | 6,611.84 | 0.00 | 6,611.84 | 6,611.84 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-5608 | 6/16/2006 | 0.00 | 11,440.12 | 0.00 | 11,440.12 | 11,440.12 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-5622 | 7/31/2006 | 0.00 | 7,411.46 | 0.00 | 7,411.46 | 7,411.46 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-5604 | 8/25/2006 | 0.00 | 143,231.11 | 0.00 | 0.00 | 143,231.11 | CIVPOL APP/NBGI | AFGHANISTAN |
| CPAP002 | DYNCORP | INV-5620 | 8/17/2006 | 0.00 | 145,291.15 | 0.00 | 0.00 | 146,291.15 | CIVPOL APP/NBGI | AFGHANISTAN |

Date: 10/03/2006  
Date to Age by: 10/03/2006  
IWWNS LLC  
Accounts Receivable Aging Report  
10/03/2006

Customer Account: DYNCORP - DynCorp International LLC

| DYNCORP PO# | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | DAYS |  |  |  |  |
| CPAPO62 | DYNCORP | INV-0827 | 9/6/2006 | 145,221.11 | 0.00 | 0.00 | 0.00 | 145,221.11 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO62 | DYNCORP | INV-1564 | 8/17/2006 | 0.00 | 17,846.80 | 0.00 | 0.00 | 17,846.80 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO08 | DYNCORP | INV-1622 | 9/26/2006 | -14,111.01 | 0.00 | 0.00 | 0.00 | -14,111.01 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO05 | DYNCORP | INV-4519 | 8/9/2006 | 0.00 | 0.00 | 217,533.76 | 0.00 | 217,533.76 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO05 | DYNCORP | INV-4488 | 7/13/2006 | 0.00 | 0.00 | 215,400.00 | 0.00 | 215,400.00 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO05 | DYNCORP | INV-3825 | 8/3/2006 | 0.00 | 0.00 | 217,533.76 | 0.00 | 217,533.76 | CIVPOL APPMOI | AFGHANISTAN |
| CPAPO05 | DYNCORP | INV-12048 | 8/6/2006 | 0.00 | 31,493.80 | 0.00 | 0.00 | 31,493.80 | CIVPOL APPMOI | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1616 | 6/14/2006 | 0.00 | 0.00 | 0.00 | 4,328.05 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO44 | DYNCORP | INV-4450 | 7/5/2006 | 0.00 | 0.00 | 4,328.05 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1492 | 6/29/2006 | 0.00 | 0.00 | 4,328.05 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-5571 | 8/23/2006 | 0.00 | 4,328.05 | 0.00 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1690 | 9/6/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1695 | 9/21/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1618 | 9/25/2006 | 4,328.05 | 0.00 | 0.00 | 0.00 | 4,328.05 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1475 | 7/31/2006 | 0.00 | 0.00 | 2,631.70 | 0.00 | 2,631.70 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1456 | 7/11/2006 | 0.00 | 0.00 | 5,888.51 | 0.00 | 5,888.51 | CIVPOL PEP | AFGHANISTAN |
| CPEPO16 | DYNCORP | INV-1522 | 8/7/2006 | 0.00 | 7,996.72 | 0.00 | 0.00 | 7,996.72 | CIVPOL PEP | AFGHANISTAN |
| REPO08 | DYNCORP | INV-1694 | 8/31/2006 | 0.00 | 49,449.70 | 0.00 | 0.00 | 49,449.70 | CIVPOL PEP | AFGHANISTAN |
| REPO08 | DYNCORP | INV-1900 | 8/21/2006 | 365,002.34 | 0.00 | 0.00 | 0.00 | 365,002.34 | CIVPOL PEP | AFGHANISTAN |
| REPO08 | DYNCORP | INV-1565 | 9/13/2006 | 0.00 | 17,360.67 | 0.00 | 0.00 | 17,360.67 | CIVPOL PEP | AFGHANISTAN |
| REPO08 | DYNCORP | INV-1597 | 9/27/2006 | 17,360.67 | 0.00 | 0.00 | 0.00 | 17,360.67 | CIVPOL PEP | AFGHANISTAN |
| REPO08 | DYNCORP | INV-1599 | 9/21/2006 | 17,360.67 | 0.00 | 0.00 | 0.00 | 17,360.67 | CIVPOL PEP | AFGHANISTAN |
| PEPO08 | DYNCORP | INV-1828 | 10/4/2006 | 37,360.57 | 0.00 | 0.00 | 0.00 | 17,360.57 | CIVPOL PEP | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-1391A | 6/26/2006 | 0.00 | 0.00 | 636.08 | 0.00 | 636.08 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-4400 | 8/14/2006 | 0.00 | 0.00 | 0.00 | 13,497.49 | 13,497.49 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-1412 | 6/18/2006 | 0.00 | 0.00 | 0.00 | 11,594.84 | 11,594.84 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-1418 | 6/15/2006 | 0.00 | 0.00 | 0.00 | 5,874.33 | 5,874.33 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-4295 | 6/22/2006 | 0.00 | 0.00 | 0.00 | 2,470.87 | 2,470.87 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-5352 | 7/21/2006 | 0.00 | 0.00 | 3,492.40 | 0.00 | 3,492.40 | CIVPOL WET LEASE | AFGHANISTAN |
| AWLPO08 | DYNCORP | INV-4523 | 9/21/2006 | 0.00 | 0.00 | 382.21 | 0.00 | 382.21 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL008 | DYNCORP | INV-4416 | 9/14/2006 | 0.00 | 0.00 | 0.00 | 9,773.01 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL008 | DYNCORP | INV-4422 | 8/15/2006 | 0.00 | 0.00 | 0.00 | 1,207.36 | 1,207.36 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL008 | DYNCORP | INV-4431 | 7/21/2006 | 0.00 | 0.00 | 0.00 | 9,773.01 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL008 | DYNCORP | INV-1451 | 7/5/2006 | 0.00 | 0.00 | 9,773.01 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |

| Date: | 10/03/2006 | WWNS LLC | | | | | | 10/03/2006 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date to Age by: 10/03/2006 | | Accounts Receivable Aging Report | | | | | | | | |
| Customer Account: DYNCORP  DynCorp International LLC | | | | | | | | | | |
| | | | | | | | DAYS | | | |
| DYNCORP PO# | | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
| CPAWL005 | DYNCORP | INV-1453 | 7/5/2006 | 0.00 | 0.00 | 653.98 | 0.00 | 653.98 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1486 | 7/18/2006 | 0.00 | 0.00 | 653.98 | 0.00 | 653.98 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1493 | 8/2/2006 | 0.00 | 0.00 | 9,773.01 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1566 | 6/17/2006 | 0.00 | 1,997.72 | 0.00 | 0.00 | 1,997.72 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1570 | 8/21/2006 | 0.00 | 9,773.01 | 0.00 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1591 | 9/7/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1596 | 9/21/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1619 | 10/2/2006 | 9,773.01 | 0.00 | 0.00 | 0.00 | 9,773.01 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1603 | 9/26/2006 | 1,997.38 | 0.00 | 0.00 | 0.00 | 1,997.38 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1624 | 9/26/2006 | 653.98 | 0.00 | 0.00 | 0.00 | 653.98 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-2382 | 6/6/2006 | 0.00 | 0.00 | 0.00 | 9,860.03 | 9,860.03 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-2439 | 7/6/2006 | 0.00 | 0.00 | 0.00 | 9,860.03 | 9,860.03 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1584 | 8/5/2006 | 0.00 | 0.00 | 9,860.03 | 0.00 | 9,860.03 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1593 | 9/7/2006 | 9,860.03 | 0.00 | 0.00 | 0.00 | 9,860.03 | CIVPOL WET LEASE | AFGHANISTAN |
| CPAWL005 | DYNCORP | INV-1595 | 9/26/2006 | 9,860.03 | 0.00 | 0.00 | 0.00 | 9,860.03 | CIVPOL WET LEASE | AFGHANISTAN |
| CREF_AFG.M0 | DYNCORP | INV-0791 | 5/30/2006 | 0.00 | 42,996.67 | 0.00 | 0.00 | 42,996.67 | CREF/AEF | AFGHANISTAN |
| | | | | | | | | | AFGHANISTAN Total | |
| | | | | $25,849.97 | 445,494.53 | 3,159,208.38 | 291,808.38 | 34,000,000.00 | | |
| CIVPL.IRQ.EQU.AISC0600 | DYNCORP | INV-4225 | 4/22/2006 | 0.00 | 0.00 | 0.00 | 43,319.57 | 43,319.57 | CIVPOL IRAQ | IRAQ |
| CIVPL.IRQ.EQU.AISC0600 | DYNCORP | INV-4277 | 4/27/2006 | 0.00 | 0.00 | 0.00 | 65.31 | 65.31 | CIVPOL IRAQ | IRAQ |
| CIVPL.IRQ.EQU.AISC0600 | DYNCORP | INV-4396 | 5/22/2006 | 0.00 | 8,867.74 | 0.00 | 0.00 | 8,867.74 | CIVPOL IRAQ | IRAQ |
| CRR0023P | DYNCORP | INV-4300 | 5/4/2006 | 0.00 | 0.00 | 0.00 | 4,691.86 | 4,691.86 | CIVPOL IRAQ | IRAQ |
| CRR0023P | DYNCORP | INV-4305 | 5/4/2006 | 0.00 | 0.00 | 0.00 | 31,336.67 | 31,336.67 | CIVPOL IRAQ | IRAQ |
| CRR0023P | DYNCORP | INV-4327 | 6/6/2006 | 0.00 | 0.00 | 0.00 | 2,345.84 | 2,345.84 | CIVPOL IRAQ | IRAQ |
| CRR0137P | DYNCORP | INV-3422 | 6/6/2006 | 0.00 | 0.00 | 0.00 | 9,153.87 | 9,153.87 | CIVPOL IRAQ | IRAQ |
| CRR0137P | DYNCORP | INV-3409 | 7/6/2006 | 0.00 | 0.00 | 0.00 | 66,799.48 | 66,799.48 | CIVPOL IRAQ | IRAQ |
| CRR0167P | DYNCORP | INV-4523 | 7/30/2006 | 0.00 | 0.00 | 0.00 | 11,145.16 | 11,145.16 | CIVPOL IRAQ | IRAQ |
| CRR0267P | DYNCORP | INV-4407 | 6/18/2006 | 0.00 | 0.00 | 6,316.92 | 0.00 | 6,316.92 | CIVPOL IRAQ | IRAQ |
| CRR0002P | DYNCORP | INV-4406 | 6/2/2006 | 0.00 | 0.00 | 4,828.04 | 0.00 | 4,828.04 | CIVPOL IRAQ | IRAQ |
| CRR0002P | DYNCORP | INV-4474 | 7/18/2006 | 0.00 | 0.00 | 58,926.59 | 0.00 | 58,926.59 | CIVPOL IRAQ | IRAQ |
| CRR0002P | DYNCORP | INV-3475 | 9/11/2006 | 100,482.01 | 0.00 | 0.00 | 0.00 | 100,482.01 | CIVPOL IRAQ | IRAQ |
| CRR0002P | DYNCORP | INV-3527 | 8/26/2006 | 0.00 | 8,737.38 | 0.00 | 0.00 | 8,737.38 | CIVPOL IRAQ | IRAQ |
| CRR0002P | DYNCORP | INV-3528 | 9/24/2006 | 9,231.04 | 0.00 | 0.00 | 0.00 | 9,231.04 | CIVPOL IRAQ | IRAQ |
| CRR0025P | DYNCORP | INV-5899 | 8/26/2006 | 123,566.10 | 0.00 | 0.00 | 0.00 | 123,566.10 | CIVPOL IRAQ | IRAQ |
| CRR0025P | DYNCORP | INV-1630 | 9/26/2006 | 34,898.96 | 0.00 | 0.00 | 0.00 | 34,898.96 | CIVPOL IRAQ | IRAQ |
| CRR0025P | DYNCORP | INV-1631 | 9/26/2006 | 34,123.31 | 0.00 | 0.00 | 0.00 | 34,123.31 | CIVPOL IRAQ | IRAQ |
| CRR0025P | DYNCORP | INV-1632 | 9/26/2006 | 374,123.01 | 0.00 | 0.00 | 0.00 | 374,123.01 | CIVPOL IRAQ | IRAQ |

Date: 10/03/2006    WWNS LLC

Accounts Receivable Aging Report

Date to Age by: 10/03/2006

Customer Account: DYNCORP   DynCorp International LLC

| DYNCORP PO# | Invoice Number | Inv Date | Current | 31 to 60 | 61 to 90 | Over 90 | Balance Due | Program | Country |
|---|---|---|---|---|---|---|---|---|---|
| CPR9025P | DYNCORP | INV-1633 | 10/03/2006 | 17,825.19 | 0.00 | 0.00 | 0.00 | 17,825.19 | CIVPOL IRAQ | IRAQ |
| CPR9025P | DYNCORP | INV-1634 | 10/03/2006 | -23,417.11 | 0.00 | 0.00 | 0.00 | -23,417.11 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1417 | 6/16/2006 | 0.00 | 0.00 | 0.00 | 316,822.22 | 316,822.22 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1420 | 6/19/2006 | 0.00 | 0.00 | 0.00 | 15,282.76 | 15,282.76 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1432 | 7/02/2006 | 0.00 | 0.00 | 0.00 | 316,822.22 | 316,822.22 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1454 | 7/06/2006 | 0.00 | 0.00 | 7,814.94 | 0.00 | 7,814.94 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1485 | 7/17/2006 | 0.00 | 0.00 | 9,179.29 | 0.00 | 9,179.29 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1452 | 7/05/2006 | 0.00 | 0.00 | 317,417.92 | 0.00 | 317,417.92 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1494 | 8/02/2006 | 0.00 | 0.00 | 316,822.22 | 0.00 | 316,822.22 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1559 | 9/01/2006 | 0.00 | 5,375.96 | 0.00 | 0.00 | 5,375.96 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1556 | 8/16/2006 | 0.00 | 7,324.28 | 0.00 | 0.00 | 7,324.28 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1557 | 8/16/2006 | 0.00 | 9,842.38 | 0.00 | 0.00 | 9,842.38 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1558 | 9/16/2006 | 0.00 | 1,614.25 | 0.00 | 0.00 | 1,614.25 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1559 | 9/16/2006 | 0.00 | 220,465.34 | 0.00 | 0.00 | 220,465.34 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1560 | 8/16/2006 | 0.00 | 24,175.32 | 0.00 | 0.00 | 24,175.32 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1561 | 9/16/2006 | 0.00 | 8,368.66 | 0.00 | 0.00 | 8,368.66 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1562 | 9/17/2006 | 0.00 | 4,539.35 | 0.00 | 0.00 | 4,539.35 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1563 | 9/17/2006 | 0.00 | 796.79 | 0.00 | 0.00 | 796.79 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1567 | 9/23/2006 | 0.00 | 4,272.62 | 0.00 | 0.00 | 4,272.62 | CIVPOL IRAQ | IRAQ |
| CPR9016P | DYNCORP | INV-1568 | 9/12/2006 | 0.00 | 3,914.60 | 0.00 | 0.00 | 3,914.60 | CIVPOL IRAQ | IRAQ |
| CPR9017P | DYNCORP | INV-1437 | 7/06/2006 | 0.00 | 0.00 | 0.00 | 320,545.41 | 320,545.41 | CIVPOL IRAQ | IRAQ |
| CPR9017P | DYNCORP | INV-1545 | 8/28/2006 | 10.00 | 0.00 | 110,046.91 | 0.00 | 110,046.91 | CIVPOL IRAQ | IRAQ |
| CVPL_IRQ_EQU_REISSUE | DYNCORP | INV-1264 | 4/01/2006 | 0.00 | 0.00 | 0.00 | 359,610.76 | 359,610.76 | CIVPOL IRAQ | IRAQ |
| WRAA07 | DYNCORP | INV-1334 | 5/06/2006 | 0.00 | 0.00 | 0.00 | 166.19 | 166.19 | WRR | IRAQ |
| WRAA07 | DYNCORP | INV-1312 | 5/06/2006 | 0.00 | 0.00 | 0.00 | 812.13 | 812.13 | WRR | IRAQ |
| | | | | 376,095.19 | 298,798.50 | 657,050.34 | 1,315,508.68 | 4,026,573.64 | IRAQ Total | |
| | | | | 337,505.68 | 744,215.86 | 2,174,228.36 | 2,107,416.87 | 9,085,254.22 | Grand Total | |



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

October 25, 2006

**George D. Ruttinger**
(202) 624-2670
gruttinger@crowell.com

VIA ELECTRONIC AND FIRST-CLASS MAIL

Michele A. Roberts, Esq.
Anthony T. Pierce, Esq.
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

      Subject: *Worldwide Networks Services, LLC v. DynCorp International, LLC,* Case
      No. 1:06CV01717 (D.D.C.)

Dear Counsel:

      We have been retained by DynCorp International LLC ("DynCorp") to represent
it in the above-referenced action filed by your client, Worldwide Network Services, LLC
("WWNS") in the U.S. District Court for the District of Columbia. While the Complaint
alleges claims sounding in tort and statutory violations, it is apparent from WWNS's
allegations that these claims arise out of or relate to performance and termination of two
contracts between DynCorp and WWNS, referred to in the Complaint as the "CIVPOL
subcontract" and the "WPPS subcontract." Indeed, before filing this action, both you and
your client wrote letters threatening DynCorp with litigation for, among other things,
"material breach" of these subcontracts.

      As you undoubtedly know, the CIVPOL subcontract contains a "Disputes" clause
that provides in pertinent part as follows:

          Any disputes <u>arising out of or relating to this Subcontract</u> and which are
          not covered by the preceding paragraph and are not resolved after a
          mutual, good faith effort <u>shall be settled by arbitration administered by the</u>
          <u>American Arbitration Association</u> under its Commercial Arbitration Rules
          in force at the time the dispute arises, and judgment on the award rendered
          by the arbitrator(s) may be entered in any court having jurisdiction thereof.

The tort and statutory claims alleged by WWNS in its Complaint, while artfully drafted
in a transparent effort to avoid the parties' agreement to arbitrate, plainly describe
"disputes arising out of or relating to" the CIVPOL subcontract. *See, e.g., Mitsubishi
Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985).

Michele A. Roberts, Esq.
Anthony T. Pierce, Esq.
Page 2



Similarly, the WPPS subcontract contains the following Disputes provision:

Either party may pursue litigation to resolve <u>any dispute</u> not covered by
the preceding paragraph and not resolved after a mutual, good faith effort
by the Parties. Any such action shall be filed <u>only in a court of competent
jurisdiction in the Commonwealth of Virginia</u>; provided, however, that <u>the
Parties hereby expressly waive any rights to trial by jury</u> and agree that
any legal proceeding hereunder shall be tried to a judge without jury. …

Again, by pleading around the obvious contractual basis for its claims, WWNS cannot
avoid its contractual agreement to present "any dispute" between WWNS and DynCorp
to a "court of competent jurisdiction in the Commonwealth of Virginia" for a trial "to a
judge without a jury." *See, e.g., M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 9-10
(1972); *Crescent Int'l, Inc. v. Avatar Communities, Inc.,* 857 F.2d 943, 944-45 (3d Cir.
1988).

Given the foregoing, it is evident that WWNS has filed its claims in the wrong
forum and has not abided by its waiver of a jury trial. Please advise me at your earliest
convenience whether WWNS will withdraw its Complaint and re-file its claims in a
proper forum. As you know, DynCorp's response to the Complaint is due November 13.
We would be prepared to discuss this issue with you at your convenience.

I have discussed the position set forth in this letter with William M. Sullivan,
counsel for defendant EDO Corporation, and he concurs in DynCorp's position.

I look forward to hearing from you.

Sincerely yours,

George D. Ruttinger

cc: William M. Sullivan, Jr., Esq.

2873203v1

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
_____ Attorneys at Law

**ANTHONY T. PIERCE**
202.887.4411/fax: 202.887.4288
apierce@akingump.com

**MICHELE A. ROBERTS**
202.887.4306/fax: 202.887.4288
mroberts@akingump.com

October 27, 2006

VIA E-MAIL AND FIRST CLASS MAIL

George D. Ruttinger
Crowell & Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

> Re:  *Worldwide Network Services, LLC v. DynCorp International, LLC and EDO
> Corporation*, Case No. 1:06CV01717 (D.D.C.)

Dear Mr. Ruttinger:

We are writing in response to your October 25, 2006 letter in which you request that we submit the above-captioned litigation to arbitration on the theory that it was somehow filed in the wrong forum.

WWNS's Complaint is properly before the United States District Court for the District of Columbia. The statutory and common law claims asserted in the Complaint do not "arise out of or relate to" the CIVPOL subcontract and therefore do not fall within the ambit of its "Disputes" clause. Nor do we agree that WPPS subcontract provisions forecloses litigation in a federal forum where, as here, the claims are independent of the subcontract. WWNS's discrimination claim against DynCorp and the DynCorp-EDO conspiracy to interfere with WWNS's contracts with WWNS's own employees occurred independent of the contractual relationship between DynCorp and WWNS, and thus any limitations contained in those subcontracts are inapplicable.

WWNS therefore will not withdraw its Complaint, as we believe the case is currently in the proper forum.

Sincerely,

Anthony T. Pierce
Michele A. Roberts

cc:    William M. Sullivan, Esq.